Nos. 2013-1506, -1587

———————————————

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

———————————————

ePlus, Inc.,

*Plaintiff-Appellee*,

v.

Lawson Software, Inc.,

*Defendant-Appellant*.

———————————————

Appeals From The United States District Court
For The Eastern District Of Virginia In Case No. 09-cv-0620,
Senior Judge Robert E. Payne.

———————————————

## PRINCIPAL BRIEF FOR APPELLANT
## LAWSON SOFTWARE, INC.

———————————————

Josh A. Krevitt
Daniel J. Thomasch
Richard W. Mark
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
(212) 351-4000

Donald R. Dunner
Erika H. Arner
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 408-4000

Mark A. Perry
  *Principal Attorney*
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Attorneys for Defendant-Appellant Lawson Software, Inc.*

# CERTIFICATE OF INTEREST

Counsel for appellant Lawson Software, Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

Lawson Software, Inc. (currently known as Infor (US), Inc.).

2.    The name of the real party in interest (if the party in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by me are:

Lawson Software, Inc. (currently known as Infor (US), Inc.) is a wholly owned subsidiary of Infor, Inc.  The shares of Infor, Inc. are beneficially owned by investment funds affiliated with Golden Gate Capital and Summit Partners through these funds' ownership of all stock in the ultimate parent entity of Infor (US), Inc.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

**Merchant & Gould P.C.**
Daniel W. McDonald
William D. Schultz
Kirstin Stoll-DeBell
Rachel C. Hughey
Andrew J. Lagatta
Joshua P. Graham
Eric R. Chad

**Morgan, Lewis & Bockius LLP**
Daniel Johnson, Jr.
Rita Emily Tautkus
Robert William Busby, Jr.
Bradford Anthony Cangro

**Troutman Sanders LLP**
Dabney J. Carr, IV
Robert A. Angle
Megan C. Rahman
Timothy James St. George
Stephen D. Otero

**Kaufman & Canoles, P.C.**
Stephen E. Noona

**Gibson, Dunn & Crutcher LLP**
Mark A. Perry
Josh A. Krevitt
Daniel J. Thomasch
Richard W. Mark
Christopher D. Dusseault
Jason C. Lo
Blaine H. Evanson
Azar Mouzari
Sarah E. Simmons
Timothy P. Best
Dace C. Martinez

**Finnegan Henderson Farabow Garrett & Dunner LLP**
Donald R. Dunner
Erika H. Arner
Allen M. Sokal
Kara F. Stoll
Molly R. Silfen
Justin R. Lowery
Elizabeth A. Laughton

/s/ Mark A. Perry
Mark A. Perry
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
T:  (202) 955-8500
F:  (202) 467-0539
mperry@gibsondunn.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.........................................................2

STATEMENT OF ISSUES ....................................................................2

STATEMENT OF THE CASE................................................................3

STATEMENT OF FACTS .....................................................................4

SUMMARY OF ARGUMENT .............................................................18

STANDARD OF REVIEW ..................................................................21

ARGUMENT ....................................................................................21

    I.    The Injunction Should Be Reversed ....................................22

        A.    The Mandate Required Reconsideration...................................23

        B.    ePlus Did Not Prove Entitlement To A Post-Remand Injunction ........................................................................24

        C.    The Modified Injunction Is Overbroad ....................................31

    II.    The Contempt Determination Should Be Reversed ...........................35

        A.    The Redesigned Products With RQC Are More Than Colorably Different ................................................................35

            1.    Lawson Modified Or Removed The Elements Previously Found To Infringe.........................................36

            2.    The Modifications Were Significant .............................41

        B.    The Redesigned Products Do Not Infringe................................46

        C.    Lawson Fully Complied With The Injunction With Respect To RSS ........................................................................50

III.    The Contempt Sanctions Should Be Reversed ...................................52

        A.    There Was No Basis For An Award Of "Disgorgement".........53

        B.    The "Coercive" Fine Exceeded The District Court's Authority ...................................................................................58

CONCLUSION .....................................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  692 F.3d 1301 (Fed. Cir. 2012) ............................................................46

*Amado v. Microsoft Corp.*,
  185 F. App'x 953 (Fed. Cir. 2006)......................................................24

*Amado v. Microsoft Corp.*,
  517 F.3d 1353 (Fed. Cir. 2008) ................................................... 24, 29

*Apple, Inc. v. Samsung Elecs. Co.*,
  695 F.3d 1370 (Fed Cir. 2012) .................................................... 27, 28

*Arbek Mfg. Inc. v. Moazzam*,
  55 F.3d 1567 (Fed. Cir. 1995) ............................................................50

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964) ............................................................................56

*Ashcraft v. Conoco, Inc.*,
  218 F.3d 288 (4th Cir. 2000) ..............................................................34

*Boyd v. Driver*,
  495 F. App'x 518 (5th Cir. 2012).................................................. 22, 24

*Bradley v. Am. Household Inc.*,
  378 F.3d 373 (4th Cir. 2004) ..............................................................54

*Broadcom Corp. v. Qualcomm, Inc.*,
  543 F.3d 683 (Fed. Cir. 2008) ............................................................21

*Broadcom v. Emulex*,
  --- F.3d ---, 2013 WL 5508730 (Fed Cir. Oct. 7, 2013)......................28

*Cal. Artificial Stone Paving Co. v. Molitor*,
  113 U.S. 609 (1885) ................................................................ 35, 50, 52

*Carbon Fuel Co. v. United Mine Workers of Am.*,
  517 F.2d 1348 (4th Cir. 1975) .............................................................53

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
  576 F.3d 1348 (Fed. Cir. 2009) ...........................................................22

*eBay, Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ........................................... 19, 25, 27, 29, 30, 31

*Emich Motors Corp. v. Gen. Motors Corp.*,
  340 U.S. 558 (1951) .............................................................................37

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012) ..... 1, 2, 3, 4, 5, 7, 10, 11, 18, 21, 22, 23, 24, 30, 33

*Ex parte ePlus, Inc.*,
  2011 WL 1918594 (BPAI May 18, 2011)............................................11

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  721 F. 3d 1330 (Fed. Cir. 2013) ..........................................................31

*Gasperini v. Ctr. for Humanities, Inc.*,
  518 U.S. 415 (1996) .............................................................................40

*Gompers v. Bucks Stove & Range Co.*,
  221 U.S. 418 (1911) .............................................................................58

*Harris Corp. v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005) ...........................................................21

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) .............................................................32

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
  512 U.S. 821 (1994) ................................................................. 53, 58, 59

*Johns Hopkins Univ. v. CellPro, Inc.*,
  152 F.3d 1342 (Fed. Cir. 1998) ..................................................... 32, 52

*Joy Techs., Inc. v. Flakt, Inc.*,
  6 F.3d 770 (Fed Cir. 1993) ..................................................................46

*Laitram Corp v. NEC Corp.*,
115 F.3d 947 (Fed. Cir. 1997) ............................................................23

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ..............................................................57

*Leman v. Krentler-Arnold Hinge Last Co.*,
284 U.S. 448 (1932) ............................................................................55

*McLean v. Cent. States, Se. & Sw. Areas Pension Fund*,
762 F.2d 1204 (4th Cir. 1985) ............................................................34

*MercExchange, L.L.C. v. eBay, Inc.*,
500 F. Supp. 2d 556 (E.D. Va. 2007) .................................................30

*Merial Ltd. v. Cipla Ltd.*,
681 F.3d 1283 (Fed. Cir. 2012) ..........................................................21

*MPT, Inc. v. Marathon Labels, Inc.*,
258 F. App'x 318 (Fed. Cir. 2007) ......................................................32

*MPT, Inc. v. Marathon Labels, Inc.*,
505 F. Supp. 2d 401 (N.D. Ohio 2007) ..............................................33

*nCube Corp. v. SeaChange Int'l Inc.*,
2012 WL 4863049 (D. Del. Oct. 9, 2012) ..........................................39

*nCube Corp. v. SeaChange Int'l, Inc.*,
--- F.3d ---, 2013 WL 5567555 (Fed. Cir. Oct. 10, 2013) ............... 19, 35, 36, 37,
39, 40, 47, 49, 50

*nCube Corp. v. SeaChange Int'l, Inc.*,
809 F. Supp. 2d 337 (D. Del. 2011) ...................................................39

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) ..........................................................32

*PPG Indus., Inc. v. Celanese Polymer Specialties*,
840 F.2d 1565 (Fed. Cir. 1988) ..........................................................27

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*,
508 U.S. 49 (1993) ..............................................................................41

*Riles v. Shell Exploration & Prod. Co.*,
   298 F.3d 1302 (Fed. Cir. 2002) ............................................................32

*Rite-Hite Corp v. Kelley Co., Inc.*,
   56 F.3d 1538 (Fed. Cir. 1995) ..............................................................57

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992) ..............................................................................26

*Salazar v. Buono*,
   130 S. Ct. 1803 (2010) ..........................................................................27

*Spindelfabrik Suessen–Schurr v. Schubert & Salzer Maschinenfabrik
   Aktiengesellschaft*,
   903 F.2d 1568 (Fed. Cir. 1990) ..................................................... 54, 55

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
   1993 U.S. App. LEXIS 11963 (Fed. Cir. 1993) ...................................31

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
   883 F.2d 1573 (Fed Cir. 1989) .............................................................55

*TiVo Inc. v. Dish Network Corp.*,
   655 F. Supp. 2d 661 (E.D. Tex. 2009) .................................................56

*TiVo Inc. v. EchoStar Corp.*,
   646 F.3d 869 (Fed. Cir. 2011) .......................... 2, 3, 12, 19, 20, 22, 31, 35, 36, 37,
                             39, 41, 42, 43, 46, 47, 50, 52

*Toshiba Corp. v. Imation Corp.*,
   681 F.3d 1358 (Fed. Cir. 2012) ...........................................................34

*Translogic Tech., Inc. v. Hitachi, Ltd.*,
   250 F. App'x 988 (Fed. Cir. 2007).......................................................31

*United States v. Alston*,
   722 F.3d 603 (4th Cir. 2013) ................................................................23

*United States v. Delfino*,
   510 F.3d 468 (4th Cir. 2007) ................................................................21

*United States v. Swift & Co.*,
   286 U.S. 106 (1932) ..............................................................................27

*United States v. United Mine Workers of Am.*,
   330 U.S. 258 (1947) .......................................................... 3, 34, 53, 55

*United States v. Wilkerson*,
   84 F.3d 692 (4th Cir. 1996) ...................................................21

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*,
   602 F.3d 1325 (Fed. Cir. 2010) .............................................21

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009) .............................................34

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
   225 U.S. 604 (1912) ...............................................................57

*Windsor Power House Coal Co. v.*
   *Dist. 6 United Mine Workers of Am.*,
   530 F.2d 312 (4th Cir. 1976) .......................................... 53, 54

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
   481 U.S. 787(1987) ................................................................53

## Statutes

28 U.S.C. § 1291 .........................................................................2

28 U.S.C. § 1292 .........................................................................2

28 U.S.C. § 1331 .........................................................................2

35 U.S.C. § 271 .........................................................................33

Rev. Stat. § 4921, as amended, 42 Stat. 392 (1922) ................55

## Rules

Federal Rule of Civil Procedure 60(b)(5) ................................25

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Lawson states as follows:

(a) There has been one previous consolidated appeal to this Court in this case and one petition for writ of mandamus.

   i.   *ePlus, Inc. v. Lawson Software, Inc.*, 2011-1396, 1456, 1554.

       (1) Date of Decision:  November 21, 2012

       (2) Composition of Panel:  Dyk, Prost, and O'Malley, JJ.

       (3) Federal Reporter Citation:  700 F.3d 509

  ii.   *In re Lawson Software, Inc.*, Miscellaneous Docket No. 118.

       (1) Date of Decision:  August 10, 2012

       (2) Composition of Panel:  Prost, Mayer, and Reyna, JJ.

(b) There is one currently pending case that may directly impact the outcome of this appeal:

       (1) Title and number:  *In re: ePlus, Inc.*, 2012-1451.

       (2) *In re ePlus, Inc.* is an appeal from the proposed cancellation by the United States Patent and Trademark Office of the only remaining patent at issue in this case (U.S. Patent No. 6,023,683).

# INTRODUCTION

After a jury found that Lawson's software products infringed five patent claims asserted by ePlus, Lawson redesigned those products to address each of ePlus's infringement theories. The district court then enjoined Lawson from selling the infringing products or those not more than colorably different. ePlus initiated contempt proceedings, arguing that Lawson's redesign efforts were a "sham" and that its products continued to infringe. On Lawson's appeal, this Court reversed the infringement findings as to four of the five claims and ordered the district court to reconsider its injunction. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 523 (Fed. Cir. 2012). On remand, the district court, without reconsidering the injunction, held a contempt hearing at which ePlus abandoned its previous theories of infringement as to the sole remaining method claim and instead presented new theories of how the redesigned products infringe. *After* the hearing, the district court reimposed the injunction and sanctioned Lawson for contempt.

The district court committed a series of reversible errors. *First*, the court's limited reconsideration of the injunction did not implement this Court's mandate. Under the correct legal standard, no injunction is warranted based on the single method claim that survived the previous appeal. *Second*, the court failed to follow this Court's precedent, both in evaluating whether the redesigned products are more than colorably different from the infringing products and in determining

whether the redesigned products infringe, by refusing to hold ePlus to the theories of infringement it contended and proved at the underlying jury trial. And *third*, the district court erred in imposing immediate and contingent sanctions against Lawson despite the fact that ePlus did not even attempt to prove that it suffered any harm from Lawson's conduct.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) & (c)(1) (injunction order) and 28 U.S.C. § 1291 (contempt order). Timely notices of appeal were filed on July 9, 2013 (Case No. 2013-1506) and August 23, 2012 (Case No. 2013-1587).

## STATEMENT OF ISSUES

1.     This Court ordered the district court to reconsider the injunction after most of the infringement findings were reversed. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 523 (Fed. Cir. 2012). Did the district court err in reimposing the injunction absent proof from ePlus that Lawson's past infringement of one method claim justifies an injunction under the traditional factors?

2.     The patentee in a contempt proceeding must prove that the redesigned products are not more than colorably different from those "contended, and proved" to infringe at the underlying trial, and that they continue to infringe under the theories of infringement previously established. *TiVo Inc. v. EchoStar Corp.*, 646 F.3d

869 (Fed. Cir. 2011) (en banc). Did the district court err in both prongs of its contempt analysis by refusing to consider ePlus's proof during trial and by relying on new theories of infringement that ePlus had not contended or proved at trial?

3.    A remedial sanction in a contempt proceeding must be based on the complainant's actual loss. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947). Did the district court err in awarding sanctions in the absence of any evidence that ePlus was harmed by Lawson's sales of the redesigned products?

## STATEMENT OF THE CASE

In 2009, ePlus sued Lawson for infringing multiple claims of three patents. After a trial, a jury found that three of Lawson's software configurations infringed a total of five claims of two of the patents-in-suit. A219–221. The district court entered an injunction against the sale or maintenance of the infringing configurations and other products not more than colorably different from them. A39; A4262–4265.

This Court reversed the infringement verdict as to four of the asserted claims and ordered the district court to reconsider the injunction. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509 (Fed. Cir. 2012).

On remand, Lawson moved to dissolve or modify the post-trial injunction based on the drastically altered infringement judgment. A4777–4800. Before ruling on that motion, the district court held a hearing on ePlus's claim that the origi-

nal injunction covered the redesigned products and that Lawson should be held in contempt. A41. After the contempt proceeding, the district court removed one software configuration from the injunction, but reimposed the injunction in all other respects. A1. The court then held Lawson in contempt. A36–37. Lawson timely appealed from both orders. A6722–6724; A6725–6727. This Court *sua sponte* consolidated the appeals.

## STATEMENT OF FACTS

1. Lawson sells computer software for supply chain management. *See* A2287; A2290. Lawson's software products are modular, allowing customers to purchase and assemble a customized e-procurement system to view, select, and order equipment and supplies using online databases. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 513–14 (Fed. Cir. 2012).

In 2009, when ePlus brought the initial infringement action, the basic building block of Lawson's system was the "Core Procurement" unit, which allowed users to load vast numbers of products into a customized "Item Master" database, and thereafter to search and select items for purchase, add all selected items to a single requisition and generate one or more purchase orders to the applicable product vendors. *ePlus*, 700 F.3d at 513–14. Requisition Self-Service ("RSS") was a user-friendly interface that could be added as a separate module to Core Procurement. A1364; A4203. Customers with all configurations (with or without RSS)

4

could access the internal Item Master database. *ePlus*, 700 F.3d at 14. Customers wanting to search third-party vendors' websites, however, had to acquire and use an additional Lawson module called Procurement Punchout. *Id.* Only a small percentage of Lawson's customers licensed Punchout. A5912. Another module, Electronic Data Interchange ("EDI"), allowed customers to electronically transmit purchase orders outside Lawson's system to a third-party vendor. *ePlus*, 700 F.3d at 514.

Lawson's software products are sold into a robust market of institutional purchasers, such as hospitals and municipalities. *ePlus*, 700 F.3d at 514; A6718–6721. For these customers, Lawson provides not only the various software configurations but also ongoing technical support, upgrades, and continued innovation. *ePlus*, 700 F.3d at 513–14; A4203–4204.

2. In 2009, ePlus sued Lawson (and a number of other companies) for infringing three acquired patents—Nos. 6,023,683; 6,055,516; and 6,505,172—which pertain to maintaining, searching, selecting, and purchasing items from catalogs maintained on a database. *See*, *e.g.*, A246–247; A267; A287. Before this Court invalidated the asserted system claims, ePlus obtained lump sum litigation settlements totaling nearly $60 million from others. A4206.

Lawson did not settle, and the infringement case went to trial before a jury that was asked to consider five product configurations:

- *Configuration No. 1* – the Core Procurement System.

- *Configuration No. 2* – Configuration No. 1 plus RSS.

- *Configuration No. 3* – Configuration No. 2 plus Punchout.

- *Configuration No. 4* – Configuration No. 1 plus EDI.

- *Configuration No. 5* – Configuration No. 2 plus Punchout and EDI.

A219–221

At trial, the vast majority of ePlus's infringement evidence was not directed at any particular claim or configuration.  ePlus did, however, present to the jury two demonstrations conducted by its expert, Dr. Weaver, expressly to prove infringement of claim 26 of the '683 patent (which, as will become apparent, is central to the current appeal).  A3904–3906 (ePlus's closing arguments); A3912 (describing how Dr. Weaver's demonstrations showed infringement as to Configuration No. 3).  In the first, Dr. Weaver demonstrated the Lawson system's capability to select and combine items from two Punchout sites on one requisition.  A1467–1482; A7040–7280; A7281; A7460–7700.  In the second, Dr. Weaver demonstrated the Lawson system's capability to combine items from Item Master and a Punchout site.  A1544–1550; A7282–7331; A7332; A7701–7750.  At trial, ePlus emphasized as a distinct advantage of the patent-in-suit this ability to combine on a single requisition (a) items from two different Punchout sites, and (b) items from Punchout and Item Master.  Dr. Weaver testified that this ability was "a big deal,"

6

"a real benefit," a "cost saver," a "time saver," and a "convenience." A1289; A1334:19–1335:18.

The jury returned 27 findings of non-infringement and 11 findings of infringement with respect to Lawson's Core Procurement System, Punchout, and EDI, exonerating Configuration Nos. 1 and 4 entirely. *See* A38–39; A219–221. The jury found Configuration Nos. 2, 3 and 5 to infringe system claim 1 of the '172 patent. A219–221. And the jury found that only Configuration Nos. 3 and 5 infringed claims 3, 26, 28, and 29 of the '683 patent. *Id.*

All three configurations the jury found to infringe perform the same basic function—searching for products in Item Master and adding those products to a single requisition list that can generate as many purchase orders as is necessary. *ePlus*, 700 F.3d at 513–14. Among the infringing configurations, the vast majority of Lawson's customers use Configuration No. 2. A5912. Configuration No. 2 is different from Configuration Nos. 3 and 5 in one notable way. In Configuration Nos. 3 and 5, in addition to searching the internal Item Master database, the customer can use Punchout to access third-party vendors' websites. A219–221; A1356. Unless and until a customer "punches out," such a customer is effectively using Configuration No. 2.

Configuration No. 2          Configuration No. 3

    

Configuration No. 5



A1360; A1365 (ePlus trial demonstratives).

3. Lawson reworked its software designs after the jury's infringement find-ings. On May 18, 2013, Lawson released a modified module, named Requisition Center or "RQC," to replace RSS in the various software configurations Lawson sells to its customers. A5211. The multiple changes made to the RQC module in-cluded structural changes to the manner in which selected items are requisitioned (relevant to claim 1 of the '172 patent) and limits on the manner in which United

Nations Standard Products and Services Code (UNSPSC) information could be used in searches (relevant to claims 28 and 29 of the '683 patent). A5297:18–5298:14. Additionally, Lawson modified RQC so that users of the redesigned Configuration Nos. 3 and 5 are left with sharply limited functionality of Punchout (relevant to claim 26 of the '683 patent). Specifically, RQC: (i) prevents a user from combining selected items from Item Master and a Punchout vendor on a single requisition; and (ii) through "Patch 1," released on June 9, 2011, prevents users from accessing a second Punchout website after placing items selected from a first Punchout site on a requisition, thereby preventing users from combining items from two or more Punchout vendors' websites on a single requisition. A43–44. Lawson implemented these changes to "design around" the theories of infringement presented to the jury by ePlus at the infringement trial.

4. On May 23, 2011, the district court permanently enjoined Lawson from "directly or indirectly making, using, offering to sell, or selling within the United States or importing into the United States" Configuration Nos. 2, 3, and 5. *See* A39. The injunction was premised on competition between Lawson's "infringing *systems*" and ePlus's e-procurement software. A4217 (emphasis added); *see generally* A4212–4231. While the district court did not make any findings regarding competition from specific configurations or with respect to specific patent claims,

all parties agreed that Configuration No. 2 accounted for the majority of sales relevant to those findings. A4922–4923.

5. After the injunction, Lawson decommissioned RSS and did not sell or install the enjoined configurations with the RSS module. A5570–5572; A5780; A7457–7458; A7459. Lawson offered RQC free to all its customers, and installed RQC on those customer systems for which it served as system administrator. A5772–5773; A5782.

ePlus initiated contempt proceedings on September 9, 2011, alleging that Lawson was in violation of the May 23, 2011 injunction for selling, servicing, and maintaining Configuration Nos. 2, 3, and 5 with RQC, which ePlus contended were not more than colorably different from those configurations with RSS. A39; A4262–4265.

6. On November 21, 2012 this Court reversed the infringement findings on four of the five claims underlying the judgment and injunction. *ePlus*, 700 F.3d at 523.

The Court held that the district court had erred in not granting Lawson's motion for summary judgment of invalidity as to claim 1 of the '172 patent and claim 3 of the '683 patent because "ePlus's system claims are indefinite." *ePlus*, 700 F.3d at 518, 520. By invalidating claim 1 of the '172 patent, this Court rendered Configuration No. 2 noninfringing and eliminated the only basis for enjoining

Configuration No. 2. *Id.* at 523. The Court also held that "the verdict of infringement" on claims 28 and 29 "is not supported by substantial evidence" because "ePlus did not present *any* evidence to the jury to make [an infringement] showing, either directly or circumstantially." *Id.* at 521 (emphasis added).

This Court affirmed only the infringement finding with respect to one method claim—claim 26 of the '683 patent—which is distinguished from claims 28 and 29 by a single limitation: "determining whether a selected matching item is available in inventory." 700 F.3d at 520 (emphasis omitted). Without the system claims, only accused Configuration Nos. 3 and 5 (which both include Punchout) could remain at issue in the contempt proceeding. *See* A219–221.

The Court remanded for the district court "to consider what changes are required to the terms of the injunction, consistent with this opinion." *ePlus*, 700 F.3d at 523.

7. Meanwhile, on reexamination, the Patent and Trademark Office concluded that all remaining claims of the '683 patent (including claim 26) are invalid due to multiple prior art references. *Ex parte ePlus, Inc.*, 2011 WL 1918594, at *1 (BPAI May 18, 2011), *aff'd*, 2012 WL 1050566, at *1, 22 (BPAI Mar. 26, 2012). ePlus's appeal to this Court is pending, fully briefed, and scheduled for oral argument on November 4, 2013. *See* No. 12-1451.

8.  After this Court devitalized the jury verdict, Lawson moved to dissolve or modify the injunction.  Lawson argued that the district court's previous findings, which encompassed Configuration Nos. 2, 3 and 5 as infringing *systems*, could not support a continued injunction because, among other things, the system claims had been invalidated, the most common configuration (No. 2) was not infringing as a matter of law, and the injunction record contained no evidence upon which to base a finding that ePlus and Lawson competed in regard to the *method* of claim 26 such that ePlus would suffer any harm in the absence of an injunction.  A4789–4798; A4942–4999.

Lawson also argued that ePlus's contempt motion could not proceed unless and until the district court ruled on Lawson's motion to dissolve or modify the injunction.  A4889:15–4891:6.  The district court disagreed, and ordered the contempt hearing to proceed on April 2, 2013, on the issue of "whether [Lawson] was, at any time after May 23, 2011, in violation of the ORDER of injunction entered herein on May 23, 2011, except that the hearing shall not consider the injunctive prohibition of that ORDER [pertaining to Configuration No. 2]."  A4773.

9.  *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869 (Fed. Cir. 2011) (en banc), requires a comparison between the features of the allegedly contumacious products (Configuration Nos. 3 and 5 with RQC) and the features of the analogous products that ePlus "contended, and proved" at trial to infringe claim 26.  *Id.* at 882; *see*

A49. In advance of the contempt hearing, the district court held several hearings and required numerous written submissions regarding this requirement. *See*, *e.g.*, A4597–4604; A4605–4616, A4617–4623, A4624–4633, A4634–4636 (letter briefs); A4464–4474, A4436–4442, A4760–4761, A4858–4866 (hearings); A4266–4278; A4309–4312; A4713–4723 (briefs); A4774–4776 (court order). Leading up to the hearing, the district court repeatedly characterized *TiVo* as not "very workable" and "a mistake." A4490.

Lawson argued that *TiVo* required ePlus to identify what it had contended and proved at the infringement trial relevant to the contempt proceeding—that is, the theories of infringement of claim 26 specifically. A4268–4278; A4309–4312; A4436–4442; A4464–4474; A4597–4604; A4624–4633. ePlus consistently disclaimed any obligation to identify what it had contended and proven at trial as a predicate for its contempt allegations, and the district court refused to hold ePlus to its burden in that regard. A4605–4616; A4617–4623. Instead, the court ruled in advance of the contempt hearing that no examination of the infringement trial record would be permitted for the purpose of determining what was "contended" *or* "proved" at that trial, declaring "If I'm wrong, I'm wrong. If the Federal Circuit thinks you can do that, then they can find a way to do it." A4441:5–4442:12; A4774–4776.

10.  At the contempt hearing, the district court properly bifurcated the proceedings to take evidence separately on the "colorability" and "actual infringement" prongs of *TiVo* (A4774), but the court permitted ePlus to conflate the separate issues through its expert Dr. Weaver, whose testimony *in the colorability phase* centered only on his opinion that the changes made to the products at issue are "not related to any claim element in Claim 26." A5132:15–5133:2; *see also* A5053:22–5054:8 ("All elements of claim 26 can still be practiced. So there is— there is no significant difference in the operation of RQC as viewed in light of claim 26."). ePlus made no attempt in the colorability phase to identify what it had "contended and proved" at the infringement trial or to compare the modified functionality of the redesigned RQC-containing products with the RSS-containing products, but instead presented its colorability case in the framework of its two *new* theories of infringement of claim 26, neither of which was presented at the infringement trial. *Compare* A5053–5054; A5063–5073, *with* A5480–5497; A5650–5694.

Consistent with its prior rulings, the district court excluded all testimony regarding the record of the infringement trial, rejecting Lawson's contention that "it is necessary to extract from the record what ePlus alleged and proved at trial" (A4962–4964), and stating that "we don't need to now go back and re-plow what happened at the trial" (A5732:6–5733:20). The court even ordered Lawson to con-

fine its post-hearing arguments to ePlus's interpretation of *TiVo*, which precluded argument from the trial record concerning what previously had been contended and proved as the basis for infringement of method claim 26.  A6502–6503.

Notwithstanding these limitations on the colorability proof, Lawson elicited evidence that the redesign made significant changes to product functions that were the basis of the infringement finding.  A5250:14–5252:6; A5332:1–9; A5375:6–17; A5253:4–13; A5425:2–5426:25; A5151:9–21.  The redesign yielded a product that made the requisition process with Punchout significantly more cumbersome and less efficient than it had been with RSS.  A5251:12–5252:6.  RSS was designed to allow a user who wished to search and select items from Item Master and Punchout, or from more than one Punchout site, to combine items from multiple sources on a single requisition that would be split into multiple purchase orders.  A5426:3–13.  RQC blocks that functionality, requiring instead that such users complete one shopping session in Item Master or Punchout and then complete a second session in the other (or in a second Punchout site), generating separate requisitions for each session.  A5250:14–5251:11.  This is the degradation of functionality that the plaintiff's expert agreed was a "big deal" and that set Lawson's products back technologically by "at least a decade."  A5184:5–18; A5193:15–5194:7.

Although ePlus did not dispute that Lawson decommissioned the RSS module and stopped selling configurations with that module, it also pursued an alternate theory of contempt based on Lawson's providing support to customers that continued to run RSS on their systems (even though they had downloaded RQC). A5771:12–5772:11. The specific support incidents ePlus referred to, significantly, concerned customers that did not have Configuration No. 3 or 5. A78; A5547:8–16; A5552:19–5553:1; A6718–6721. Because they did not have those configurations, the cited customers could not perform the steps of method claim 26.

11. On June 11, 2013, two months *after* the contempt hearing, the district court entered an order providing that the May 23, 2011 injunction would "no longer apply to Configuration No. 2," but leaving that injunction "in effect in all other respects." A34.

12. On August 16, 2013, the district court issued an order adjudicating Lawson in contempt of the May 23, 2011 injunction with respect to its continued sale of Configuration Nos. 3 and 5 with the redesigned software module RQC and with respect to the original configurations with RSS. A36–37; A75–76; A79–80.

In applying *TiVo*, the district court ruled that in assessing what was "contended, and proved" for the purposes of the colorability analysis, it need not examine the record of the infringement trial, instead, explaining that "[t]o see, what was proved at trial, the Court relies on the verdict that the jury returned." A58; A55

("the verdict of the jury ... stands for itself").  But the jury returned only a series of general verdicts, answering "YES" or "NO" to whether the accused configurations infringed various claims.  A219–221.  Only the jury's findings of "YES" as to method claim 26 survived this Court's review.

And rather than examine the actual record of the infringement trial to determine what was *contended* at trial, the district court explained that its contempt finding relied on ePlus's *pretrial* infringement allegations (the "Infringement Claim Charts" (A464–477)), which the court acknowledged identified only ePlus's "claims at the *commencement* of the action" (A55 (emphasis added)).  The charts—which were tantamount to allegations in a complaint, not evidence—were not used at trial, nor were all the theories therein presented to the jury.  The court listed six theories regarding claim 26 purportedly massed within ePlus's pretrial charts, none of which were clearly identified in those charts, but (as explained above) ePlus focused its presentation to the jury on only two such theories, neither of which was presented at the contempt hearing.  The district court ignored these facts.  A55–58.

Although ePlus's expert admitted at the contempt hearing that Lawson's redesign removed aspects of RSS that were "beneficial," and a "convenience," setting the technology back by "more than a decade" (A5184:5–18; A5193:15–5194:7),  the district court concluded that "Configurations 3 and 5 with RQC are

17

not more than colorably different from those with RSS" (A69), and that, based on ePlus's new infringement theories, "Configurations 3 and 5 with RQC continue to infringe ePlus' patent" (A76).

The court ordered Lawson to pay ePlus "disgorgement" in the amount of $18,167,950 based on Lawson's alleged RQC-related profits. A36. It did not award any damages related to the use of Lawson's original products with RSS. And, indeed, ePlus did not even attempt to calculate any remedy based on the use of RSS. A5898:9–5899:4. The district court further levied a "coercive fine," payable to the court registry, of $62,362 per day until Lawson establishes compliance with the injunction. A36–37. These sanctions have been stayed pending resolution of this appeal. A6728–6729; Docs. 29, 36.

## SUMMARY OF ARGUMENT

I. This Court, after reversing most of the jury's infringement verdict, ordered the district court to "consider what changes are required to the terms of the injunction, consistent with this opinion." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 523 (Fed. Cir. 2012). The district court did not follow this instruction; indeed, Lawson's motion to vacate or modify the injunction remained pending throughout the contempt hearing. The district court then concluded, erroneously, that this Court's mandate precluded it from fully reconsidering the injunction. ePlus never proved that injunctive relief is warranted based on the sole remaining

method claim (which the Patent and Trademark Office has since rejected). *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–94 (2006). The district court therefore erred in reimposing the injunction and concluding the contempt proceedings.

II. The district court then erred in finding Lawson in contempt based on the products Lawson redesigned following the jury's verdict. ePlus bore the burden in the contempt proceeding to prove, by clear and convincing evidence, "*both* [A] that the newly accused product is not more than colorably different from the product found to infringe *and* [B] that the newly accused product actually infringes." *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (en banc); *see also nCube Corp. v. SeaChange Int'l, Inc.*, --- F.3d ---, 2013 WL 5567555, at *3 (Fed. Cir. Oct. 10, 2013). The district court erred in its application of both prongs.

A. On the first prong (colorable differences), the district court erroneously refused to consider what *ePlus* "contended, and proved" at the infringement trial. The district court thought that "the Federal Circuit, in *TiVo*, did not intend for district courts to devine [*sic*] what was in the mind of juries when they returned their verdicts." A51 (quoting A4963). Indeed, the court affirmatively *barred* Lawson from presenting evidence and argument regarding how ePlus argued infringement to the jury. A5731–5733. The district court was required to consider that evidence (*nCube*, 2013 WL 5567555, at *5), and its error was prejudicial because the in-

fringing functionality ePlus presented at the infringement trial through Dr. Weaver's demonstrations concerning method claim 26 does not exist in the redesigned RQC-containing configurations, and thus ePlus could not recreate its trial demonstrations at the contempt hearing. The undisputed modifications to the functionality of Punchout in the redesigned configurations rendered those configurations more than colorably different from the infringing configurations, and on that basis it was error for the district court to have even proceeded to the infringement phase of the contempt proceeding. *TiVo*, 646 F.3d at 882 (if the newly accused product is "more than colorably different from the adjudged infringing one … the inquiry into whether the newly accused product infringed is irrelevant").

B.   ePlus also did not prove the second prong—actual infringement—by clear and convincing evidence, because claim 26 is a *method* claim, and the evidence was undisputed that Lawson disabled, in the redesigned products, the functionalities that ePlus alleged were infringing in the original products at the infringement trial. ePlus improperly attempted to introduce new infringement theories, but failed to prove even those.

III.   Finally, the district court erred in imposing sanctions against Lawson. Even though ePlus failed to prove any damages at the infringement trial, and did not even try to prove any losses during the contempt proceedings, the district court ordered Lawson to pay ePlus some $18 million in "disgorgement." The court also

ordered Lawson to pay into the court registry a fine of $62,362 per day in the event of noncompliance with its injunction order, without specifying what precise acts are necessary in order to establish compliance. Both the disgorgement award and fine were stayed pending resolution of this appeal. A6728–6729; Docs. 29, 36.

## STANDARD OF REVIEW

This Court reviews an order modifying an injunction and a contempt order for abuse of discretion. *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1292 (Fed. Cir. 2012); *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 702 (Fed. Cir. 2008). Evidentiary rulings are reviewed under the law of the regional circuit (*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1331 (Fed. Cir. 2010)), which in the Fourth Circuit is an abuse of discretion (*United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996)). A district court abuses its discretion where its decision rests on an error of law. *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005); *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007).

## ARGUMENT

The entire contempt proceeding—the reimposition of the injunction, the determination that Lawson's sale of redesigned products is in contempt of that injunction, and the sanctions assessed against Lawson for that conduct—was directly contrary to, and in some instances in open disregard of, this Court's previous decision in this case (*ePlus, Inc. v. Lawson, Inc.*, 700 F.3d 509 (Fed. Cir. 2012)), as

well as this Court's controlling exposition of the framework for civil contempt in the patent context (*TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (en banc)).  Both orders under review should be reversed.

## I.    The Injunction Should Be Reversed

The district court's May 23, 2011 injunction was based on a jury verdict finding that three Lawson software configurations infringed two system and three method claims of two patents held by ePlus.  *ePlus*, 700 F.3d at 515–16.  This Court invalidated both of the system claims and reversed the infringement findings as to two of the method claims, entirely exonerating software Configuration No. 2 (the one used by most of Lawson's customers).  *Id.* at 523.  With only one method claim remaining, the Court explicitly instructed the district court to "consider what changes are required to the terms of the injunction, consistent with this opinion." *Id.*

The remand order *required* the district court to make all changes to the injunction expressly or implicitly required by this Court's disposition of the previous appeal.  *See Boyd v. Driver*, 495 F. App'x 518, 523 (5th Cir. 2012); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1356 (Fed. Cir. 2009).  Yet, the district court proceeded to hold the contempt hearing before deciding Lawson's motion to vacate or modify the injunction.  *See TiVo*, 646 F.3d at 881 ("there may be circumstances in which the initiation of contempt proceedings

would constitute an abuse of discretion by the district court"). The district court erred as a matter of law in implementing the mandate.

## A.    The Mandate Required Reconsideration

The district court erroneously refused Lawson's request to "determine whether it would have entered the [post-trial] injunction if the circumstances then had been as they are now" (A15), based on its conclusion that this Court's mandate "prohibited [it] from retrospectively dissolving the injunction" (A19). Although a district court's decision on an injunction is typically reviewed for abuse of discretion, the district court committed *legal* error in concluding that this Court's mandate limited that discretion. That determination is reviewed de novo. *Laitram Corp v. NEC Corp.*, 115 F.3d 947, 950 (Fed. Cir. 1997) (interpretation by an appellate court of its own mandate is properly considered a question of law, reviewable de novo); *see also United States v. Alston*, 722 F.3d 603, 606 (4th Cir. 2013).

The district court mistakenly determined that the May 23, 2011 injunction was "affirmed" by this Court. A19. This Court *declined* to analyze whether equity continued to support (or ever supported) the injunction and *expressly* assigned that task to the district court. *ePlus*, 700 F.3d at 523. Nor did this Court's limited consideration of the "scope of the injunction" preclude reconsideration. *See* A12–13. This Court considered only whether having enjoined the *future* sale of products, the district court could also enjoin service and maintenance of *previously sold*

23

products. *ePlus*, 700 F.3d at 522. That holding did not limit the district court from reconsidering the injunction in its entirety, as this Court elsewhere required in the same decision.

The district court also determined, mistakenly, that it could not revisit the injunction because this Court did not vacate it. A18–19. For this logical fallacy, the court relied on *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008), which involved a remand *without* any instructions to reconsider an injunction. *See Amado v. Microsoft Corp.*, 185 F. App'x 953 (Fed. Cir. 2006) (remanding only to "determine[] the ultimate disposition of the funds"). In the circumstances of that case, the initial injunction was implicitly affirmed (517 F.3d at 1360); here, however, this Court required the court to reconsider the injunction on remand.

This Court *both* overturned findings on which the injunction was based *and* expressly remanded for reconsideration of the injunction. The mandate thus *required* the district court to reexamine the propriety of the injunction *ab initio*. *See Boyd*, 495 F. App'x at 523 (district court must comply with "both the letter *and the spirit* of the appellate court's mandate") (emphasis added). The district court's refusal to follow this Court's directive was reversible error.

### B.    ePlus Did Not Prove Entitlement To A Post-Remand Injunction

The May 23, 2011 injunction was based almost exclusively on findings that Lawson's software configurations infringed two broad system claims. In light of

24

this Court's invalidation of those system claims, equity cannot support that same broad injunction based on a single, narrow method claim that relates to only a discrete fraction of the system's functionality. Indeed, as the factual findings in support of the post-trial injunction lacked *any* analysis specific to the performance of method claim 26, there is no longer anything in the record that could support the injunction. A4210–4261.

1. Following reversal of most of the infringement findings, ePlus bore the burden to prove, based on the sole remaining method claim, its entitlement to equitable relief under the traditional factors. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

The district court refused to hold ePlus to its burden of proof. Instead, it turned equity on its head by treating its earlier injunction analysis as unaffected by this Court's judgment and requiring Lawson to shoulder the burden that each of the *eBay* factors weighed *against* the existing injunction. A28. The court sought to justify this novel analytical approach in part by placing the "burden of production" with respect to modification of the injunction on *Lawson* under Federal Rule of Civil Procedure 60(b)(5). A24 n.3. Lawson brought its Rule 60(b)(5) motion only as a means of putting the mandate before the district court (A6183:16–25), and was required to "produce" only information showing "that a significant change in circumstances warrants revision" or dissolution. *Rufo v. Inmates of Suffolk Cnty. Jail*,

502 U.S. 367, 383 (1992). Lawson easily met that burden by explaining the effect of this Court's reversal of nearly all infringement findings. *See* A4789–4798; A4945–4951.

The post-trial injunction was based on now-defunct findings that Lawson's configurations infringed broad *system* claims. This Court, however, invalidated those system claims and all that remains is a single *method* claim, which the most popular configuration cannot infringe. A219–221. In the context of software products, there is a huge difference between an adjudication of infringement of two broad system claims, on the one hand, and a single narrow method claim, on the other. The vast majority of evidence introduced at the post-trial injunction hearing related to purported competition between ePlus and Lawson in regard to licensing systems as a whole, not any particular method of using the various configurations. A4210–4231.

Following the remand, it was ePlus's burden to show that an injunction could be sustained only as to a single method claim. Yet, the district court did not hold ePlus to its burden, relying instead on its post-trial injunction findings and refusing to consider whether the record *currently* supports an injunction with respect to method claim 26.

"A court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an 'instrument of wrong.'"

*Salazar v. Buono*, 130 S. Ct. 1803, 1816 (2010) (quoting *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932)).  The district court's refusal to properly apply the *eBay* factors on remand is grounds for reversal.  *PPG Indus., Inc. v. Celanese Polymer Specialties*, 840 F.2d 1565, 1572 (Fed. Cir. 1988) (a district court by definition abuses its discretion when it makes an error of law).

2.  None of the four equitable factors supports an injunction based on claim 26 alone.  *See eBay*, 547 U.S. at 391.

a.  There is no evidence of irreparable injury to ePlus.  *eBay*, 547 U.S. at 391.  In order to show irreparable injury, a party must show both "1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement."  *Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed Cir. 2012).  ePlus proved neither.

The only Lawson configurations capable of infringing method claim 26 are Configuration Nos. 3 and 5, which are used by only about 20% of the customers originally impacted by the jury verdict.  A28; A5912:1–14; A4217.  Yet, ePlus did not show any harm based on sales of the modules that make up these configurations.  Instead of holding ePlus to its burden after remand, the district court pointed to its original findings on competition concerning Lawson's core procurement system.  A26; A4216–4217.  With respect to lost sales, those findings focused almost exclusively on the modules that are common to Configuration Nos. 2, 3 and 5 (*see*

27

A4220–4224 (relying on three examples to find lost sales and not attributing any to Punchout or EDI)), which both parties agree account for the great majority of Lawson's sales (A4922–4923). Configuration No. 2 is now out of the case, and those sales cannot have any bearing on injunctive relief for past infringement of method claim 26.

The district court identified no injury to ePlus, let alone irreparable injury, related to infringement of claim 26 by sales of Configuration Nos. 3 and 5. In fact, ePlus obtained the system-based injunction by arguing, in part, that Punchout, the modular component contained in Configuration Nos. 3 and 5 that is essential to distinguish those configurations from Configuration No. 2, "does not drive [] sales" of Lawson's procurement systems. A733 ("Lawson has never won a sale merely because of its Punchout product").

And even if ePlus had shown any irreparable injury, there is no basis to find that the injury is *related* to any alleged infringement. *Apple*, 695 F.3d at 1374. Because no configuration without the Punchout module was found to infringe claim 26, ePlus's admission that Punchout "does not drive [] sales" precludes a finding that there is a "sufficiently strong causal nexus relat[ing] the alleged harm to the alleged infringement." *Id.* at 1374; *see also Broadcom v. Emulex*, --- F.3d ---, 2013 WL 5508730, at *10–11 (Fed Cir. Oct. 7, 2013) (where there is "considerable evidence that the patented feature was not a determinative factor in sales,"

28

there is no irreparable harm). The injunction should be reversed on this basis alone. *Amado v. Microsoft Corp.*, Case 8:03-CV-00242, ECF No. 661 at 19–20 (C.D. Cal. Mar. 13, 2007) (reconsidering and dissolving injunction previously based on now "defunct presumption of irreparable harm"), *aff'd*, 517 F.3d 1353 (Fed Cir. 2008).

b. Similarly, there is no evidence that money damages would be inadequate. *eBay*, 547 U.S. at 391. The district court announced that its finding on this factor remained valid "for the same reasons that made it so in the first place." A27. After this Court's decision, however, the only remaining infringement findings concern a *feature* of Configuration Nos. 3 and 5 that, according to ePlus, does not drive sales. Moreover, many customers can (and do) use the now-enjoined configurations without infringing. A770.

ePlus has made clear its intention to use the threat of a continued injunction to leverage a settlement. A4642 ("enforcement of the injunction with respect to claim 26 will render Lawson unable to service and maintain infringing systems and enable a quick resolution of this case once and for all"). ePlus's stated goal to utilize "a ruling in equity as a bargaining chip suggests both that such party never deserved a ruling in equity and that money is all that such party truly seeks, rendering monetary damages adequate in the first instance." *MercExchange, L.L.C. v. eBay,*

*Inc.*, 500 F. Supp. 2d 556, 582 (E.D. Va. 2007); *see also eBay*, 547 U.S. at 396–97 (Kennedy, J., concurring).

ePlus was not awarded damages at the conclusion of the infringement trial due to defects in its proof. *See ePlus*, 700 F.3d at 522–23 (rejecting ePlus's cross-appeal of exclusion of damages evidence). That ePlus's litigation conduct in the merits phase precluded it from obtaining an award of damages should not have redounded to its benefit in the injunction analysis, either in 2011 or 2013.

c. The balance of hardships does not tip in ePlus's favor. *eBay*, 547 U.S. at 391. The district court again improperly relied on its earlier findings to reach an indefensible conclusion, instead of focusing—as it should have—on hardship *specifically attributable* to the infringement of claim 26. Since acquiring the patents-in-suit in 2001, ePlus has granted non-exclusive, lump sum licenses to five of its biggest competitors, generating nearly $60 million in settlement and licensing revenue, based in large part on system claims that have now been invalidated. A4206. At the same time, Lawson has been wrongfully enjoined from lawful activities, and forced to spend considerable resources to design around five claims. Responding to the original verdict imposed hardships on Lawson and inconvenience on its customers *before* this Court reversed the findings as to four of the claims (*ePlus*, 700 F.3d at 517–22) and rendered much of Lawson's design-around unnecessary. The balance of hardship now tips sharply in *Lawson's* favor.

d.  Finally, the fourth *eBay* factor, the public interest, can no longer support an injunction.  *eBay*, 547 U.S. at 391.  The public's interests in robust competition, consumer choice, and innovation are disserved by an injunction barring Lawson from selling its redesigned products.  *Cf. TiVo*, 646 F.3d at 883 ("legitimate design-around efforts should always be encouraged as a path to spur further innovation").

This factor alone is sufficient here to warrant vacatur of the injunction, because the '683 patent—including the sole claim to survive this Court's previous decision—has been determined to be invalid by the PTO.  If this Court confirms the invalidity of the patent, the injunction will have to be vacated as a matter of law.  *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F. 3d 1330, 1340–47 (Fed. Cir. 2013) (PTO invalidation voids extant judicial enforcement proceedings); *Translogic Tech., Inc. v. Hitachi, Ltd.*, 250 F. App'x 988, 988 (Fed. Cir. 2007); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 1993 U.S. App. LEXIS 11963, at *2–3 (Fed. Cir. 1993) ("a final decision of unpatentability means the patent was void *ab initio*").

## C.    The Modified Injunction Is Overbroad

In any event, the reimposed injunction prohibiting all *sales* of Configurations Nos. 3 and 5 is overbroad with only a single *method* claim remaining.

Injunctions must be "narrowly tailor[ed] ... to fit the specific adjudged viola-
tions" and "cannot impose unnecessary restraints on lawful activity." *Riles v. Shell
Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002); *Johns Hopkins
Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1366 (Fed. Cir. 1998). As ePlus has previ-
ously argued, "[i]t is axiomatic that the injunction should be of a breadth that is
commensurate with the jury's infringement verdict." A741.

"Method claims are only infringed when the claimed process is performed,
not by the sale of an apparatus that is capable of infringing use." *Ormco Corp. v.
Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006). Because Configuration
Nos. 3 and 5 have substantial lawful uses (including all functionality performed by
Configuration No. 2), the district court's order exceeds the permissible scope of an
injunction. On this basis alone, it should be reversed.

The district court invoked two cases in which this Court affirmed injunctions
against sales as a remedy for infringement of a method claim. A31. However,
both cases support Lawson's contention that *this* injunction is overbroad. In *i4i
Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010), this Court ap-
proved the injunction only *after* affirming a jury's finding that the enjoined product
had no "substantial noninfringing uses." *Id.* at 850–51. Similarly, an injunction
was sustained in *MPT, Inc. v. Marathon Labels, Inc.*, 258 F. App'x 318, 320 (Fed.
Cir. 2007), where the "jury [had] already found that the [product] does not have a

substantial non-infringing use." *MPT, Inc. v. Marathon Labels, Inc.*, 505 F. Supp. 2d 401, 421 (N.D. Ohio 2007). Here, in contrast, Configuration Nos. 3 and 5 have substantial non-infringing uses.

Many customers who have Configuration Nos. 3 and 5 do not practice the claimed method. A733 ("not all customers that have Punchout make use of it"). Indeed, the most common uses of these configurations—searching for and purchasing selected items in Item Master—are also core functions of Configuration No. 2 and are, thus, non-infringing under the law of this case. *ePlus*, 700 F.3d at 519–20; A219–221.

Recognizing as much, this Court affirmed infringement of claim 26 without even mentioning *sales*, but based on "evidence that Lawson installed, maintained, demonstrated and managed the infringing systems for its customers." *ePlus*, 700 F.3d at 520–21. The district court nevertheless concluded that an injunction on *mere sale* was appropriate here because this Court affirmed a finding of contributory infringement under 35 U.S.C. § 271(c). A30–31. That was reversible error. This Court explicitly limited its affirmance to "direct and induced infringement," finding infringement based on factors beyond sale. 700 F.3d at 521.

It was ePlus's burden to prove the *lack* of substantial non-infringing uses to establish that mere sale of Configuration Nos. 3 and 5 infringes claim 26. 35 U.S.C. § 271(c); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362–63 (Fed.

Cir. 2012). The district court erroneously found otherwise, going so far as to bar Lawson from questioning ePlus's expert on non-infringing uses of Configuration Nos. 3 and 5. A5753–5754 ("No, the burden of raising a substantial non-infringing use is on you [Lawson], I think"); A5747–5754.

It cannot fairly be disputed that the core functions of Configuration Nos. 3 and 5 (that may also be performed by Configuration No. 2) are non-infringing uses that are far from "unusual, far-fetched, illusory, impractical, occasional, aberrant or experimental." *Toshiba*, 681 F.3d at 1362 (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009)). Mere sales may not be enjoined.

\* \* \*

The injunction is unsupportable. Because the injunction was the basis for the civil contempt finding, reversing the injunction would moot the entire post-remand proceeding—no injunction, no contempt. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 295 (1947) ("The right to remedial relief [in civil contempt] falls with an injunction which events prove was erroneously issued"); *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302–03 (4th Cir. 2000) (same); *McLean v. Cent. States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985) ("reversal of the underlying order ordinarily invalidates any civil contempt sanctions predicated thereon").

## II.    The Contempt Determination Should Be Reversed

Contempt "is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *TiVo*, 646 F.3d at 881–82 (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)).  Under *TiVo*, a party seeking contempt based on a redesigned product bears the burden of proving, by clear and convincing evidence, "*both* [A] that the newly accused product is not more than colorably different from the product found to infringe *and* [B] that the newly accused product actually infringes."  *Id*. at 882 (emphases added); *see nCube Corp. v. SeaChange Int'l, Inc.*, --- F.3d ---, 2013 WL 5567555, at *3 (Fed Cir. Oct. 10, 2013).  ePlus met neither burden, and the district court committed reversible error under both prongs of the contempt analysis with respect to Lawson's redesigned configurations.  The court's "alternative" ruling regarding RSS was also erroneous.

### A.    The Redesigned Products With RQC Are More Than Colorably Different

The district court committed two principal errors in applying the "colorability" prong under *TiVo*.  First, notwithstanding *TiVo*'s express direction, the district court flatly refused to consider what ePlus "contended and proved" at the infringement trial.  Second, the court erroneously conducted a functional comparison of the original and redesigned products as a whole, rather than comparing the modified *elements* of those products to the *elements* found to be infringing at trial.

### 1. Lawson Modified Or Removed The Elements Previously Found To Infringe

The district court was required to compare "those aspects of the accused product that were previously alleged to be, and were a basis for, a prior finding of infringement, and the modified features of the newly accused product." *TiVo*, 646 F.3d at 882. This analysis must "focus on those elements of the adjudged infringing products that the patentee previously *contended*, *and proved*, satisfy specific limitations of the asserted claims." *Id.* (emphasis added). If "one or more of those elements previously found to infringe has been modified, or removed," and the difference between the old and new products is "significant," "[c]ontempt is then inappropriate." *Id.*

Limiting contempt proceedings to those elements of a product contended and proved to infringe at trial is necessary to ensure that such proceedings do not exceed the constitutional limitations on civil contempt. "In this way, the *TiVo* standard preserves values of notice and preservation of trial rights by keeping contempt suitably limited." *nCube*, 2013 WL 5567555, at *5. ePlus prosecuted the contempt proceeding without regard to these constitutional constraints; and the district court, in allowing it to do so, committed reversible error.

a. The district court's fundamental error was its refusal (at ePlus's insistence) to follow this Court's directive to consider only the evidence presented at the infringement trial in determining the "basis for[] the prior finding of infringement."

*TiVo*, 646 F.3d at 882.   Contended and proved—in the context of a jury verdict—can mean only one thing:  evidence presented *at trial* in such a way as to form a basis for the verdict as to the products and claim at issue.  *Id.*; *see Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 569 (1951).  For example, the district court in *nCube* carefully parsed the record of the infringement trial in assessing what was "contended, and proved" at trial, and this Court expressly affirmed that approach.  *nCube*, 2013 WL 5567555, at *5.

The district court, however, stated that "the Federal Circuit, in *TiVo*, did not intend for district courts to devine [sic] what was in the mind of juries when they returned their verdicts."  A51 (quoting A4963).  And the court repeatedly refused to examine the trial record and hold ePlus to its burden to prove by "clear and convincing evidence" what it had contended, and proved at trial.  *TiVo*, 646 F.3d at 879; A4962–4964 (rejecting Lawson's contention that "it is necessary to extract from the record what ePlus alleged and proved at trial"); A4414–4415 ("What was contended and proved is resolved by the jury's verdict, and that's all we're going to deal with.  If it's been found to have infringed, we'll presume the jury accepted the testimony of the person who proffered the case for infringement."); A6502–6503.

Not only did the district court refuse to hold ePlus to its burden (*TiVo*, 646 F.3d at 882–83) and refuse to "assess the trial evidence and attempt any conclusion

as to what was proven" (A55), it affirmatively *barred* Lawson from presenting evidence and argument showing how ePlus argued infringement to the jury. A5731–5733 (sustaining ePlus's objections to evidence about what was presented at trial); A6502–6503 (ordering Lawson to "confine its oral presentation (and any related demonstrative aides [sic]) to addressing the issues of colorability and infringement *as they have been presented in the briefs by ePlus*") (emphasis added); A4963–4964 (ordering that *TiVo* does not contemplate "recycling and reinterpret[ing]" trial evidence); A5468–5469; A4862–4866; A5117–5119 ("You're going to have a chance to take it up with the Federal Circuit exactly whether your interpretation is right or not. And you've preserved it seven ways from Sunday, I think.... I just don't think it's correct."). Indeed, the Court barred testimony on what was proven at trial even though Lawson's Director of Development, who attended trial, testified that he based Lawson's re-design efforts specifically on the infringement theories that ePlus had demonstrated at trial. A5290; A5294.

Instead, the district court considered *only* ePlus's pre-trial "Infringement [Claim] Charts" and the simple verdict form in determining what was "contended and proved." A55–58. In other words, the district court credited ePlus's factual allegations at the *pleading* stage as "contended, and proved" at trial, refusing to consider which of these theories was even presented to the jury, much less which formed the "basis for[] the prior finding of infringement." This was reversible er-

ror under *TiVo*. 646 F.3d at 882. If an infringement theory was not presented to and accepted by the jury, it is unlawful—indeed unconstitutional—to base a contempt finding on that theory.

This Court's recent decision in *nCube* applies squarely and requires reversal here. In *nCube*, this Court affirmed the district court's denial of contempt where the defendant similarly removed the functionality that formed the predicate for the infringement finding at the underlying trial. *nCube Corp. v. SeaChange Int'l, Inc*., 2012 WL 4863049, at *5 (D. Del. Oct. 9, 2012). After considering the evidence presented at the infringement trial to determine what the plaintiff "contended, and proved," the court found that the features of the modified products were more than colorably different from the features of the products proven to infringe at trial. This Court affirmed that finding, basing its holding on the fact that the plaintiff "never relied on the MAC address *at trial* to prove infringement." *nCube*, 2013 WL 5567555, at *5 (emphasis added).

The court here *acknowledged* that its approach to colorability was in direct conflict with that taken by the district court in *nCube*. A53–54 (citing *nCube Corp. v. SeaChange Int'l, Inc.*, 809 F. Supp. 2d 337 (D. Del. 2011)). It sought to justify its departure from *nCube* on the ground that the *nCube* court somehow violated the reexamination clause of the Seventh Amendment. A53–55. The court had it exactly backwards. The Constitution expressly allows examination of evi-

dence presented to a jury in accordance with the "rules of the common law" (U.S. Const. amend. VII), the Supreme Court has previously affirmed the practice for the purposes of determining what was proved at trial (*Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 435–36 (1996)), and this Court has now expressly endorsed that practice in the contempt context (*nCube*, 2013 WL 5567555, at *5). *nCube* lays bare the error in the district court's approach here.

ePlus relied at the infringement trial on two demonstrations to prove infringement of claim 26, emphasizing the ability to combine on a single requisition (a) items from two different Punchout sites, and (b) items from Punchout and Item Master. *See* A1467:6–1482:2; A1544:11–1550:12; A7040–7080; A7281; A7460–7700; A7282–7331; A7332; A7701–7750; *see also* A674 (relying on first demonstration as proof of infringement of claim 26). It is undisputed that the limitations on Punchout in RQC-containing configurations make it impossible for any customer to use Configuration No. 3 or 5 in either manner demonstrated by Dr. Weaver at the infringement trial. A6268; A5136:14–5138:15; A5744:8–23. Those restrictions on Punchout functionality cannot be circumvented by users. A5134:13–5144:8. It is no longer possible to combine items from two or more Punchout vendors on the same requisition; nor is it possible to combine items from the Item Master and a Punchout vendor on the same requisition. Given the significance ePlus placed on that functionality at the infringement trial, the removal of the same

in Lawson's redesign rendered its RQC-containing configurations more than color-ably different from the infringing RSS-containing configurations, precluding a finding of contempt.

Lawson designed around the theories of infringement that were contended and proved at trial, and therefore may not be held in contempt of the injunction. Although ePlus maintains that the redesign was a "sham" (Doc. 26 at 7), it did not come close to proving that Lawson's design-around efforts were not "legitimate" or "permissibl[e]." *TiVo*, 646 F.3d at 883; *cf. Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 51 (1993) (articulating standard for "sham litigation"). Indeed, ePlus's persistent and successful efforts to divert the district court's attention from the theories of infringement presented at trial, in addition to constituting invited error, actually confirm that Lawson successfully designed around those theories.

### 2.    The Modifications Were Significant

After determining what elements were "contended and proved" to infringe at the underlying trial, a court deciding a contempt motion must determine whether "one or more of those elements previously found to infringe has been removed" and then "make an inquiry into whether that modification is significant." *TiVo*, 646 F.3d at 882. The comparison to determine whether there has been significant change must focus on the modified elements, *not* the overall functionality of the

41

product.  *Id.* at 882 (if only one element of a product has been significantly modified, the product "as a whole" is more than colorably different).

Rather than conducting the comparative analysis required under *TiVo*, the district court determined, *sua sponte*, that whether a modification is significant should be determined by applying the "doctrine of equivalents."  A46–48.  Relying on this Court's pre-*TiVo* decision in *KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1527 (Fed. Cir. 1985), the court explained that "[w]hile the doctrine of equivalents was designed to address infringement by a 'process that does not literally infringe upon the express terms of a patent claim,' … it appears to be the origin of the 'colorable differences' concept."  A47 n.4 (citation omitted). The district court went on to conclude that "[i]t is sensible to apply, as the Federal Circuit directs, a similar 'colorable differences' test to the redesigned *product*" and asked only whether "the newly accused *product* is not more than colorably different from the adjudged infringing *product*."  A48 n.4, A70 (emphases added).

The district court committed legal error in adopting and applying a "doctrine of equivalents" approach to the colorability analysis.  This Court has never endorsed or applied a doctrine of equivalents approach.  In fact, this Court rejected that approach in *TiVo*, which made clear that the colorability analysis must be undertaken before, and independent of, the infringement analysis.  *TiVo*, 646 F.3d at

882. That would be impossible if colorability were to be evaluated pursuant to the doctrine of equivalents, as the district court erroneously determined.

The district court also found that analysis of "the features … that remain *unchanged* is helpful in assessing the significance of the modifications that were made to the infringing product" and proceeded to assess the unchanged components of Lawson's accused configurations (i.e. the core modules of Configuration Nos. 3 and 5 that are also in No. 2). A64–65 (emphasis added). But, again, this entirely misses the point of the colorable differences test. If the infringing element of the product has been modified, the *whole* product is colorably different. *TiVo*, 646 F.3d at 882. Indeed, in most cases, only a single modification is at issue. *Id.* at 882 n.1. That is particularly true where, as here, a method claim is asserted and the sole remaining claim does not cover the lawful core procurement functionality of Lawson's systems that long predates ePlus's patent. *See*, *e.g.*, A234 at col. 1:11–17; A227–228 at "References Cited."

To avoid infringement (and, *a fortiori*, contempt) liability, Lawson had only to design around the limitations of the sole remaining method claim, as it did in the RQC module that was released after the jury's verdict. The "unchanged" elements of Lawson's products are irrelevant to the colorability analysis, and the district court's decision to rely on those elements only underscores its misapplication of *TiVo*.

43

Focusing on the modified elements, as *TiVo* and *nCube* require, shows that the modifications made by Lawson are significant.  It is undisputed that Lawson's redesign removed both of the functionalities demonstrated to the jury to prove infringement of claim 26.  ePlus's own expert conceded that the functionalities removed were "a real benefit," a "cost saver," a "time saver," and a "convenience." A1289:9–17; A1334:22–1335:9; A5178:7–18; A5183:20–25; A5184:5–11.  Dr. Weaver even conceded that the functionalities Lawson removed in RQC were "a big deal in the context of the patent," and that the changes Lawson implemented were a step back by more than a decade.  A5184:10–11; A5193:22–5194:7.  The patent's inventors also claimed that the functionalities Lawson removed in RQC were a "distinct advantage[]" of the patent-in-suit.  A6976 (including as a "distinct advantage[]" "the capability of shopping in many stores at once"); *see also* A5435:7–17.  The redesign prevents customers from combining purchases across multiple Punchout vendors and the Item Master and eliminates the possibility of single purchase orders with such multi-sourced items, adding steps and complexity to the purchasing process.  A5250:14–5251:11; A5253:4–13; A5426:3–13.  As such, Lawson took this "distinct advantage[]" out of its products.  A6976.

In comparing Lawson's redesigned products to the products found to infringe, the district court, over Lawson's objections (A6297–6298), relied on a handful of internal Lawson documents discussing modifications *not* at issue in this

44

case.  Following the jury verdict, Lawson engaged in multi-purpose redesign ef-

forts.  While it made modifications to design around claim 26, it also expended

significant resources to make modifications in light of the four other claims that it

was originally found to infringe (*e.g.*, A5297:18–5298:20).  Following the reversal

of the infringement findings on those four claims, the latter changes are now moot.

Yet, in using a handful of internal Lawson documents to buttress its conclusion

that RQC was not more than colorably different from RSS (*see* A65–67), the dis-

trict court made no attempt to exclude from consideration documents discussing

modifications made to features of Lawson's products in order to design around

those now moot claims or documents that have no bearing on Punchout functional-

ity, such as whether retraining was necessary to use RQC.  *Compare*, *e.g.*, A66

(court's reliance on PX-1124 for the proposition that Lawson's staff "took the view

that RQC 'looks/appears exactly like RSS XML did'"), *with* A5166:13-5167:23

(ePlus's expert does not know whether PX-1124 relates to Punchout); *compare*

A66–67 (court reliance on lack of retraining), *with* A5145:25–5147:18 (ePlus's ex-

pert's admission that lack of retraining does not necessarily show insignifi-

cance).  But whether the user interfaces of RSS and RQC had visual similarities

has nothing to do with the contempt issues that were tried, which went to the modi-

fied functionality of Punchout in the redesigned configurations.  Not one of the

documents cited by the district court says or fairly suggests that Lawson held the

view that the changes made to RQC *to limit the functionality of Punchout* were not significant; indeed the overwhelming evidence was precisely to the ry. A5395:10–18; A5332:1–9; A5333:10–18; A5382:23–5383:1; A5373:10–19.

It was error to rely on these documents. Modifications to design around claim 1 of the '172 patent and claims 3, 28 and 29 of the '683 patent are legally irrelevant. In failing to recognize the irrelevance of documents unrelated to modifications to design around claim 26, just as in refusing to reconsider the injunction on the *current* record, the district court simply treated this Court's previous decision as a nullity.

### B.     The Redesigned Products Do Not Infringe

If a district court determines that the modified elements at issue are no more than colorably different than those found to infringe at trial, it must then determine whether or not the newly accused product "actually infringes." *TiVo*, 646 F.3d at 883. There can be no finding of infringement unless there is clear and convincing evidence that each and every step of method claim 26 is performed. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed Cir. 1993); *see also Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1307 (Fed. Cir. 2012).

The district court erred in finding that "Lawson took all steps necessary to perform the steps of Claim 26." A73. The first four limitations of claim 26 require:

1. maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;

2. selecting the product catalogs to search;

3. searching for matching items among the selected product catalogs;

4. building a requisition to generate one or more purchase orders for the selected matching items[.]

A246–247. The undisputed evidence at the contempt hearing, however, showed that Lawson did not perform each of these elements merely by selling Configuration Nos. 3 and 5, nor did users of RQC-containing configurations perform each step.

Rather than relying on the theories of infringement it presented at trial, at the contempt hearing ePlus proffered two *new* infringement theories through its expert, Dr. Weaver. A7356–7357. In a contempt proceeding, however, infringement *must* be proven with a theory unambiguously "called out" at trial. *nCube*, 2013 WL 5567555, at *4–5 (declining to find infringement theory not specifically articulated at trial); *TiVo*, 646 F.3d at 882. At trial, ePlus did not prove either of the infringement theories it presented in the contempt proceeding.

The first new demonstration purported to show how RQC Configuration No. 5 could be used to infringe claim 26 via the procurement of items using Item Master and EDI alone, *without the use of Punchout* ("Item Master-EDI Path"). A7357; A5709:22–A5710:4; A5730:18–A5731:17. But, even if this theory was presented

47

to the jury, it was rejected and, thus, not "proved."  The jury found that Configuration No. 4, which contains both of the components needed to infringe under the new theory (Item Master and EDI) but *not Punchout*, did not infringe claim 26. A221.  The proper conclusion from this finding is that Item Master and EDI (without Punchout) cannot satisfy at least one limitation of claim 26.  In fact, at the infringement trial, the *only* configurations found to infringe claim 26 were those with Punchout (Nos. 3 and 5).  A220–221; A5731:10–17.

Dr. Weaver's first new demonstration also failed to perform the second element of claim 26, "selecting the product catalogs to search."  As the video, screenshots, and testimony describing this demonstration made clear, he searched for *items*—not according to vendor catalogs he selected—in Item Master, but by using UNSPSC categories.  A7357; A7358–7408; A5657:8–20.  Indeed, on cross-examination, Dr. Weaver conceded that using UNSPSC would not allow one to search only items from a specific vendor.  A5720:18–5721:25 (Dr. Weaver admitting that in performing his contempt demonstration, he "practiced elements two and three simultaneously").

ePlus's second new infringement theory purported to demonstrate how Configuration Nos. 3 and 5 could be used to perform all the steps of claim 26 by procuring items from a single Punchout website.  A7356; A5675:5–5682:24; A5743:15–18; A5745:20–23.  ePlus never contended to the jury that method claim

26 could be infringed via procuring items from one Punchout website (*e.g.*, Staples) (*see* A7356) at the underlying trial.  A1289:9–17; A1334:22–1335:9.  Accordingly, a finding of contempt based on this theory also cannot stand.  *See nCube*, 2013 WL 5567555, at *5 ("The problem is that ARRIS never relied on the MAC address at trial to prove infringement.  Rather, ARRIS relied on the ClientID to prove infringement, but never called out the MAC address as the infringing aspect of that element.").  ePlus actually distinguished its patent from the prior art by stressing the critical capacity of the Lawson system to combine items from multiple Punchout vendors (or from Item Master and a Punchout vendor) on a single requisition.  A1288:16–1289:17.  That is not possible with RQC.

Dr. Weaver's second demonstration also did not perform all elements of claim 26.  The first limitation of claim 26 requires "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources."  A246–247.  The catalogs searched and the items eventually selected from such search must come from "at least two product catalogs" "maintained" on "a database."  *Id.*  But Dr. Weaver conceded that catalogs available on Punchout sites are not "maintained" by the user (or Lawson), but by the Punchout vendor itself.  A5736:18–5737:8; A5739:20–5740:22.

The fatal flaw in both of ePlus's new demonstrations is that they were not presented to the jury at the infringement trial.  Rather than invoking the contempt

power, ePlus could have initiated a *new* infringement action in which it could have developed new theories such as these. *Arbek Mfg. Inc. v. Moazzam*, 55 F.3d 1567, 1570 (Fed. Cir. 1995) (where the redesigned product is significantly different from the original, "the modifying party generally deserves the opportunity to litigate the infringement questions at a new trial"). Because ePlus chose the contempt route, it was limited to proving infringement with the same theory it "stressed" at trial. *nCube*, 2013 WL 5567555, at *5. Dr. Weaver's new demonstrations could not establish contempt because they were not presented to the jury; and they are legally insufficient in any event because they do not show that every limitation of claim 26 is practiced by users of the redesigned products.

ePlus therefore failed to meet its burden of proving actual infringement by clear and convincing evidence. *TiVo*, 646 F.3d at 879. The evidence it presented at the contempt hearing is insufficient as a matter of law to support a finding of contempt, a form of relief limited to cases where the violation is so clear as to warrant summary proceedings. *Id.* at 881–82 (quoting *Cal. Artificial Stone Paving*, 113 U.S. at 618).

## C. Lawson Fully Complied With The Injunction With Respect To RSS

Ostensibly in the alternative to its findings related to Lawson's redesigned products with RQC (which for obvious reasons were the focus of the contempt hearing), the district court also held Lawson in contempt of the injunction with re-

spect to its original products with RSS.    A79–80.    This too was erroneous and should be reversed.[*]

The district court held Lawson in contempt for "[1] instructing (and permitting) its employees and agents to continue to service the Infringing Configurations and [2] deliberately instructing its customers on how to continue to use RSS, even after the RQC product had been released." A78–80.  It is undisputed, however, that following the injunction Lawson decommissioned RSS and *required* existing customers to download RQC or forgo support on their existing product.  A5831:9–13; A5769:6–5780:21; A5766:14–17; A7333–7350.  The district court did not even mention this compliance in its contempt order.

ePlus did not offer any proof that any customer performed method claim 26 with an RSS configuration as a basis for contempt. And, regarding customer support, the district court identified only two customers purportedly "instructed" by Lawson on how to continue to run RSS after installing RQC, but *neither* of the customers had Configuration Nos. 3 or 5 and, thus, they could not perform method claim 26.  *Compare* A6717–6721, *with* A78; A5547; A5552–5553.  As a matter of law, it cannot be contumacious conduct to provide service on a product that never

---

[*] Despite the fact that it has long been in compliance with the injunction as to RSS, Lawson has now taken additional steps going well beyond those required by the injunction to demonstrate compliance as required by the contempt order.  A36–37. On September 20, 2013 it submitted a detailed report to the district court documenting each of these steps and confirming its full compliance with the court's injunction with respect to RSS.  A6749–6795.

infringed. *See Johns Hopkins*, 152 F.3d at 1366 ("judicial restraint of lawful non-infringing activities must be avoided"). Reliance on conduct unrelated to claim 26 was improper and exemplifies the district court's continued refusal to acknowledge the effect of this Court's decision reversing the infringement findings.

Moreover, the contempt sanctions could not be sustained on the basis of RSS-related conduct. Although ePlus showed no harm with respect to RQC- or RSS-related conduct, ePlus did not even *attempt* to calculate any remedy based on use of RSS, and thus the sanctions actually awarded pertained only to RQC. A5898:9–5899:4 (ePlus's expert Dr. Ugone acknowledging same).

\* \* \*

Contempt is to be used sparingly and only "where there is [no] fair ground of doubt as to the wrongfulness of the defendant's conduct." *TiVo*, 646 F.3d at 881–82 (quoting *Cal. Artificial Stone Paving*, 113 U.S. at 618); *see also KSM*, 776 F.2d at 1531–32. The convoluted contempt proceedings culminating in a 70-page order demonstrate that this was anything but a clear case. The district court's multiple legal errors require reversal of the determination that Lawson was in contempt of the May 23, 2011 injunction.

## III.    The Contempt Sanctions Should Be Reversed

The district court erred as a matter of law in awarding disgorgement untethered to any harm or loss to ePlus and in devising a coercive fine prohibiting a

broad undefined course of conduct. Thus, even if the Court could affirm the injunction and the contempt determination, it would at the very least have to reverse the contempt *sanctions*.

Remedies for civil contempt are restricted to those that (1) compensate an innocent party for the contemnor's wrongdoing, or (2) coerce a contemnor to comply with a court order in the future. *See Carbon Fuel Co. v. United Mine Workers of Am.*, 517 F.2d 1348, 1349 (4th Cir. 1975). Compensatory remedies may be retroactive, whereas coercive penalties are exclusively prospective. *Windsor Power House Coal Co. v. Dist. 6 United Mine Workers of Am.*, 530 F.2d 312, 316 (4th Cir. 1976). A sanction that fails to satisfy the criteria for compensatory and coercive sanctions is tantamount to a criminal contempt finding (*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 837–38 (1994)), and such sanctions may not be levied absent additional safeguards not afforded here (*id.* at 833; *Young v. United States. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798–99 (1987)).

## A.    There Was No Basis For An Award Of "Disgorgement"

"Where compensation is intended, a fine is imposed, payable to the complainant." *United Mine Workers*, 330 U.S. at 304 (citation and footnote omitted). Such fine, which is not intended to punish a contemnor, "must of course be based upon evidence of complainant's actual loss." *Id.*; *Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 903 F.2d 1568, 1579 (Fed.

Cir. 1990); *Bradley v. Am. Household Inc.*, 378 F.3d 373, 378 (4th Cir. 2004); *Windsor Power House Coal*, 530 F.2d at 317.  The court erred in awarding "disgorgement" to ePlus in the absence of any showing of harm or loss and in failing to properly apportion Lawson's profits.

1.  While the district court purported to award disgorgement as a "compensatory" civil remedy (A87), the $18 million award it issued was not connected to any showing of actual pecuniary loss or harm on the part of ePlus during the contempt period.  ePlus did not even *attempt* to prove harm.  ePlus did not introduce evidence of a single lost sale, and ePlus's damages expert conceded that he did not consider:   (1) any market share data from on or after the date of the injunction; (2) any information about ePlus's post-injunction profits;  (3) any data regarding ePlus's post-injunction sales; or (4) whether ePlus tried to win any of the business from Lawson's customers that was ultimately disgorged to ePlus.  A5887–5888.

Indeed, the evidence established, via the admitted deposition testimony of ePlus's corporate representative, that ePlus suffered no harm whatsoever from Lawson's activities following the injunction's issuance, having never so much as attempted to make any of the sales for which the district court disgorged profits. A4283–4284; A4285; A4288.  At the direction of counsel, ePlus's expert did not even *try* to put forth a lost profits or a reasonable royalty calculation.  A5886–5891.

The district court nevertheless held that "disgorgement is a measure by which the Court can determine compensatory damages for contumacious behavior *where actual damages have not been shown*." A87 (emphasis added). On that basis, the court ordered disgorgement of 100% of Lawson's profits to a peripheral player controlling less than 1% of the e-procurement market (*see* A7414–7416; A7443; A7455–7456), which could at best be expected to have secured 1% of Lawson's sales if Lawson had exited the market. *Cf. State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576–79 (Fed Cir. 1989) (calculating lost profits based on market share where multiple competitors in market). The disgorgement award was thus a windfall to ePlus, the antithesis of "compensatory," and therefore contrary to law. *See United Mine Workers*, 330 U.S. at 304; *Spindelfabrik*, 903 F.2d at 1579.

The district court relied on *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448 (1932), where the Supreme Court held that in a civil contempt action predicated on patent infringement, "profits are recoverable not by way of punishment but to insure full compensation to the party injured." *Id.* at 455–56. At that time, however, disgorgement was an available compensatory remedy for patent infringement in the first instance. Rev. Stat. § 4921, as amended, 42 Stat. 392 (1922). The Patent Act was amended in 1946 to remove disgorgement as an available remedy for patent infringement. *See Aro Mfg. Co. v. Convertible Top Re-*

*placement Co.*, 377 U.S. 476, 507 (1964) (distinguishing disgorgement from "damages"). While some courts have assumed with little analysis that disgorgement is a permissible remedy in the patent infringement contempt context without any showing of harm, the better reasoned view is that a remedy that exceeds plaintiffs' actual loss constitutes punishment, which is not permitted in civil contempt proceedings. *See TiVo Inc. v. Dish Network Corp.*, 655 F. Supp. 2d 661, 665 (E.D. Tex. 2009).

ePlus used the contempt proceeding to make an end run around the statutory preclusion of disgorgement as an available remedy for patent infringement. This maneuver allowed ePlus to recover a windfall that it could not have received had it proved infringement to a jury. Because a disgorgement award untethered to any showing of actual loss cannot be considered compensatory, and because ePlus made no showing of actual loss whatsoever before the district court, the district court erred in awarding an $18 million disgorgement sanction.

2. The district court also failed to factor in the challenged configurations' substantial non-infringing uses, which affects the manner in which profits should be accounted for and fully apportioned. Instead, the district court ordered disgorgement of *all* of Lawson's profits associated with the challenged configurations. A107. As discussed above, Configuration Nos. 3 and 5 perform many functions entirely independent of the method allegedly covered by claim 26. Indeed,

Configuration Nos. 3 and 5 are identical to the non-infringing Configuration No. 2 except that they also include the additional Punchout modules (and, in the case of Configuration No. 5, EDI).

And because the allegedly infringing *feature* did not drive demand for the *product*, any monetary remedy should have been apportioned to represent only the value of the patented feature. *See Rite-Hite Corp v. Kelley Co., Inc.*, 56 F.3d 1538, 1566–67 (Fed. Cir. 1995); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 614–15 (1912). ePlus never argued, and the district court never found, that the incremental feature that allegedly allows the challenged configurations to practice claim 26 (Punchout) drives sales. Indeed, ePlus argued just the opposite in prior briefing to the district court, justifying its initial injunction request through reliance on testimony from Lawson's employees that "Procurement Punchout does not drive S3 sales," and "Lawson has never won a sale merely because of its Punchout product." A733.

The district court's failure to account for these undisputed facts in calculating the "disgorgement" amount demonstrates that this sanction, far from being "compensatory," in fact punishes Lawson for engaging in lawful activity. It therefore violates the Due Process Clause and basic principles of civil contempt.

## B.     The "Coercive" Fine Exceeded The District Court's Authority

"Coercive" contempt remedies are available "to compel future compliance with a court order ... only if the contemnor is afforded an opportunity to purge" through compliance. *Bagwell*, 512 U.S. at 827–29 ("once … obeyed, the future ... daily fines are purged").

A court may award a prospective fine only to coerce affirmative, specific acts, not to prohibit sweeping categories of conduct such that "determining compliance becomes much more difficult." *Bagwell*, 512 U.S. at 843 (Scalia, J., concurring). Orders may coerce compliance only upon "a discrete command, observance of which is readily ascertained." *Id.* at 843. Thus, "[t]he paradigmatic coercive, civil contempt sanction[s]" condition prospective penalties on the failure to perform *easily identifiable and affirmative acts*, such as requiring a contemnor to "pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance." *Id.* at 828 (quotation omitted). Complex prohibitory injunctions are unsuitable for coercive enforcement. *Id.* at 837–38 (overturning coercive fines because, *inter alia*, the "contumacy [did not] involve simple, affirmative acts, such as the paradigmatic civil contempts examined in *Gompers*"); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442–43 (1911).

Here, the district court's vague coercive fine order is not aimed at compelling compliance with an easily ascertainable, affirmative act (as this entire pro-

ceeding establishes).  Rather, the award levies "a fine of $ 62,362 per day for every day that Lawson remains in contempt" unless "Lawson demonstrates ... that it is in compliance with the injunction."  A106.  The specific conduct to be "coerced" is not defined in the order and leaves open whether Lawson is prohibited from redesigning its products to avoid infringement, whether Lawson must somehow force its customers to uninstall Punchout, and how Lawson is expected to "demonstrate" compliance by proving a negative.  This case is a far cry from the "paradigmatic civil contempts" where it is facially evident to a contemnor what he must do to avoid sanctions.  *Bagwell*, 512 U.S. at 837.

The district court even acknowledged this problem at oral argument.  *See* A6646:22–6647:22 ("THE COURT:  How do we know when they come into compliance? ....  I don't know that that's necessarily going to work.").  Without explanation, the court changed course in its contempt order and imposed the coercive sanction anyway.  ePlus's recent letter to the district court contesting Lawson's compliance with the RSS portion of the injunction—notwithstanding Lawson's submission of a detailed declaration outlining the extreme lengths to which it has gone to ensure complete compliance—demonstrates precisely why a coercive fine is particularly ill suited to this case.  A6749–6795; A6796–6798.

The district court also miscalculated the prospective fine.  The court repeatedly indicated its intention to tether the coercive fee to Lawson's *incremental* daily

profits.  A6742 n.4 ("daily incremental profit of $62,362"); A6743 (coercive "fine equal to the daily incremental profit"); *id.* ("The coercive remedy is directly linked to the daily incremental profit that Lawson gained from the consequences of its contempt").  But $62,362 is not Lawson's daily profit, and no party has ever claimed it is.  Indeed, the court adjudicated Lawson's daily incremental profit to be $24,850, the profit figure that ePlus's expert posited.  A95.  Because the district court assessed a coercive fee 250% higher than this sum, it amounts to a punitive fine that was beyond the district court's authority to levy.

*   *   *

The contempt sanctions awarded here are literally unprecedented.  The district court cited no case, and we know of none, in which "disgorgement" was awarded to a patentee who suffered no damages from the complained-of conduct.  Nor did the court cite any case, and again we know of none, in which a coercive fine was levied to compel compliance with a multi-faceted injunction of considerable complexity.  Contempt is reserved for clear cases; if the record of these proceedings proves anything, it is that this is not such a case.

## CONCLUSION

The order reimposing the injunction should be reversed and the contempt order vacated as moot.  In the alternative, the contempt order should be reversed.

Dated:  October 22, 2013

Respectfully submitted,

By: _____/s/ Mark A. Perry_____

Josh A. Krevitt
Daniel J. Thomasch
Richard W. Mark
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
(212) 351-4000

Donald R. Dunner
Erika H. Arner
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
(202) 408-4000

Mark A. Perry
  *Principal Attorney*
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
T:  (202) 955-8500
F:  (202) 467-0539
mperry@gibsondunn.com

*Attorneys for Defendant-Appellant Lawson Software, Inc.*

61

# ADDENDUM

# TABLE OF CONTENTS

Order Modifying the Order of Injunction Entered on May 23, 2011 (June 11, 2013) (Dkt. 1083) ....................................................................A1

Memorandum Opinion (June 11, 2013) (Dkt. 1082) ..............................................A6

Contempt Order (Aug. 16, 2013) (Dkt. 1088) ......................................................A36

Memorandum Opinion (Aug. 16, 2013) (Dkt. 1087) ...........................................A38

U.S. Patent No. 6,023,683 (Feb. 8, 2000)...........................................................A227

35 U.S.C. § 271 .............................................................................................. A248-1



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ePLUS INC.,

    Plaintiff,

v.                                Civil Action No.3:09cv620

LAWSON SOFTWARE, INC.,

    Defendant.

**ORDER MODIFYING THE ORDER
OF INJUNCTION ENTERED ON MAY 23, 2011**

Pursuant to the mandate of the United States Court of Appeals for the Federal Circuit, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that the injunction in this matter, entered by ORDER dated May 23, 2011 (Docket No. 729), is modified by deleting from its scope the product defined in sub-paragraph 1 on page 2 of the Order, colloquially known as "Configuration 2," and specifically being identified in the Injunction Order as Lawson's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules) and Requisition Self-Service or "RSS." The injunction ORDER, a copy of which is attached hereto, shall remain in effect in all other respects.

Consistent with the provision of the injunction, it is further ordered that Lawson shall provide all customers of the Infringing Products and Services a copy of this Order.

It is so ORDERED.

<table>
<tr><td></td><td>/s/ <i>REP</i></td></tr>
</table>

Richmond, Virginia          Robert E. Payne
Date: June 11, 2013        Senior United States District Judge

**A1**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**



FILED

MAY 23 2011

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

ePLUS, INC.,

     Plaintiff,

v.                        Civil No. 3:09cv620

LAWSON SOFTWARE, INC.

     Defendant.

### ORDER

This matter having been brought before the Court by Plaintiff ePlus, Inc. ("ePlus") for an Order, and the Court having considered the moving papers, all opposition thereto, and the arguments of counsel, and the Court having found that:

   (1)   absent an injunction against infringement, ePlus will suffer an irreparable injury;

   (2)   remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

   (3)   an injunction against the Defendant will not materially harm the Defendant, and in any event, considering the balance of hardships between the Plaintiff and Defendant, the balance tips decidedly in favor of an injunction;

   (4)   the public interest will be best served by a

**A2**

permanent injunction; and

(5) a permanent injunction is appropriate under 35 U.S.C. § 283,

it is hereby ORDERED that the Defendant, Lawson Software, Inc. ("Lawson"), including its officers, directors, agents, servants, employees, subsidiaries, affiliates, successors in interest, and attorneys, and any person in active concert or participation with them, are permanently enjoined from directly or indirectly making, using, offering to sell, or selling within the United States or importing into the United States any of the following product configurations and/or installation, implementation, design, configuration, consulting, upgrade, maintenance and support and training and other related and associated services and any colorable variations thereof (the "Infringing Products and Services"):

(1) Lawson's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules) and Requisition Self-Service or "RSS";

(2) Lawson's Core S3 Procurement System (LSF/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules), RSS,

A3

and Punchout;

(3) Lawson's Core S3 Procurement System (LSF/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules), RSS, Punchout, and Electronic Data Interchange or "EDI," and

(4) Lawson's M3 e-Procurement Software.

In addition, Lawson is enjoined from:

(1) Circulating, publishing or disseminating within the United States any literature or information that encourages the use, sale or importation of any of the Infringing Products and Services; and

(2) Aiding and abetting, actively inducing, or in any way contributing to the making, use, sale or importation of any of the Infringing Products and Services within the United States. This injunction extends to the provision of any instruction, encouragement, installation, implementation, maintenance or support for any of the Infringing Products and Services.

It is further ORDERED that Lawson, including its officers, directors, agents, servants, employees, subsidiaries, affiliates, successors in interest, and attorneys, and any person in active concert or

participation with them, are required to notify all customers who have purchased all or any of the Infringing Products and Services of the terms of this Order, and to provide said customers with a copy of this Order.

It is further ORDERED that this injunction is to remain in effect until the expiration of both the '683 Patent and the '172 Patent, the latest of which is to expire on February 8, 2017.

It is further ORDERED that, with respect to Lawson's installation, implementation, design, configuration, consulting, upgrade, maintenance, support, training, and other related and associated services for the 277 customers who previously purchased the adjudicated infringing systems detailed above before the verdict and who provide only healthcare services, this Order will not take effect until November 23, 2011.

It is so ORDERED.

_____/s/_____   REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 23, 2011
4:45 PM



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ePLUS INC.,

     Plaintiff,

v.                              Civil Action No. 3:09cv620

LAWSON SOFTWARE, INC.,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the mandate, on remand, of the United States Court of Appeals for the Federal Circuit, instructing this Court "to consider what changes are required to the terms of the injunction consistent with this opinion"[1] and on defendant Lawson Software, Inc.'s ("Lawson") MOTION PURSUANT TO FED. R. CIV. P. 60 TO DISSOLVE OR MODIFY THE MAY 23, 2011 INJUNCTION (Docket No. 1011). For the reasons and to the extent set forth below, the injunction will be modified and Lawson's MOTION PURSUANT TO FED. R. CIV. P. 60 TO DISSOLVE OR MODIFY THE MAY 23, 2011 INJUNCTION (Docket No. 1011) will be denied.

## PROCEDURAL BACKGROUND

ePlus, Inc. ("ePlus") filed this action against Lawson for infringement of three patents: U.S. Patent Nos. 6,023,683 (the "'683 Patent"), 6,055,516 (the "'516 Patent"), and 6,585,173

_____

[1] *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 523 (Fed. Cir. 2012).

(the "'172 Patent"). Following a three week trial, a jury determined that the '683 Patent and '172 Patent were infringed and it found that the '562 Patent was not infringed. The jury further found that all asserted claims of the patents-in-suit were valid. On May 23, 2011, the Court issued a permanent injunction enjoining Lawson, its officers, agents, and employees and "any person in active concert or participation with them" "from directly or indirectly making, using, offering to sell, or selling within the United States or importing into the United States" certain product configurations (so-called Configurations Two, Three, and Five) and services. (Docket No. 729).

Lawson appealed to the United States Court of Appeals for the Federal Circuit and ePlus cross-appealed. On November 21, 2012, the Court of Appeals issued its decision reversing-in-part, vacating-in-part, affirming-in-part and remanding the action. In its decision, the Court of Appeals found that claim 1 of the '172 patent and claim 3 of the '683 patent were invalid for indefiniteness. ePlus, Inc., 700 F.3d at 519-20. The Court of Appeals also held that claims 28 and 29 of the '683 patent were not "supported by substantial evidence" and vacated the judgment of infringement as to those claims. Id. at 521-22. The Court of Appeals, however, affirmed the finding of infringement as to claim 26 of the '683 patent and affirmed the breadth of the injunction (namely, that Lawson was enjoined from "servicing

**A7**

and maintaining products sold before the injunction issued"). Id. at 520, 522. Lawson had argued that, because "damages [were] not an issue in this case," Lawson should not have been enjoined from "servicing and maintaining products sold before the injunction issued." Id. at 522. The Federal Circuit noted that, although there was authority for the proposition that a company should be permitted to service products sold "free of liability," in this case it was a result of "the district court's enforcement of discovery rules [that] ePlus was not permitted to present any evidence of damages." Id. The Federal Circuit noted "that does not mean that Lawson was authorized to sell products that infringe ePlus's patent," and affirmed the scope of the injunction. Id. The Court of Appeals, then, remanded the action for this Court "to consider what changed are required to the terms of the injunction, consistent with this opinion." Id. at 523.

By Order dated November 27, 2012 (Docket No. 981), the parties were ordered to file statements of position setting forth their views as to the effect of the Federal Circuit's opinion on how the injunction should be modified. ePlus filed its statement on December 10, 2013 (Docket No. 985); Lawson filed its statement on December 27, 2012 (Docket No. 990); and ePlus filed a reply on January 7, 2013 (Docket No. 993).

On December 21, 2012, ePlus filed a petition for rehearing and rehearing en banc, the effect of which was to stay issuance of the mandate. Thereafter, Lawson took the view, with which the Court agreed, that the Court was without jurisdiction to modify the injunction until the Court of Appeals had issued its mandate. The petition for rehearing and rehearing en banc was denied on January 29, 2013. The mandate was received February 5, 2013 (Docket No. 1006).

All the while, the parties were engaged in discovery and briefing respecting contempt proceedings that ePlus had initiated because of Lawson's alleged violations of the injunction. Additionally, on February 7, 2013, the lead counsel for ePlus suffered a fatal heart attack, and thereafter proceedings were slowed for a while.

In a telephone conference held on March 14, 2013, both parties were asked whether they intended to offer evidence respecting modification of the injunction. Both parties declined to offer evidence.

Subsequently, Lawson filed its MOTION PURSUANT TO FED. R. CIV. P. 60 TO DISSOLVE OR MODIFY THE MAY 23, 2011 INJUNCTION (Docket No. 1011). An opposition (Docket No. 1027) and reply (Docket No. 1031) thereto were filed. Oral argument was held on April 9, 2013 (Tr. at Docket No. 1056).

**A9**

## DISCUSSION

Lawson argues that the appropriate analysis is for the Court to ask whether it would have issued the injunction if the state of the case had been then what it is following the Federal Circuit's decision. If the Court concludes that an injunction would not have been appropriate, says Lawson, the Court should dissolve the injunction ab initio. Lawson Reply (Docket No. 1031) at 6-7 ("In light of these changed circumstances, the Court must go back and consider on the existing record whether an injunction could even issue based on the single remaining method claim."). In the alternative, Lawson argues that the current record does not support a continuation of the injunction as to the remaining claim.

ePlus takes the view that the Court should enter an order stating that the injunction "remains in full force and effect, with the lone exception that the injunction no longer applies to Configuration 2." Pl. Br. in Opp. (Docket No. 1027) at 1. ePlus also argues that the so-called "mandate rule" prohibits the Court from reevaluating the propriety vel non of the injunction. Id. at 4. Instead, ePlus maintains that the Court should simply accept the affirmance of the injunction as to all areas in which it would not be inconsistent with the Federal Circuit's decision and issue an order clarifying that the injunction does not apply

5

**A10**

to those configurations for which the finding of infringement was vacated.

## The Mandate Rule

"Few legal concepts are as firmly established as the doctrine that the mandate of a higher court is controlling as to matters within its compass." United States v. Bell, 5 F.3d 64, 66 (4th Cir. 1993). The so-called "mandate rule" is "nothing more than a specific application of the 'law of the case' doctrine." Piambino v. Bailey, 757 F.2d 1112, 1120 (11th Cir. 1985). When appellate courts have "executed their power in a cause before them, and their final decree or judgment requires some further act to be done, [they] cannot issue an execution, but shall send a special mandate to the court below to award it." Sibbald v. United States, 37 U.S. 488, 492 (1838). The Supreme Court in Sibbald went on to declare that:

> Whatever was before the [appellate court],
> and is disposed of, is considered as finally
> settled. The inferior court is bound by the
> decree as the law of the case; and must
> carry it into execution, according to the
> mandate. They cannot vary it, or examine it
> for any other purpose than execution; or
> give any other or further relief; or review
> it upon any matter decided on appeal for
> error apparent; or intermeddle with it,
> further than to settle so much as has been
> remanded.

Id. If the lower court "mistakes or misconstrues the decree of [the appellate] court, and does not give full effect to the

6

**A11**

mandate, its action may be controlled, either upon a new appeal . . . or by a writ of mandamus to execute the mandate of [the appellate] court." In re Sanford Fork & Tool Co., 160 U.S. 247, 255 (1895). However, the lower court "may consider and decide any matters left open by the mandate of [the appellate] court; and its decision on such matters can be reviewed by a new appeal only." Id. at 256. And, of course, "the opinion delivered by [the Court of Appeals], at the time of rendering its decree, may be consulted to ascertain what was intended by its mandate; and, either upon an application for a writ of mandamus, or upon a new appeal, it is for [that] court to construe its own mandate, and to act accordingly." Id. These well-settled principles control the issues now ripe for decision.

On November 21, 2012, the Federal Circuit issued its decision in this case. ePlus, Inc. v. Lawson Software, Inc., 700 F.3d 509 (Fed. Cir. 2012). That opinion provided that the action was being remanded "for the district court to consider what changes are required to the terms of the injunction consistent with this opinion." Id. at 523. That mandate must be viewed in perspective of the fact that the Court of Appeals upheld the injunction against Lawson's argument that it was "too broad." Id. at 522. That contention must be assessed in perspective of the fact that, on appeal, Lawson argued that the injunction should not have prevented it from "servicing and maintaining

products sold before the injunction issued." Id. The Court of Appeals disagreed finding that the scope of the injunction did not constitute "abuse of discretion." Id.

Compliance with the mandate also must take into account that, on appeal, Lawson also argued that the Court erred in entering a permanent injunction relating to claim 26 of the '683 patent. See generally Brief for Defendant-Appellant Lawson Software at 41, ePlus, Inc. v. Lawson Software, Inc, No. 2011-1396 (Fed Cir. 2012) ("The district court abused its discretion in entering a permanent injunction and denying JMOL of noninfringement of Claims 26, 28, and 29 of the '683 patent."). The Federal Circuit explicitly upheld the finding of infringement as to claim 26 of the '683 patent. ePlus, 700 F.3d at 521 ("[W]e affirm the district court's denial of JMOL of non-infringement with respect to the jury's verdict of direct and induced infringement of claim 26.").

Considering that the Federal Circuit affirmed the judgment of direct and indirect infringement of Claim 26, rejected Lawson's challenge to the breadth of the injunction, and held that "[t]o the extent that we have not addressed any of the parties' arguments on appeal or cross-appeal, we have determined them to be unpersuasive," it is rather clear that the Court of Appeals affirmed the decision to issue the injunction. Moreover, in explicitly rejecting Lawson's argument that the injunction is

overbroad, the decision per force affirms the entry of the injunction in the first place. That is further confirmed by the Federal Circuit's instruction to consider, on remand, "what changes are required to the terms of the injunction" consistent with its opinion. Id. at 523. Rather clearly, that instruction presupposes the affirmance of the injunction that is to be modified. The question, then, is for the Court to determine "what was intended by [the] mandate." In re Sanford Fork & Tool Co., 160 U.S. at 256.

According to ePlus, the Court is simply without authority to revisit the propriety vel non of the injunction and, instead, is limited by the mandate rule to adjusting the scope of injunction to exclude those configurations for which the judgment of infringement was vacated. See ePlus Br. in Opp. at 4. In response, Lawson argues that "fresh consideration of the injunction must occur because of the Federal Circuit mandate." Lawson Reply at 2. While ePlus' argument rests on a fairly straightforward interpretation of the mandate rule (i.e., that because remand was only to consider the "terms" of an otherwise-affirmed injunction, the Court must limit the scope of its review to the terms of an injunction that must continue to exist), Lawson seems to conflate the Court's obligation under the mandate with the provision of Fed R. Civ. P. 60(b)(5) that permits the Court prospectively to alter an injunction.

As Lawson correctly contends, requests to modify injunctions generally ask "whether changes in conditions after entry of the injunction warrant[] revision of the restraints originally imposed." Lawson Reply at 3; see also United States v. Swift & Co., 286 U.S. 106, 114 (1932) ("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions."). However, says Lawson, the Federal Circuit mandate "requires the Court to address the remedy question with the premise that the jury returned an infringement verdict as to method claim 26 only." Lawson Reply at 3. In other words, Lawson argues that this Court must retrospectively determine whether it would have entered the injunction if the circumstances had then been as they are now.[2] The parties agree, as they must, that some portion of the injunction must be eliminated, retrospectively, under Fed. R. Civ. P. 60(b)(5), as being based on "an earlier judgment that has been reversed or vacated." The dispute regards the portions of the injunction that were not reversed or vacated by the

---

[2] There is no question that Lawson's end goal is for the Court to conclude that the injunction was invalid ab initio. Such a decision would inevitably affect the on-going contempt proceedings as, of course, a finding of civil contempt is necessarily predicated on "the existence of a valid decree." Ashcraft v. Conoco, Inc., 218 F.3d 288, 301 (4th Cir. 2000); see also (Tr. of Motions Hearing (Docket No. 1052) at 4:5-8 (Mr. Thomasch: "Because this is a civil contempt case and not a criminal contempt case, Lawson cannot be considered in contempt of anything other than an injunction that's in force.")).

Federal Circuit's decision, viz. as it pertains to Claim 26 of the '683 patent.

During oral argument and in its briefing, Lawson placed principal reliance on the decision of the Federal Circuit in Amado v. Microsoft Corp., 517 F.3d 1353 (Fed. Cir. 2008). However, the principles elucidated in Amado counsel strongly against accepting Lawson's position here. In Amado, following a jury verdict of infringement, the district court entered a permanent injunction, which was stayed pending resolution of the appeal. See 527 F.3d at 1356 (discussing the background of the case). On appeal from the final judgment, the Federal Circuit affirmed the district court "in all respects" and remanded to determine the distribution of funds in an escrow account. Amado v. Microsoft Corp., 185 F. App'x 953 (Fed. Cir. 2006) ("Amado I"). On remand, however, the district court was faced with a motion to reconsider the previously issued (and affirmed) permanent injunction in perspective of the intervening decision of the Supreme Court of the United States in eBay, Inc. v. MercExchange, LLC, 547 U.S. 388 (2006).

Upon review, the district court dissolved the injunction (which had remained stayed through the initial appeal and the district court's further consideration). See Amado, 517 F.3d at 1356. The plaintiff appealed, arguing inter alia, that "the district court's original injunction order, which granted but

11

**A16**

stayed the injunction, was incorporated into the mandate in
Amado I, thus depriving the district court of authority either
to extend the stay or dissolve the injunction." Id. at 1357. In
addressing the applicability of the mandate rule, the Federal
Circuit noted that, while the propriety of the injunction was
not directly before it during Amado I, because the appeal had
been from a final judgment which "expressly noted that a
permanent injunction . . . had been entered," and because the
defendant had failed to challenge the propriety of the
injunction in the initial appeal, "the mandate rule operates as
a bar to the district court's reconsideration of the initial
issuance of the injunction." Id. at 1360. However, "there is a
fundamental difference . . . between the granting of
retrospective relief and the granting of prospective relief."
Id. The Court of Appeals explained, "while the mandate rule
would prevent the district court from dissolving the injunction
ab initio, it does not preclude the district court from
modifying, or dissolving, if it determines that it is no longer
equitable." Id. (emphasis added). The Court of Appeals held
that, both under the principles of equity that undergird
injunctions as well as under the explicit language of Fed. R.
Civ. P. 60(b)(5), the district court is free to "reconsider the
prospective application of the permanent injunction on remand,"
id., even though it was not permitted to dissolve it ab initio.

12

**A17**

Thus, _Amado_ quite clearly stands for the proposition that, if the grant of the injunction "was within the scope of the judgment appealed from," and that judgment is, in relevant part, affirmed, then the mandate rule "would prevent the district court from dissolving the injunction _ab initio_." _Id._ at 1360. Indeed, if the Federal Circuit had intended this Court to revisit the propriety _vel non_ of the injunction, it certainly would have given such an instruction, as it, indeed, has done in other cases. _See e.g._ _Edwards Lifesciences AG v. CoreValue, Inc._, 699 F.3d 1305, 1316 (Fed. Cir. 2012)("The judgment of the district court is affirmed, with the exception that we remand for reconsideration by the district court, in view of changed circumstances, of the court's rulings on the permanent injunction and the protective order."); _Fresenius USA, Inc. v. Baxter Int'l., Inc._, 582 F.3d 1288, 1304 (Fed. Cir. 2009) ("In addition, although we hold that the district court did not abuse its discretion when it permanently enjoined Fresenius, we vacate the injunction and remand so that the court may revise _or reconsider_ the injunction in light of the fact that only claims 26-31 of the ' 434 patent remain valid and infringed.")(emphasis added); _Acumed LLC v. Stryker Corp._, 483 F.3d 800, 811-12 (Fed. Cir. 2007) ("Accordingly, the permanent injunction is vacated. On remand, the district court should reconsider the four-factor test as propounded by the Supreme Court's decision in _eBay_ as to

13

**A18**

whether or not an injunction should issue."). The Federal Circuit gave no such instruction here. Here, the Federal Circuit's mandate is a clear instruction to modify the affirmed injunction to make it conform to the decision issued on appeal.

Under the mandate rule, the Court is prohibited from retrospectively dissolving the injunction as to issues that were affirmed by the Federal Circuit. Thus, the Court concludes that the "mandate rule" prohibits it from heeding Lawson's call to dissolve the injunction <u>ab initio</u>.

### Federal Rule of Civil Procedure 60(b)(5)

Having found that the mandate of the Federal Circuit does not require, and that, indeed, the "mandate rule" in fact forbids, the Court from retrospectively reassessing the propriety of an injunction in this action, it nonetheless remains necessary to determine whether the injunction remains prospectively appropriate. Lawson filed its motion pursuant to Fed. R. Civ. P. 60(b)(5), which provides, in relevant part, that

> On motion and just terms, the court may relieve a party . . . from a final judgment, order or proceeding, [where] the judgment . . . is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable.

Fed. R. Civ. P. 60(b)(5). The discretion of the Court to modify or dissolve the prospective effect of its equitable remedies is an inherent power of a court sitting in equity. <u>See</u> <u>Sys. Fed'n</u>

14

**A19**

No. 91, Ry. Emp. Dept., AFL-CIO v. Wright, 364 U.S. 642, 647 (1961) ("The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief.").

Because Rule 60 is a procedural rule, it is assessed "under the law of the particular regional circuit court where appeals from the district court would normally lie." Ashland Oil, Inc. v. Delta Oil Products Corp., 806 F.2d 1031, 1033 (Fed. Cir. 1986); see also W.L. Gore & Associates, Inc. v. C.R. Bard, Inc., 977 F.2d 558, 561 n.3 (Fed. Cir. 1992) ("In this procedural matter we look to the precedent of the Third Circuit, for the federal question of application of Rule 60(b) to provide relief from judgment is not exclusive to the Federal Circuit."). Accordingly, it is the law of the Fourth Circuit that applies to the Rule 60(b) analysis in this case.

"When confronted with any motion invoking [60(b)(5)], a district court's task is to determine whether it remains equitable for the judgment at issue to apply prospectively and, if not, to relieve the parties of some or all the burdens of that judgment on 'such terms as are just.'" Alexander v. Britt, 89 F.3d 194, 197 (4th Cir. 1996). The burden is on the party seeking relief to demonstrate "that a significant change in

15

**A20**

circumstances warrants revision of the" judgment. <u>Rufo v.</u>
<u>Inmates of Suffolk Cnty. Jail</u>, 502 U.S. 367, 383 (1992). There
are a number of factors that must be considered in determining
whether to modify or dissolve an injunction. These include:

> (1) the circumstances leading to entry of
> the injunction and the nature of the conduct
> sought to be prevented; (2) the length of
> time since entry of the injunction; (3)
> whether the party subject to its terms has
> complied or attempted to comply in good
> faith with the injunction; (4) the
> likelihood that the conduct or conditions
> sought to be prevented will recur absent the
> injunction; (5) whether the moving party can
> demonstrate a significant, unforeseen change
> in the facts or law and whether such changed
> circumstances have made compliance
> substantially more onerous or have made the
> decree unworkable; and (6) whether the
> objective of the decree has been achieved
> and whether continued enforcement would be
> detrimental to the public interest.

<u>Crutchfield v. U.S. Army Corps of Engineers</u>, 175 F. Supp. 2d
835, 844 (E.D. Va. 2001); <u>see also</u> <u>MicroStrategy, Inc. v.</u>
<u>Business Objects, S.A.</u>, 661 F. Supp. 2d 548, 553 (E.D. Va. 2009)
(citing <u>Crutchfield</u> for "the six factors the court should
consider in determining whether to dissolve the injunction").

Lawson made clear in oral argument that it is pursuing its
Rule 60 motion under the theory that the injunction "is based on
an earlier judgment that has been reversed or vacated" and,
therefore, must be dissolved. Fed. R. Civ. P. 60(b)(5); <u>see</u> (Tr.
at 1181:15-18 (THE COURT: "You are going under Rule 60(b)(5),

16

**A21**

the component that says, it has been based on an earlier judgment that has been reversed." MR. THOMASCH: "That is correct.")). Indeed, Lawson made clear that its "fundamental attack" under Rule 60 was its view that "this injunction needs to be dissolved _ab initio_." (Tr. at 1180:7-8). Lawson distinguished the assertion that it was primarily pursuing from the conventional "prospective application" prong of Rule 60(b)(5) which Lawson, correctly, described as

> [A]llow[ing] us to argue that even though the injunction on May 23rd, 2011, was properly granted, something has happened since then by way of new facts that we could bring to the Court's attention, and we would have a burden to show to the Court that those new facts justify the Court in amending or modifying or even dissolving the injunction on a prospective basis, because while it was appropriate when rendered, it became inappropriate in light of things.

(Tr. at 1180:11-19). Lawson specifically eschewed that theory of relief as its primary argument.

It is only as an "alternative argument" that Lawson argues for prospective relief from the injunction and then on the basis that there are substantial non-infringing uses of the configurations that remain following the Federal Circuit decision and that, as a result, an injunction cannot issue against their sale. See (Tr. at 1206:5-8 ("Because there are undeniably substantial non-infringing uses, . . . a method claim will not allow for an injunction against the sale of a

product.")). Under neither theory, and neither at argument nor in their papers, does Lawson structure its request under the Rule 60(b) analysis that is used in this circuit. The most obvious explanation is that Lawson is steadfastly seeking the dissolution of the injunction ab initio, relief which the Court already has concluded is barred by the "mandate rule" but which also prevents Lawson from conceding the validity of the injunction and challenging it prospectively. Nevertheless, in perspective of the Federal Circuit's decision, there is no question that the circumstances of the action have changed significantly and, insofar as some modification of the obviously necessary, it is appropriate to assess whether the continuation of the injunction is equitable under the changed circumstances.

As a result of the Order of March 12, 2013 (Docket No. 1019), the parties have presented their arguments regarding the dissolution of the injunction with reference to the four factor test set forth in eBay Inc. v. MercExchange, LLC, 547 U.S. 388 (2006) that governs the issuance of an injunction. At oral argument on Lawson's motion, the Court expressed concern that it has erred in so framing the issue. See (Tr. at 1179:7-9 (The Court: "Mr. Thomasch, I will tell you that after having done that, I have done considerable additional reading, and I'm not sure that that's correct.")). In truth, however, the four so-called eBay factors fall squarely within the first factor, ("the

18

**A23**

circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented,") and the fifth factor, (whether those circumstances have changed) of the Crutchfield analysis for a Rule 60(b)(5) modification. See Crutchfield, 175 F. Supp. 2d at 844. Accordingly, it is appropriate that the analysis of the prospective equitability of the injunction be informed by the eBay analysis.[3]

In eBay, the Supreme Court of the United States set forth a four-fact test to be met before a court may issue a permanent injunction. The moving party must show:

> (1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

---

[3] Both ePlus and Lawson declined the Court's invitation to hold an evidentiary hearing on the continuation of the injunction. See (Tr. of Conference Call on March 14, 2013 (Docket No. 1025) at 11:11-18). Lawson took the position that ePlus carried the burden of showing that an injunction was appropriate "solely on the findings of the infringement of method claim 26." (Id. at 10-20-22). ePlus took the position that the record was fully developed before the injunction initially issued (Id. at 12:3-8) and that, what is more, Rule 60(b)(5) placed the burden of production on Lawson. (Id. at 13:5-12). The latter point is, of course, true. See Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 383 (1992) ("[A] party seeking modification of a [judgment] bears the burden of establishing that a significant change in circumstances warrants revision of the [judgment].").

19

**A24**

eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006); Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1327 (Fed. Cir. 2008). In deciding ePlus' initial motion for a permanent injunction, the Court issued a lengthy opinion examining and applying the eBay factors to the situation that then existed. See Memorandum Opinion dated May 23, 2011 (Docket No. 728). That decision was substantially affirmed by the decision of the Federal Circuit, which affirmed the injunction that issued. At the same time, the Federal Circuit affirmed the judgment of infringement only as to one claim: claim 26 of the '683 patent.

The question before the Court at this stage, then, is whether the Federal Circuit's decision otherwise altered the circumstances undergirding the Court's analysis pursuant to eBay such that the prospective application of the injunction as to Claim 26 of the '683 patent is inequitable. Indeed, although the Court is uncertain whether the four-factor eBay test must be the appropriate test to apply to the continued application to an injunction that has, itself, been affirmed by the Court of Appeals but which was based on a judgment that has, in part, been reversed or vacated, it is not incompatible with the "principles of equity" that guide both eBay and the Court's authority to dissolve an inequitable injunction to reassess the continued propriety of the injunction in terms of the eBay factors. Compare eBay, 547 U.S. at 391 (finding that the four-

20

**A25**

factor test is guided by "well-established principles of equity") with Swift, 286 U.S. at 114 (recognizing that the power to alter an injunction was present "by force of principles inherent in the jurisdiction of the chancery").

In assessing the first eBay factor, irreparable harm to ePlus absent and injunction, the Memorandum Opinion of May 23, 2011 (Docket No. 728), found that ePlus and Lawson directly compete in the marketplace, that such competition "weighs heavily in favor of a finding of irreparable harm," and that ePlus "has shown lost sales and lost market share because of Lawson's infringement." Mem. Op. of May 23, 2011 at 12-22. The Court further found that Lawson's infringement had deprived ePlus of the ability to attract other customers by offering exclusive access to an innovative product, and that this factor also supported a finding of irreparable injury. Id. at 26-27. As a result of those factors, and others, the Court concluded the ePlus had "established that, without a permanent injunction, it will suffer irreparable injury." Id. at 33.

As to the second factor, "adequate remedy at law," the Court noted that "whether a patentee has an adequate remedy at law 'inevitably overlaps' with whether a patentee has suffered irreparable harm." Id. at 33 (quoting MercExchange, LLC v. eBay, Inc., 500 F. Supp. 2d 556, 582 (E.D. Va. 2007)). The Court further found that a "going forward royalty" could not be

21

**A26**

adequately determined as ePlus' other licenses "reflect[ed] unique considerations which defy quantification." Mem. Op. at 35. As a result, the Court concluded that ePlus had met its burden to demonstrate that it had no adequate remedy at law. Id. at 40. That finding remains valid for the same reasons that made it so in the first place.

The third factor, balance of hardships, required the Court to assess "the relative effect of granting or denying an injunction on the parties." i4i Ltd. v. Microsoft Corp., 598 F.3d 831, 862 (Fed. Cir. 2010). In its original injunction opinion, the Court found that, absent an injunction, "ePlus will continue to suffer irreparable harm." Mem. Op. at 40. The Court compared that fact with the finding that "an injunction will have little collateral effect on Lawson as a whole." Id. at 41. The Court found that the irreparable injury that ePlus would suffer tipped the balance of hardships in ePlus' favor when contrasted with the minimal impact on Lawson's business. Id. at 43.[4] Lawson offered no proof that the balance of hardships has changed, and the Court finds that it has not.

---

[4] The Court also noted that Lawson purported to be designing around the patent and therefore would suffer no harm at all. Id. at 42. Whether Lawson succeeded in the design around is at issue in the pending contempt proceedings and thus cannot be used in the irreparable harm analysis. But, even if Lawson did not succeed in that effort, the remaining findings still show that ePlus will suffer irreparable injury absent an injunction.

The fourth eBay factor requires the Court to consider the public interest. In that section of its analysis, the Court gave "considerable weight to the strong public interest favoring entry of injunctive relief to protect ePlus' patent rights." Id. at 44. However, recognizing the public interest implications, the Court created a "sunset provision" for Lawson's 277 "healthcare customers" to allow adequate time for healthcare customers to "transition to non-infringing systems." Id. at 48. The Court also recognized that customers of Lawson's infringing products would have access to non-infringing products. Id. at 47. As a result, the Court found that the public interest favored entering injunctive relief. Id. at 49. That finding remains valid.

On this record, it is clear that Lawson has not carried its burden to show that the foregoing findings as to the eBay factors are no longer viable or that continuing the injunction as to configurations infringing Claim 26 of the '683 patent is inequitable. In fact, the only change to those findings that Lawson identifies is that, as a result of the Federal Circuit's decision, only 150 Lawson customers would be affected by the injunction. Lawson Reply at 18. Lawson argues that this diminishes the Court's finding that ePlus suffered an irreparable injury because, says Lawson, there is insufficient evidence in the record to conclude that ePlus directly competed

23

**A28**

for those customers. Id. In response, ePlus emphasizes the Court's previous findings that ePlus is a small company and it argues that lost sales for even 150 customers constitutes irreparable harm. ePlus Opp. at 21; see also Mem. Op. of May 23, 2011 at 26 ("Consequently, though there may not be a large number of lost sales to Lawson's infringing software, due both to the fact that vendors compete against one another in secret generally and that ePlus is a relatively smaller vendor in the defined market, ePlus has put forth sufficient evidence of lost sales and lost market share to support a finding of irreparable harm."). The Court rejected Lawson's argument that ePlus had demonstrated an insufficient amount of lost sales in its original opinion. There is no reason to alter that conclusion here. Further, as ePlus correctly notes, the reduction in the number of affected Lawson customers also serves to shift the balance of hardships even more in ePlus' favor as the hardship to Lawson has, by its own admission, been substantially reduced. As ePlus notes, the Court's earlier finding that an injunction effecting a larger number of customers would have "little collateral effect on Lawson as a whole," augurs heavily in favor of the conclusion that an injunction effecting few fewer customers would have, at least, a similarly limited collateral effect. see Mem. Op. at 41; ePlus Opp. at 22.

At the very least, however, Lawson argues that the injunction cannot be continued as to the sale of the infringing configurations. Lawson argues that since Claim 26 of the '683 patent is a "method claim" the Court may not enjoin the sale of the configurations simply because they may be used to infringe ePlus' patent. See Mem. in Supp. at 5. As Lawson notes, mere sale of a product that can be used to perform an infringing act does not constitute "direct infringement." See e.g., Ormco Corp. v. Align Tech., Inc., 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed, not by the sale of the apparatus that is capable of infringing use."). ePlus responds that this is not a situation in which Lawson's infringement is predicated on mere sale. Opp. at 12. After all, the Federal Circuit observed that "there remains no serious dispute that Lawson's customers infringe claim 26" and "the record contains substantial evidence to show that Lawson itself infringes claim 26. In particular, there is evidence that Lawson installed, maintained, demonstrated, and managed the infringing systems for its customers." ePlus, Inc., 700 F.3d at 520-21. The Federal Circuit further found that there was sufficient evidence from which to find that Lawson both infringed claim 26 and induced its customers to infringe claim 26. Id. at 521. Further, as ePlus notes, Lawson appealed this Court's conclusion that there was sufficient evidence to view

25

**A30**

Lawson as a contributory infringer and, insofar as the Federal Circuit did not address that argument, it affirmed this Court's conclusion. See 700 F.3d at 523 n.2 ("To the extent that we have not addressed any of the parties' arguments on appeal or cross-appeal, we have determined them to be unpersuasive."). To that end, the Federal Circuit has affirmed that there was sufficient evidence from which to conclude that Lawson engaged in direct, indirect, and contributory infringement of ePlus' patent. Thus, this presents a case far from the mere sale of a product that can be used to infringe. The Federal Circuit has consistently upheld injunctions on the sale of products following findings of contributory and induced infringement. See e.g. i4i Ltd. v. Microsoft Corp., 598 F.3d 831 (Fed. Cir. 2010); MPT, Inc. v. Marathon Labels, Inc., 258 F. App'x 318 (Fed. Cir. 2007) (reversing an injunction as overbroad as to the location of sales, but affirming an injunction on the sale of a product that infringement on a method claim after a finding of willful inducement). On this record, the Court finds that, in perspective of the evidence that Lawson directly infringed, induced infringement, and contributorily infringed Claim 26 of the '683 patent that an injunction against the sale of the configurations used to so infringe is appropriate.

Lawson also argues that the sale of Configurations 3 and 5 cannot constitute contributory infringement because both

26

**A31**

configurations have substantial non-infringing uses. That, says Lawson, forecloses the prospective continuation of the injunction.

That contention is without merit. In i4i Ltd. v. Microsoft Corp., 598 F.3d 831, 850-51 (Fed. Cir. 2010), the Federal Circuit held that "a party is liable for contributory infringement if that party sells, or offers to sell, a material or apparatus for use in practicing a patented process." The jury received substantial evidence of contributory infringement. Lawson appealed both the inducement and contributory infringement verdict. The Federal Circuit affirmed the verdict as to the method of Claim 26 and held that Lawson induced infringement, ePlus, 700 F.3d at 520, and rejected all arguments not addressed in its opinion, id. at 723 n.2, which would include Lawson's argument that it did not contributorily infringe. Thus, Lawson's argument is foreclosed by the Federal Circuit's decision.

For the foregoing reasons, the Court concludes that the record established, and the findings made, in the Court's initial opinion granting injunctive relief continues to support ePlus' request to continue the injunction as to all configurations covered by Claim 26 of the '683 patent. Nothing in the Federal Circuit's decision undermined those conclusions and, for the foregoing reasons, the Court concludes that

27

injunctive relief remains appropriate and will deny Lawson's motion to dissolve the motion prospectively.

### The Changes to the Injunction

Having concluded that the mandate rule precludes the Court from retrospectively revisiting the injunction and that Lawson has not made an adequate showing to support the prospective dissolution of the injunction and that the eBay four-factor test continues to support the grant of injunctive relief based on the record presently before the Court, the question remains as the appropriate scope of the injunction at this point.

There is no doubt that the Federal Circuit mandate requires some modification to the terms of the injunction. The verdict can no longer support any injunction of those configurations no longer found to be infringing. Nevertheless, for the reasons set forth above, the injunction shall remain in force as to those configurations that infringe Claim 26 of the '683 patent. The jury found that Configurations No. 3 and No. 5 infringed that claim. See Verdict Form (Docket No. 600) at 2-3. Configuration No. 3 consists of Lawson's "Core S3 Procurement System (Lawson System Foundation/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules), Requisition Self-Service, and Punchout." Id. at 2. Configuration No. 5 is formed by Lawson's "Core S3 Procurement System (Lawson System Foundation/Process Flow, in combination with Inventory Control,

Requisition, and Purchase Order Modules), Requisition Self-Service, Punchout, and Electronic Data Interchange." Id. at 3. As a result, the Court entered an injunction against those Configurations. Order of May 23, 2011 (Docket No. 729) at 2-3. In addition, the Court enjoined Lawson's "M3 e-Procurement Software" based on a pre-trial stipulation that, if any of the S3 Procurement products were found to be infringing, then the M3 e-Procurement System would also be found to infringe. See Amended Final Pretrial Order (Docket No. 480) at 4. Those aspects of the injunction remain undisturbed by the Federal Circuit decision. However, the Court also entered the injunction against Configuration No. 2 ("Core S3 Procurement System" and "Requisition Self-Service") on the basis of the finding of infringement as to Claim 1 of the '172 patent. See Order of May 23, 2011 at 2; Verdict at 1. The Federal Circuit having concluded that Claim 1 of the '172 patent is invalid for indefiniteness, that provision of the injunction cannot stand. Accordingly, the injunction must be modified so as to no longer apply to Configuration No. 2. The injunction shall remain in effect in all other respects.

## CONCLUSION

For the reasons set forth above, the Court will modify the original injunction pursuant to the mandate of the Federal

29

**A34**

Circuit and will deny Lawson's MOTION PURSUANT TO FED. R. CIV. P. 60 TO DISSOLVE OR MODIFY THE MAY 23, 2011 INJUNCTION (Docket No. 1011), except insofar as the modification shall operate to dissolve the injunction as to Configuration No. 2. The injunction shall remain in effect in all other respects.

It is so ORDERED.

_____ /s/ _____ _R.E.P_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June _11_, 2013

30

**A35**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



ePLUS INC.,

    Plaintiff,

v.                                                    Civil Action No. 3:09cv620

LAWSON SOFTWARE, INC.,

    Defendant.

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, ePlus Inc.'s ("ePlus") MOTION TO SHOW CAUSE WHY LAWSON SOFTWARE, INC. SHOULD NOT BE HELD IN CONTEMPT (Docket No. 798) is granted. The Court finds, by clear and convincing evidence, that Lawson Software, Inc. ("Lawson") is in contempt of the Court's May 23, 2011 injunction.

Judgment is entered in favor of the plaintiff, ePlus Inc., and against the defendant, Lawson Software, Inc., in the sum of EIGHTEEN MILLION, ONE HUNDRED AND SIXTY-SEVEN THOUSAND, NINE HUNDRED AND FIFTY DOLLARS ($18,167,950) with interest thereon at 0.12% annually from the present date until paid in full.

ePlus' request for enhanced damages and attorneys' fees is denied.

To assure future compliance with the Injunction Order as amended (Docket No. 1083), Lawson Software, Inc. shall pay to the Clerk, United States District Court, a fine of $62,362 per day until Lawson establishes that it is in compliance with the

**A36**

Injunction Order; provided that the payment obligation is suspended until September 20, 2013 and, if by then, Lawson purges the contempt and establishes that it is in compliance with the Injunction Order, no fine shall be payable. If by September 20, 2013, Lawson does not establish that it is in compliance with the Injunction Order, the fine shall be payable from August 16, 2013 until compliance is established.

It is so ORDERED.

                              /s/         _R E P_
                         Robert E. Payne
                         Senior United States District Judge

Richmond, Virginia
Date: August __16__, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ePLUS INC.,

     Plaintiff,

v.                                        Civil Action No. 3:09cv620

LAWSON SOFTWARE, INC.,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on plaintiff ePlus, Inc.'s ("ePlus") MOTION TO SHOW CAUSE WHY LAWSON SOFTWARE, INC. SHOULD NOT BE HELD IN CONTEMPT (Docket No. 798). For the reasons set forth below, the Court concludes, by clear and convincing evidence, that Lawson Software, Inc. ("Lawson") is in contempt of the May 23, 2011 Permanent Injunction (Docket No. 729). Accordingly, ePlus' motion will be granted.

## PROCEDURAL BACKGROUND

On May 19, 2009, ePlus filed this action against Lawson for infringement of three patents: U.S. Patent Nos. 6,023,683 (the "'683 Patent"), 6,055,516 (the "'516 Patent"), and 6,585,173 (the "'172 Patent"). Following a three week trial, a jury determined that the '683 Patent and '172 Patent were infringed, and it found that the '562 Patent was not infringed, by Lawson's products. The jury further found that all asserted claims of the

**A38**

patents-in-suit were valid. On May 23, 2011, the Court issued a permanent injunction enjoining Lawson, its officers, agents, and employees and "any person in active concert or participation with them" "from directly or indirectly making, using, offering to sell, or selling within the United States or importing into the United States" certain product configurations (so-called Configurations Two, Three, and Five) and services. (Docket No. 729). Lawson appealed to the United States Court of Appeals for the Federal Circuit and ePlus cross-appealed.

On September 9, 2011, while the appeals were pending, ePlus filed its motion for order to show cause, alleging that Lawson was in contempt of the injunction. The focus of ePlus' contempt motion concerned a module of the adjudged infringing system configurations called Requisition Self-Service ("RSS"). After the trial, Lawson redesigned RSS and created Requisition Center ("RQC") in its stead. ePlus alleged that the new RQC product was not more than colorably different from RSS and that it infringed ePlus' patents. On November 23, 2011, the Court entered a Scheduling Order (Docket No. 849) setting the contempt proceedings to commence on February 27, 2012.

By Memorandum Opinion and Order dated February 21, 2012 (Docket No. 917), following extensive briefing, the Court found that Lawson had waived attorney-client privilege for a number of documents relating to the redesign process and ordered their

2

**A39**

production. On February 24, 2012, the Court entered an Order (Docket No. 930) staying the contempt proceedings to permit Lawson to seek a Writ of Mandamus in the Federal Circuit to review the Order of February 21. On August 16, 2012, the Federal Circuit denied the petition for a Writ of Mandamus (Docket No. 957). The Federal Circuit's Order was followed by ePlus' Motion to Enforce the Order of February 21 (Docket No. 958) which was, in turn, granted in part and denied in part by an Order dated December 14, 2012 (Docket No. 988).

Meanwhile, on November 21, 2012, the Federal Circuit had issued its decision reversing-in-part, vacating-in-part, affirming-in-part and remanding the action. In its decision, the Federal Circuit found that claim 1 of the '172 patent and claim 3 of the '683 patent were invalid for indefiniteness. ePlus, Inc. v. Lawson Software, Inc., 700 F.3d 509, 519-20 (Fed. Cir. 2012). The Court of Appeals also held that claims 28 and 29 of the '683 patent were not "supported by substantial evidence" and vacated the judgment of infringement as to those claims. Id. at 521-22. The Court of Appeals, however, affirmed the finding of infringement as to claim 26 of the '683 patent and affirmed the breadth of the injunction. Id. at 520, 522.[1] ePlus filed a

---

[1] By Order dated June 11, 2013 (Docket No. 1083) and for the reasons set forth in the accompanying Memorandum Opinion of that date (Docket No. 1082), the Court modified the original injunction by eliminating from its scope the product

3

**A40**

petition for rehearing and rehearing <u>en banc</u>. On January 29, 2013, the Federal Circuit denied that petition. The mandate of Federal Circuit was received and entered on February 11, 2013 (Docket No. 1006). The contempt proceedings thereafter resumed in this Court.

A hearing was held on the contempt motion on April 2, 2013 through April 9, 2013. Closing arguments were held on April 26, 2013. Pursuant to an Order entered January 24, 2013 (Docket No. 1002), ePlus filed post-hearing briefs on colorability (Docket No. 1057), infringement (Docket No. 1058) and remedies (Docket No. 1059). Lawson filed responses (Docket Nos. 1070, 1072, & 1072). ePlus filed replies (Docket Nos. 1073, 1074, & 1075). The parties also filed proposed findings of fact and conclusions of law (Docket Nos. 1060 & 1069). The issues were thereafter argued.

**FINDINGS OF FACT**

## The Redesign Process

Following the jury verdict in this action, Lawson began efforts to design around ePlus' patent. Lawson had its first meeting to that end on the day after the jury verdict and placed Dale Christopherson in charge of redevelopment. Christopherson's

---

configuration known as "Configuration 2" in perspective of the Federal Circuit decision. The Court left the injunction in effect in all other respects.

4

**A41**

redesign team consisted of a variety of Lawson individuals including technical people and representatives of the legal department. Principally, Christopherson's team included Bruce McPheeters, Lawson's General Counsel; members of the law firm that represented Lawson during the underlying infringement action; Todd Dooner, who was responsible for actually writing the computer code; and Keith Lohkamp, who was to represent the "business side" of Lawson during the design effort. The team also included Keith Knuth, a product architect; Stephanie Lim, who was in charge of quality assurance testing; Dwight DeLancey, a software engineer; Darci Snyder, who was responsible for product management; and Donna Hircate, whose role in the redesign process is unclear. In addition, Lawson hired an independent attorney to assist with the redesign process.

The redesign team began work on February 8, 2011. It began unit testing of the redesigned product on March 1, 2011 and held a "start-up meeting" on March 30, 2011. The new product was released to customers on May 18, 2011. Patch 1 to the new product was made available to customers on June 9, 2011.

Lawson's initial plan was to present the redesigned product to the Court for approval before its public release; specifically, Lawson intended to present the product to the Court at the hearing scheduled on whether to enter a permanent injunction. Lawson decided not to follow that course.

5

The redesign team proposed several alternative "redesigns" that the Lawson attorneys rejected as being insufficient. Patch 1 was implemented at the behest of Lawson's attorneys who were concerned that the redesign effort had not gone far enough. However, additional redesign proposals were rejected because they would unacceptably limit the functionality of Lawson's software. For example, Lawson considered, and rejected, changes that would remove the search capabilities of the systems, the requisition building capabilities, and the purchase order creation capability completely. Most notably, the redesign team and the attorneys disagreed over whether the inventory checking capability of the product would, or must, be removed from the new product. The views of counsel on the subject were rejected by Christopherson, and the change was not made.

### The Redesigned Product: RQC

RSS was the only component of the Infringing Configurations of Claim 26 of the '683 patent that was modified.[2] One of the primary goals of the redesign process was to minimize the impact on Lawson's current customers. For the present purposes, Lawson relies on two changes made to RSS which it claims renders RQC "more than colorably different" than RSS. First, Lawson made

---

[2] Other changes were made to address other aspects of the adjudged Infringing Configurations. They are not at issue here because of the Federal Circuit's decision setting aide part of the verdict.

changes to RSS intended to prevent a customer from simultaneously using Item Master and Punchout in the same session. Essentially, RQC requires that a user using Item Master and Punchout place the products ordered from each on a different requisition form than the other. On May 18, 2011, Lawson released RQC with this modification.

The second change took place following the release of RQC when Lawson developed and released so-called "Patch 1." Lawson approved the development of Patch 1 on June 3, 2011 and released it on June 9, 2011. Patch 1 expanded the Item Master/Punchout "limitation" to sessions involving multiple Punchout vendors, so that once a user accesses a Punchout vendor's website, RQC prevents the user from accessing another Punchout vendor's website without closing the first window. As a result of RQC and Patch 1, while a user can place multiple items from Item Master on one requisition or multiple items from a single Punchout vendor on one requisition, the user can no longer combine items from Item Master with items from Punchout vendors on the same requisition nor can he combine items from multiple Punchout vendors onto a single requisition. Further, as a general principle, there is no way for Lawson's users to disable these changes in the RQC module.[3]

---

[3] As discussed *infra*, while it is not possible to circumvent the feature when running RQC, Lawson designed RQC so that a user can

The foregoing findings of fact provide a basic factual context for discussion of the procedural and substantive legal issues relevant to the contempt hearing. Further findings of fact are made as appropriate in the ensuing legal discussion and conclusions.

## DISCUSSION

### The TiVo Test

Contempt is a "severe remedy and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." <u>Cal. Artificial Stone Paving Co. v. Molitor</u>, 113 U.S. 609, 618 (1885). The analysis for whether a party should be held in contempt for violating an injunction issued in a patent infringement case as the result of its redesigned product is governed by the decision of the United States Court of Appeals for the Federal Circuit in <u>TiVo Inc. v. EchoStar Corp.</u>, 646 F.3d 869 (Fed. Cir. 2011). <u>TiVo</u> instructs that a contempt proceeding is appropriate upon a "detailed accusation from the injured party setting forth the alleged facts constituting the contempt." <u>Id.</u> at 881.

The contempt analysis is two-fold: "the party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product

---

change the settings to allow the Lawson user to continue to run RSS, even after installing RQC.

8

**A45**

found to infringe and that the newly accused product actually infringes." Id. at 882. Throughout the analysis, the Court must be mindful that "legitimate design-around efforts should always be encouraged as a path to spur further innovation." Id. at 883 (citing State Indus. Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236 (Fed. Cir. 1985)). Nonetheless, "a defendant's diligence and good faith efforts are not a defense to contempt." TiVo, 646 F.3d at 880.

The Federal Circuit has emphasized that the "not more than colorably different" test should not be guided by the question of whether the new product actually infringes the patent. See TiVo, 646 F.3d at 882 ("Today, we reject that infringement-based understanding of the colorably different test."). Rather, the focus must be on "the differences between the features relied upon to establish infringement and the modified features of the newly accused products." Id. Further,

> The analysis must focus not on differences
> between randomly chosen features of the
> product found to infringe in the earlier
> infringement trial and the newly accused
> product, but on those aspects of the accused
> product that were previously alleged to be,
> and were a basis for, the prior finding of
> infringement, and the modified features of
> the newly accused product. Specifically, one
> should focus on those elements of the
> adjudged infringing products that the
> patentee previously contended, and proved,
> satisfy specific limitations of the asserted
> claims. Where one or more of those elements
> previously found to infringe has been

> modified, or removed, the court must make an inquiry into whether that modification is significant.

Id. At the most basic level, a product is not more than colorably different from another product if it "performs substantially the same function in substantially the same way with substantially the same result." Arlington Indus., Inc. v. Bridgeport Fittings, Inc., Civ. A. No. 3:02-cv-134, 2013 WL 1149230, at *3 (M.D. Penn. March 19, 2013) (citing Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950)).[4]

---

[4] The "colorability" analysis derives from the so-called doctrine of equivalents. See KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc., 776 F.2d 1522, 1527 (Fed. Cir. 1985) ("This doctrine was adapted from the familiar doctrine of equivalents . . ."). The Supreme Court of the United States has explained that an infringing product is equivalent when it is "a copy of the thing described in the specification of the patentee, either without variation, or with such variations as are consistent with its being in substance the same thing." Burr v. Duryee, 68 U.S. 531, 573 (1863). The Court has explained, "one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result" Union Paper-Bag Mach. Co. v. Murphy, 97 U.S. 120, 125 (1877). "[M]ere colorable departures from the patented device do not avoid infringement." Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42 (1929) (emphasis added). "A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement." Id. (citing Ives v. Hamilton, 92 U.S. 426, 430 (1875)).

While the doctrine of equivalents was designed to address infringement by a "process that does not literally infringe upon the express terms of a patent claim," Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 21 (1997), it appears to be the origin of the "colorable differences" concept. See Graver Tank, 339 U.S. at 612 ("Though infringement was not literal, the (continued)

The precise meaning of the Federal Circuit's instruction that the Court frame the "more than colorably different" analysis in perspective of "those elements . . . that the patentee previously contended, and proved," id. at 882, has been a source of considerable debate in this action. Lawson has doggedly maintained that the Court must first examine the trial record in the underlying infringement action and determine which arguments the jury accepted in finding that Lawson's product infringed. See generally (Def. Br. on More than Colorable Differences (Docket No. 1070) at 3-4). The parties agree that "only product features relied upon to prove infringement at trial, and subsequently modified by the infringer, are relevant." (Pl. Br. on TiVo (Docket No. 833) at 4); (Def. Br. on TiVo (Docket No. 837) at 5).

---

changes which avoid literal infringement are colorable only."). It is sensible to apply, as the Federal Circuit directs, a similar "colorable differences" test to the redesigned product. Not to determine whether or not the new product is "equivalent" to the patented product (for such a determination would tread upon the alleged contemnor's right to try that issue), but rather to determine whether the redesigned product "performs substantially the same function in substantially the same way to obtain the same result" as the product previously found to infringe. TiVo instructs that the test is "whether the newly accused product is . . . different from the product previously found to infringe." TiVo, 646 F.3d at 882. TiVo did not reject KSM's definition of colorability, rather it rejected the perceived tendency of district courts to "focus solely on infringement by the newly accused devices in deciding contempt." Id.

11

**A48**

TiVo plainly instructs that the Court must compare the elements of the infringing products with the elements of the newly designed product. "If those differences between the old and new elements are significant, the newly accused product as a whole shall be deemed more than colorably different . . . ." TiVo, 646 F.3d at 882. The question, then, is where the Court should look to determine which "elements" were found to infringe and to what extent, if any, the Court is permitted to inquire into the bases underlying the jury's determination that the original product infringed.

Lawson is undoubtedly correct that that ePlus is confined, in a contempt proceeding, to the theories of infringement that were advanced in the underlying infringement action and, similarly, is bound by the results in that action. As Lawson correctly argues, "where a plaintiff's infringement argument against a newly-accused product differs from that previously presented to the jury, [a] defendant is entitled to have a jury, not the Court, adjudicate the new theory." (Def. Br. on Colorable Differences at 6); see also Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc., 154 F.3d 1345, 1350 (Fed. Cir. 1998); Arbek Mfg., Inc. v. Maozzam, 55 F.3d 1567, 1570 (Fed. Cir. 1995).

Ordinarily, the Court would turn to the complaint to determine what was "contended." However, the complaint in this

12

**A49**

action contains nothing more than the cursory allegations that ePlus owns a patent, that Lawson "makes, uses, sells, offers to sell and/or imports" certain "products, services, methods, or processors that infringe" the patent, and that ePlus is, therefore, entitled to damages and injunctive relief. See (Complaint (Docket No. 1) at ¶¶ 20-23).[5] However, shortly before the Initial Pre-Trial Conference, the parties agreed to a scheduling and discovery order which required, inter alia, ePlus to file "a statement identifying, for each Defendant[,] the product, products, or part thereof, that are accused of infringement, and, for each such product or part thereof, shall identify on an element-by-element, claim-by-claim basis how such product or part thereof infringes." See (Proposed Discovery Plan filed November 18, 2009 (Docket No. 121)). As a result, on December 8, 2009, ePlus filed "Infringement Claim Charts" detailing the manner in which ePlus alleged that Lawson's products infringed upon three of ePlus' patents. See (Exs. To Pl.'s Infringement Claim Charts (Docket No. 133) ("Infringement

---

[5] The applicability of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) to patent actions, and to this action in particular, was a matter of significant discussion during the Initial Pre-Trial Conference held on November 13, 2009. See generally (Tr. of Pre-Trial Conference (Docket No. 131) at 3:25-4:16). At that conference, the Court observed, "I don't know how long this case has been going, but we are pretty far down the road. And from what I see . . . we still don't know what patents or what claims of what patents are infringed by what products." (Id. at 4:10-16).

Chart")). These claims, as therein outlined, were pursued by ePlus in discovery and at trial. The Court concludes that the proper vehicle through which to determine what ePlus "contended" to be infringing is by an examination of the Infringement Charts as they apply to the relevant claims of the relevant patent.

The next question is the manner in which the Court is to determine what ePlus "proved" at the original trial. See TiVo, 646 F.3d at 882 (noting that the Court must focus on "those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims.") (emphasis added). Lawson insists that the proper approach is for the Court independently to examine the underlying trial evidence in an effort to determine exactly what the jury found. The Court consistently has taken the view that "the Federal Circuit, in TiVo, did not intend for district courts to attempt to devine [sic] what was in the mind of juries when they returned their verdicts." See Memorandum Opinion dated March 27, 2013 (Docket No. 1035) at 7.[6] The approach urged by Lawson runs afoul of a fundamental principle of our jurisprudence: that "the controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the

---

[6] To that end, the Court barred from the contempt proceeding expert testimony that attempted "to explain what the documents in the trial showed." Id. at 8.

facts." <u>Dimick v. Schiedt</u>, 293 U.S. 474, 485 (1935). Indeed, as a general matter, "it would be constitutionally impermissible for the district court to re-examine the jury's verdict." <u>Duro-Last, Inc. v. Custom Seal, Inc.</u>, 321 F.3d 1098, 1107 (Fed. Cir. 2003); <u>see also</u> <u>Connell v. Sears, Roebuck & Co.</u>, 722 F.2d 1542, 1545 (Fed. Cir. 1983 ("Jury verdicts must be treated with great deference. The Seventh Amendment to the Constitution preserves the right to trial by jury in suits at common law and also provides that United States Courts shall not re-examine facts tried by jury except under the rules of common law.").

Lawson relies, principally, on two decisions to support its contention that the Court must "go[] back and look[] at the evidence" at the original trial in order to determine what was "contended and proved" at trial. <u>See</u> (Tr. of Closing Argument (Docket No. 1078) at 24:12-18). First, Lawson points to <u>Taser International, Inc. v. Stinger Systems, Inc.</u>, No. CV07-42-PHX-JAT (D. Az. Jan 18, 2012). In <u>Taser</u>, the district court had decided the underlying case on summary judgment and later was faced with the claim that a redesigned product was "apart from a few cosmetic changes, essentially the same" as the infringing product. <u>Taser</u>, Slip Op. at 2. After setting forth the <u>TiVo</u> "colorable differences" test, the district court examined its summary judgment opinion, and the findings contained therein, to determine the nature of the previous infringement and the

15

**A52**

relevant features of the product in order to determine the elements relevant to the colorability analysis. The court detailed those features that it had "emphasized" in its opinion finding infringement as well as the evidence upon which it relied in arrived at its conclusion. Id. at 8. The court then examined the features of the new product in perspective of those features. After its analysis, the Taser court concluded that the products were more than colorably different and that, therefore, a contempt proceeding was not appropriate. Id. at 10.

Taser is not helpful to the present analysis simply because it was a summary judgment case. A court assessing the reasons underlying its own decision does not threaten the "traditional sanctity of jury verdicts" nor does it invite "speculation as to the manner in which the jurors arrived at it." Midwest Underground Storage, Inc. v. Porter, 717 F.2d 493, 501 (10th Cir. 1983).

Second, Lawson emphasizes the decision in nCube Corp. v. Seachange International, Inc., 809 F. Supp. 2d 337 (D. Del. 2011). There, the injunction at issue followed a jury verdict. In nCube, the district court compared the trial testimony with the testimony at the contempt hearing. See e.g. id. at 355 ("The Court concurs that [the witnesses] hearing testimony was consistent with his trial testimony."). The court went on to articulate the expert's trial testimony and then contrast it

16

with the record established during the contempt hearing. Id. Indeed, the nCube court addressed the argument that, because the plaintiff's expert had testified at trial that a particular feature of the infringing product satisfied a particular limitation, the removal of that feature made the product more than colorably different. Id. at 354. The court rejected that argument both on the basis that the expert had not limited his opinion to that particular feature and on the basis that TiVo permitted a contempt finding if the infringing feature was merely replaced with a component that "does not amount to a significant change." Id. at 354 n. 6, 355.

The nCube court provided no analysis or explanation for its decision to return to the trial testimony other than the statement that "any analysis about whether colorable differences exist with respect to the modified ITV product must focus on how ARRIS alleged and proved to the jury that" the original product infringed. Id. at 354. The court neither addressed nor acknowledged the problems inherent in a court's attempt at analyzing what the jury found and why.

That renders nCube of no utility because "[c]ourts have always resisted inquiring into a jury's thought processes." United States v. Powell, 469 U.S. 57, 67 (1984). nCube offers no reason to deviate from that time-honored practice. The Court is ill-equipped to attempt to determine which evidence the jury

relied upon to reach which conclusion, and long-standing policy counsels against such an endeavor. It would impermissibly intrude upon the sanctity of the jury verdict for the Court to assess the trial evidence and attempt any conclusion as to what was proven, beyond the fact of the verdict itself. In sum, the Court will assess what was "contended" in light of ePlus' claims at the commencement of the action and what was "proved" is the verdict of the jury, which stands for itself.

## The Features Contended and Proved

Claim 26 of United States Patent No. 6,023,683 (the "'683 Patent") claims:

> A method comprising the steps of: maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources; selecting the product catalogs to search; searching for matching items among the selected product catalogs; building a requisition using data relating to selected matching items and their associated source(s); processing the requisition to generate one or more purchase orders for the selected matching items; and determining whether a selected matching item is available in inventory.

Elec. Sourcing & Sys. Method, U.S. Patent No. 6,023,683 (filed Aug. 10, 1994) (issued Feb. 8, 2000).

In its Infringement Chart for the '683 patent, (Docket No. 133-2), ePlus laid out the manner in which it believed that

18

**A55**

Lawson's products infringed Claim 26. (Id. at 56-69).[7] ePlus advanced several theories regarding the infringement of each element of Claim 26. As a result of the Federal Circuit decision in ePlus, the only claim remaining for which a valid finding of infringement remains is Claim 26 of the '683 patent. See ePlus, 700 F.3d at 521 (affirming the jury verdict as to Claim 26). Accordingly, the features found to infringe at trial must necessarily be those that infringed Claim 26 for purposes of the TiVo analysis.

In essence, ePlus contended that Lawson's products infringed Claim 26 of the '683 patent in the following ways: First, that the Item Master component of the Inventory Control module and Purchase Order application allowed the importation of multiple product catalogues into a centralized database and/or the "Punchout Procurement" module allowed a used to access multiple supplier catalogues through vendor websites and "digital marketplaces." (Infringement Chart at 56-63).

Second, that a user could "select among (1) catalogs hosted by suppliers [i.e., Punchout vendors], (2) an internal database containing multiple supplier catalogs [i.e., Item Master], and

---

[7] As a result of the Federal Circuit decision in ePlus, the only claim remaining for which a valid finding of infringement remains is Claim 26 of the '683 patent. See ePlus, 700 F.3d at 521 (affirming the jury verdict as to Claim 26). Accordingly, the features found to infringe at trial must necessarily be those that infringed Claim 26.

(3) digital marketplaces with multiple suppliers' catalog data." (Id. at 63). In addition, when a Lawson user elected to use the Punchout module, the user would be able to select products from the external website (which appeared in a "separate browser session"), place them in an "electronic 'shopping cart,'" and return "the selected cart contents to the Lawson Requisitions Self-Service application." (Id. at 64).

Third, ePlus alleged that Lawson's systems allowed users to search the product catalogues based on criteria such as product name, manufacturer code, or partial descriptions. (Id. at 64-65).

Fourth, ePlus contended that Lawson's products would allow the creation of a single requisition from Item Master or Punchout. (Id. at 65-66). Specifically, ePlus identified "Requisition Self-Service" as enabling "web-based requisitioning from approved product catalogs." (Id. at 66).

Fifth, ePlus contended that Lawson's products had the ability to generate purchase orders from the requisitions, specifically emphasizing the ability of Requisition Self-Service ("RSS") to automatically generate purchase orders for items on approved requisitions with no additional data input. (Id. at 67).

Finally, ePlus contended that either through the Electronic Data Interchange ("EDI") or the Punchout Module, Lawson's

software permitted the end user to confirm with the supplier whether or not the requested item is in inventory. Such information is either contained in the supplier's catalog or can be requested by the end user by electronic notification. (Id. at 68).

These contentions were pressed at trial. To see, what was proved at trial, the Court relies on the verdict that the jury returned.

Here, the jury returned a mixed verdict. See Verdict Form (Docket No. 600). The jury found that Configuration 3 (which consisted of the Core S3 Procurement System, RSS and Punchout) and Configuration 5 (Core S3 Procurement System, RSS, Punchout, and EDI) infringed Claim 26 of the '693 patent. The jury found that Configuration 4 (Core S3 Procurement System with EDI) did not infringe Claim 26.[8] For the reasons set forth above, the jury verdict stands for itself. It suffices to say, however, that ePlus proved, at trial, that Configurations 3 and 5 infringed Claim 26 of the '693 patent and did not prove that Configuration 4 did.

---

[8] The jury also found that Configurations 3 and 5, as well as Configuration 2 (Core S3 Procurement System plus RSS), infringed Claim 1 of the '172 patent. The jury also found that Configurations 3 and 5 infringed Claims 3, 28, and 29 of the '683 patent. Those findings were vacated by the Federal Circuit's decision in ePlus v. Lawson, 700 F.3d 509 (Fed. Cir. 2012).

**"More than Colorably Different"**

TiVo instructs the Court to first determine whether "the newly accused product is so different from the product previously found to infringe that it raises a fair ground of doubt as to the wrongfulness of the defendant's conduct." 646 F.3d at 882. In so doing, the Court is to examine "those differences between the old and new elements" and determine whether or not they are "significant." Id. Both Lawson and ePlus place great emphasis on the word "elements" and "products" as used by the Federal Circuit in TiVo. According to Lawson, the Court must determine whether the change to the modified element is "significant." See (Def. Colorability Br. at 17). ePlus, on the other hand, argues that the test is whether or not the modification has made the new product more than colorably different. (Pl. Reply Br. on Colorability at 6). That is, under Lawson's view, the change must be assessed in a vacuum, looking only at the feature before and after the modification, while in ePlus' view the modification must be assess in relation to the infringing product as a whole.

Unfortunately, TiVo uses the terms rather interchangeably. For example, TiVo instructs that, "if those differences between the old and new elements are significant, [then] the newly accused product as a whole shall be deemed more than colorably different," 646 F.3d at 882 (emphasis added), which would seem

22

**A59**

to support Lawson's position. At the same time, TiVo directs that "the primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe," id. (emphasis added), and then say that it is necessary to examine the "significance of the differences between the two products," id. (emphasis added), which would seem to support ePlus' claim that the proper analysis focuses on the changes to the overall infringing product. TiVo also instructs that the significance of the modifications "is much dependent on the nature of the products at issue. The court must also look to the relevant prior art, if any is available, to determine if the modification merely employs or combines elements already known in the prior art in a manner that would have been obvious to person of ordinary skill in the art at the time the modification was made." Id. (emphasis added).[9]

The Court concludes that the correct analysis is somewhere between the positions advanced by Lawson and ePlus. The Court must examine the changes to the elements to determine whether there has been a modification to an element that was adjudged to infringe. This determination, which will likely generally be uncontested, must take place in a relative vacuum, focusing only

---

[9] The parties agree that no prior art assessment need be made in this case.

23

**A60**

on the element as existed before and as modified. But, in conducting the next step of the analysis, "whether that modification is significant," id., the Court must, as directed, focus on the "nature of the products." Id. That is to say, TiVo instructs that the Court must assess the significance of the modification in the context of the product that was found to infringe. That makes sense, of course, because a change to an element that may seem substantial when viewed in insolation may have no bearing on the manner in which the product was found to infringe. Similarly, a modification that might, on its own, seem insignificant could be quite significant in the context of the product.

For example, Lawson made changes to RSS in order to "design around" the findings of infringement as to Claim 1 of the '172 patent and Claim 28 and 29 of the '683 patent.[10] As a result of the Federal Circuit's decision, which vacated the finding of infringement as to those claims, those changes were not presented, or discussed more than cursorily, at the hearing on ePlus' contempt motion. Tellingly, however, Lawson does not rely on those changes as "elements" of the product that have been modified. Even if those modifications were, in and of

---

[10] Mr. Christopherson explained that there were three broad areas of changes on which the redesign process focused: Punchout (which changes are at issue here); the "shopping cart," and "UNSPSC." (Tr. at 333:13-14).

24

**A61**

themselves, "significant," they are not significant with respect to the manner in which Lawson's product was found to have infringed Claim 26 of the '683 patent. It is for this reason that the "colorability" analysis must be undertaken in the context of the manner in which the <u>product</u> itself was found to infringe.

There is no serious dispute over the nature of the changes made to RSS to produce RQC. The dispute is over whether the changes were made to "those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement" or whether they are "randomly chosen features of the product found to infringe." <u>TiVo</u>, 646 F.3d at 882.[11]

According to ePlus, the modifications made to RSS to create RQC were not related to Claim 26 of the '683 patent and, thus, the analysis need not go further. (Pl. Br. on Colorability at 6). In ePlus' estimation, the changes to RSS constitute "randomly chosen features" and there the Court does not need to

---

[11] Both parties have bandied about the phrase "randomly chosen features." Although the word "random" can be defined as "made without definite aim, reason, or pattern," Random House Dictionary (2013), the Court interprets the distinction drawn in <u>TiVo</u> to require the Court to consider whether or not the modification was to the infringing aspects of the product and, if they were not, then they were "random." It is, of course, true that there will always be <u>some</u> purpose behind the selection of a particular element to modify.

determine whether they are substantial in nature. In essence, ePlus contends that, because, in its view, systems with RQC continue to infringe Claim 26 in the same way as systems with RSS, the modifications cannot be related to the infringing aspects of the Configurations at issue. Lawson responds that the features that were modified to create RQC were central to the demonstrations used by ePlus' expert at trial and were referred to positively by that expert when questioned about them. (Def. Br. on Colorability at 16-17). Indeed, Lawson argues, the "only" demonstrations that were relevant to show what ePlus "contended and proved" at trial involved the combination of items from Punchout and Item Master or from multiple Punchout sites. (Id. at 17).

Although Lawson's argument appears simply to reiterate its view that the proper mode of analysis is for the Court to parse through the trial record and determine for itself what the jury found was proven – an argument that the Court has continually rejected – the Court nevertheless finds that, whatever significance the modifications have to the overall product, the modifications to RSS relate to the features of Lawson's products that were contended and proven to infringe at trial. It is uncontested that interplay between RSS, Punchout, and Item Master formed at least one of the bases for a finding of

infringement of Claim 26 of the '683 patent,[12] and that recognition of the infringing nature of the interplay formed the central issue in the redesign process. Similarly, the alterations to RSS to create RQC related to the manner in which Lawson's products infringed ePlus' patent, at least insofar as they focused on the manner in which Lawson's product performed steps 3 through 5 of Claim 26.

Having determined that the modifications are relevant to elements of Lawson's products, the Court must determine "whether th[ose] modification[s are] significant." TiVo, 646 F.3d at 882. ePlus began its assessment by outlining the features of RSS that were not changed as evidence that the changes that were made were not relevant to Claim 26. See (Pl. Br. on Colorability at 8). While there is no requirement under TiVo that Lawson make many changes to many things – indeed contempt is inappropriate if there is any significant change made to any relevant feature – identification of the features of RSS that remain unchanged is helpful in assessing the significance of the modifications that were made to the infringing product. Thus, while Lawson is correct that TiVo does not ask the Court to examine the aspects of the product that are unmodified, the significance of the

---

[12]  Indeed, the only configuration to lack RSS and Punchout (Configuration 4) was found not to infringe.

27

**A64**

modification to the product can be assessed with some reference to what remained unchanged.

Here, it is undisputed that Lawson made no relevant changes to the core systems, including the Inventory Control, Requisition, and Purchase Order modules. Similarly, the only change that Lawson made to Punchout itself was the "Multiple Punchout" limitation; each Punchout session works exactly the same as before. Lawson rejected any proposed changes to the inventory checking capability of Punchout and EDI, the requisition capabilities of the modules, or the purchase order creation aspects of the modules. All that has changed is the interplay between RQC and Punchout.

Although not dispositive, evidence of how Lawson described the redesign, both internally and externally, is both pertinent and compelling. See Merial Ltd. v. Cipla Ltd., 681 F.3d 1283, 1301 (Fed. Cir. 2012) (finding testimonial evidence particularly compelling when the "statements come from the defendant's chief executive regarding his own product"). Here, Lawson consistently presented the changes between RSS and RQC as insubstantial. Internally, Lawson explained that the only change in functionality between RSS and RQC was "a warning pop-up that you are about to leave the Lawson site when you punch out." (Pl. Ex. 1030). The internal documents explained, "the process remains completely the same except if you try to punch out on a req.

28

**A65**

that is already in use with non-Punchout items, it will tell you that you need to open a separate req., and it will perform that action for you." (Id.).

To its customers, Lawson stressed that RQC has "100% of the functionality" that they had with RSS. Lawson emphasized the similarities between RQC and RSS in order to assuage concerns over the stability of code itself. See e.g., (Pl. Ex. 1123 ("And, when you look at the differences [between RSS and RQC], most changes would have very minimal code impact and thus a limited risk")). Stressing the simplicity of the installation process, Lawson explained that "RQC is just a new user interface to access [customers'] requisition functionality." (Pl. Ex. 1065); see also (Pl. Ex. 1072 ("[T]he new product is a change to the user interface only.")). Lawson's customer support staff took the view that RQC "looks/appears exactly like RSS XML did" and that "users will probably not even notice the difference, really." (Pl. Ex. 1124).

Indeed, Lawson concluded that the changes in RSS were so minimal that no training would be required for users of RQC. ePlus' expert explained that the significance of this fact is that, "if RQC requires minimal or no retraining, then RQC must

be very similar to RSS." (Tr. at 166:20-22).[13] That view is supported by Lawson's internal communications which reflect concern from some that, if RQC were different from RSS, retraining would be required, followed by consolation from the design team that "since RQC has 100% of the existing functionality of RSS, no training issues have been identified to date." (Pl. Ex. 1057).[14] In essence, Lawson consistently maintained, both to its customers and its employees, that RQC is "really the same thing as RSS XML was except for a few adjustments. (however, I'm not allowed to say that.)." (Pl. Ex. 1027). Evidence of this ilk is compelling, particularly when those statements come from Lawson's key staff "regarding [their] own product." Merial Ltd., 681 F.3d at 1301.

---

[13] Citations to the Transcript of the contempt hearing ("Tr.") refer to the consecutively paginated transcripts filed at Docket Nos. 1052, 1053, 1054, 1055 & 1056.

[14] "Functionality" appears to be a word with many connotations. In most of the contexts in which Lawson assures customers that RQC retains "100% of the functionality" of RSS, it would be a plausible reading to conclude that Lawson intends to assure its customers (as well as its internal sales people) that the new product will continue to meet the customers' needs. This is apparent in, for example, the reference to "100% functionality you require." (Pl. Ex. 1056). In the training context, however, the focus would naturally have been on how the product is used, rather than on the results achieved. After all, the customer needs to be trained on how to use the product (as well as on what the product does). That RQC was so similar to RSS that no retraining was required, despite some apparent cosmetic difference, certainly suggests that RQC "performs substantially the same function in substantially the same way to obtain the same result" Union Paper-Bag Mach. Co., 97 U.S. at 125.

Lawson's principal argument as to why RQC is more than colorably different from RSS relies on Lawson's claim that RQC altered the features that ePlus relied on in its demonstrations to prove infringement at trial. See (Def. Br. on Colorability at 16–17). Of course, even "if a redesigned product replaces a component that practiced a limitation, the redesigned component may still be held to be infringing (and therefore a basis for contempt) if the redesigned component does not amount to a significant change." nCube, 809 F. Supp. 2d at 354 n. 6. Moreover, for the reasons discussed previously, the Court rejects Lawson's call to reexamine the trial evidence and explore the jury verdict.

Lawson's other argument stems from its view that the RSS to RQC modifications constituted a degradation in function of the Lawson software because the modification altered the user experience. (Def. Br. on Colorability at 19). Lawson identifies two principal changes to the user experience: first, it argues that Lawson's software is no longer "a one-stop shop for whatever a customer may want to purchase." (Id. at 19). Second, Lawson asserts that "the changes have severely limited the circumstances under which a user has the ability to comparison shop" (id.) because the redesigned product generates more requisitions to review, and thus "increase[s] the burden on

31

**A68**

those employees of Lawson's customers who are 'approvers.'" (<u>Id.</u> at 20).

Lawson argues, in essence, that the mere fact that the product may be less desirable makes it more than colorably different. In support of this, Lawson relies almost entirely on its view of what features were emphasized at the trial, but presented no evidence that it lost any customers on account of the asserted degradation, assuaging customer concerns by consistently emphasizing the insignificance of the modifications. At best (or worst), the modification makes the process slightly slower. Customers are subjected to a "warning pop up" and, depending on the Punchout sites used, may require multiple requisition orders to be generated. These changes, while perhaps degrading the customer experience, are not significant modifications in perspective of the infringing nature of the initial product.

In sum, the Court concludes that Lawson's Configurations 3 and 5 with RQC are not more than colorably different than those with RSS. While the Court agrees that the changes "relate" to the features that were contended and proved to infringe, the Court concludes that, the modifications were not significant. See <u>TiVo</u>, 646 F.3d at 882 ("Where one or more of those elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is

significant."). Although no one factor is dispositive, the Court notes that Lawson, both internally and externally, presented the modifications as insignificant; the time of development is indicative of (although by no means dispositive of) an insignificant modification; and the modification did not substantially alter the manner in which Lawson's product performed the various steps of Claim 26 of the '683. For all the foregoing reasons, the Court finds, by clear and convincing evidence, that Configurations 3 and 5 with RQC, and those configurations with RSS, "perform[] substantially the same function in substantially the same way to obtain the same result." <u>Union Paper-Bag Mach. Co.</u>, 97 U.S. at 125. That is, the newly accused product is not more than colorably different from the adjudged infringing product.

**<u>Infringement</u>**

Once it is determined that the products are no more than colorably different, <u>TiVo</u> instructs that "a finding that the newly accused product continues to infringe the relevant claims is additionally essential for a violation of an injunction against infringement." <u>TiVo</u>, 646 F.3d at 883. Accordingly, it is necessary now "to evaluate the modified elements of the newly accused product against the asserted claim, on a limitation by

33

**A70**

limitation basis, to ensure that each limitation continues to be met." Id.[15]

The Court credits the testimony and demonstrations of Dr. Weaver, ePlus' expert, as establishing the infringement component of the TiVo analysis. As Dr. Weaver demonstrated, the product configurations with RQC can still be used to perform all the steps of Claim 26; i.e., they can be used to (i) maintain at least two product catalogs; (ii) select one or more vendor catalogs in Item Master and search those catalogs; (iii) connect to external Punchout sites and search those catalogs; (iv) combine one or more selected items from one or more vendors into a single requisition; (v) generate one or more purchase orders from a single requisition; and (vi) determine the availability of a selected item. Dr. Weaver demonstrated how the configurations with RQC could perform each of the steps and how the replacement of RSS with RQC did not alter or eliminate the capability of the Lawson configurations to perform the steps of Claim 26 in the manner that the configurations with RSS did. His testimony is accepted as credible and reliable. The record, as a whole, fully corroborates Dr. Weaver's testimony.

---

[15] TiVo makes clear that "the party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." Id. at 882.

Lawson's primary argument in response to Dr. Weaver's testimony is that ePlus did not use a similar demonstration (involving infringement by purchasing a product from a single multi-vendor Punchout site) during the underlying trial. As discussed previously, the Court's task is not to review the trial evidence. However, the Court will note that this method of infringement was specifically contended in the Infringement Charts as a manner in which Lawson's products infringed. (Infringement Chart at 56-63). While Lawson describes this as a "newly-minted infringement theory," ePlus plainly identified the ability of Punchout to connect to "vendor website catalogs and digital marketplaces" as a basis for its contention of infringement. (Infringement Chart at 59).

In truth, Lawson's argument on infringement is not that the configurations cannot be used to infringe Claim 26 of the '683 patent, but that "even assuming _arguendo_ that this Court finds that ePlus has proven by clear and convincing evidence that RQC Configurations 3 and 5 are capable of infringing claim 26, ePlus is still not entitled to a finding of contempt against Lawson." (Def. Br. on Infringement at 11). This, says Lawson, is so because "[m]ethod claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use," Ormco Corp. v. Align Tech., Inc., 463 F.3d 199, 1311 (Fed. Cir. 2006). And, Lawson argues, ePlus

35

has failed to demonstrate that Lawson performed, directly or indirectly, the method. (Def. Br. on Infringement at 12).

Dr. Weaver testified, and ePlus' exhibits showed, that Lawson had installed and implemented Configurations 3 and 5 with RQC on its own systems and had trained its personnel to use those configurations in a manner that infringed ePlus' patent. Lawson also developed training videos and "webinars," as well as live demonstrations for customers, in which it demonstrated for its customers the use of the configurations in a manner that infringe Claim 26 of the '683 patent. In each of these situations: in the live demonstrations, in the recorded demonstrations, and in its own internal use, the evidence presented established that Lawson took all steps necessary to perform the steps of Claim 26. It is settled that, "where an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way, there is sufficient evidence for a jury to find direct infringement." Toshiba Corp. v. Imation Corp., 681 F.3d 1358, 1365 (Fed. Cir. 2012); see also Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1318 (Fed. Cir. 2009) ("As Lucent notes 'Microsoft not only designed the accused products to practice the claimed invention, but also instructed its customers to use the accused products in an infringing way.'"). ePlus has proved direct infringement by RQC.

36

**A73**

To begin, there was substantial evidence establishing that Lawson induced infringement. To show "induced infringement" ePlus "must show direct infringement, and that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." i4i Ltd. v. Microsoft Corp., 598 F.3d 831, 851 (Fed. Cir. 2010) (internal quotation omitted). In Toshiba, the Federal Circuit considered (and rejected) both of the arguments that Lawson makes in this case: first, that there are substantial non-infringing uses and, second, that ePlus has failed to put on direct evidence of Lawson's customers directly infringing the ePlus' patent.

The Federal Circuit has explained that "the existence of a substantial non-infringing use does not preclude a finding of infringement." Toshiba, 681 F.3d at 1364 (citing Erbe Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278 (Fed. Cir. 2010)). In Erbe Elektromedizin, the Federal Circuit explained that while, under a contributory infringement theory, the plaintiff has to prove that a product has no substantial non-infringing uses, "no such requirement . . . exists for induced infringement." 629 F.3d at 1284.

Similarly, it is clear that the showing of "direct infringement can be proven by circumstantial evidence." Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1326 (Fed. Cir. 2009). Here, there is extensive circumstantial evidence showing

that, at Lawson's direction, Lawson's customers are using RQC and using it a manner that infringes the patent. Indeed, it is rather facile for Lawson to suggest that the Court should find, for the purposes of one argument, that Lawson's customers had made the switch to RQC and then, in another argument, claim that there is no evidence that its customers are not simply continuing to use RSS. Nevertheless, "a finding of infringement can rest on as little as one instance of he claimed method being performed." Lucent, 580 F.3d at 1317. While Lawson did not keep records of how many of its customers switched over to RQC, Mr. Hanson testified that Lawson installed RQC on at least 60 customers' systems follow its release. (Tr. at 612:6-8). Lawson designed its products "to be used in an infringing way and instructed users to use them in the infringing way." Toshiba, 681 F.3d at 1365. The record is replete with evidence that Lawson specifically encouraged, trained, and developed demonstrations and materials to assist its customers in infringing the patent. That, coupled with the fact that Lawson installed the products on the machines of some 60 customers, is sufficient for the Court to find that Lawson induced infringement of Claim 26 of the '683 patent. Moreover, Lawson installed and used RQC itself.

For the reasons set forth above, the Court concludes, by clear and convincing evidence, that ePlus has met its burden of

establishing that the Configurations 3 and 5 with RQC continue to infringe ePlus' patent. Thus, the Court finds that Lawson is in contempt of the May 23, 2011 injunction.

## Direct Violation of the Injunction

"The power of civil contempt, inherently vested in every court which exercises equity jurisdiction, makes the injunction an effective judicial remedy." Landman v. Royster, 354 F. Supp. 1292, 1300 (E.D. Va. 1973). When a court "employs the extraordinary remedy of injunction, it directs the conduct of a party, and does so with the backing of its full coercive powers." Nken v. Holder, 556 U.S. 418, 428 (2009) (internal citations omitted). Quite apart from the analysis established by TiVo respecting a redesigned product, it is well-settled that violation of an injunction is subject to contempt proceedings. See e.g., Bessette v. W.B. Conkey Co., 194 U.S. 324, 330 (1904).

Here, the Injunction Order enjoined Lawson, "including its officers, directors, agents, servants, [and] employees" from "directly or indirectly making, using, offering to sell or selling within the United States" any of the infringing products, as well as enjoined Lawson from "circulating, publishing, or disseminating within the United States any literature or information that encourages the use, sale, or importation of" the infringing products. Injunction Order (Docket No. 729) at 2-3. In addition, the Order provided, and

the Federal Circuit affirmed, that Lawson was enjoined from "servicing and maintaining products sold before the injunction issued." ePlus, 700 F.3d at 522; see also Injunction Order at 2. The Injunction Order provided a sunset provision for some 277 enumerated health care customers of Lawson who were to be afforded a period of time to undertake the transition to the new product and who could continue to be provided maintenance services for that period.[16]

Following the issuance of the injunction, Lawson informed its customers that they could continue to run RSS. While Lawson kept records of how many customers had downloaded RQC, it made no effort to determine how many customers had actually installed and used RQC. Indeed, RQC was specifically designed so that, even after installation of RQC, the only thing that would need to be changed in order to allow RSS to continue to run on the customers systems were the "RSS bookmarks." (Tr. at 548:2-6 (The Court: "[I]f I were a customer of Lawson running RSS in June of 2011, do I still have that capacity if I have RSS and RQC today? Mr. Lohkamp: "Yes, you have that capability to change the bookmarks.")). In fact, the only change required in order to run RSS after the installation of RQC is to the bookmarks. (Tr. at

---

[16] As shown at the contempt hearing, the testimony on which the Court decided that the sunset provision was necessary was simply not true. Indeed, it was, at best, a deliberate, gross exaggeration. But, in fact, it was a deliberate untruth sponsored by Mr. Hager.

542:12-20). Although the RQC installation process changes the bookmarks, the customer is able to change them back, provided that he has the appropriate "administrator" access to his own computers. (Tr. at 548:10-549:25).

While the mere ability to circumvent the design around would be insufficient to support a finding of contempt, the record indicates that Lawson employees provided customers with instructions on how to run RQC and RSS in parallel. While most of the customers for which Lawson provided this information were "healthcare" customers, subject to the sunset provision of the Injunction Order, not all were. The evidence demonstrated that Lawson provided specific information to, at least, two non-healthcare Lawson customers: Western Lake Superior Sanitary and Columbia Association. See (Tr. at 588:23-25 & 582:13-16).

Further, the installation of RQC did not automatically result in the uninstallation of RSS. (Tr. at 576:3-8). To the contrary, Lawson specifically instructed its clients not to uninstall RSS before installing RQC. (Tr. at 580:11-16). While this allowed (and Lawson instructed) the healthcare customers to test-run RQC during the sunset period, Lawson's instructions also permitted those customers to run RSS even after the sunset period expired. Lawson made no effort to determine if any of its customers who had been instructed on how to continue to run RSS ever actually switched over to RQC. Lawson made no effort to

41

**A78**

ever determine if <u>any</u> customer actually used RQC and had no information on which customers were running RQC and if any customer had ever downloaded Patch 1. <u>See</u> (Tr. at 854:7-10).[17] However, despite being aware of the fact that users could (and did) continue to use RSS after downloading RQC, Lawson instructed its employees to provide support to customers merely upon the verification of RQC <u>download</u>. <u>See</u> (Tr. at 850:6-852:16). While Lawson purported to have instructed its employees to discontinue service once it became apparent that the customer was using RSS, it is abundantly clear that Lawson employees would (and did) service the Infringing Configurations substantially in their entirety. (Tr. at <u>id</u>.). Further, Lawson made no effort to identify which customers had downloaded Patch 1, so that despite Lawson's concerns that RQC without Patch 1 would be in violation of the injunction, Lawson would provide service to customers who had never downloaded or installed Patch 1. (Tr. at 854:7-14).

Based on this record, the Court concludes that, quite apart from the <u>TiVo</u> contempt analysis pertaining to Lawson's redesign effort, Lawson was in contempt of the Court's May 23, 2011

---

[17] Lawson did keep records of which customers downloaded RQC, but because RQC required a separate installation process following the download, the mere download of RQC is not indicative of installation and (because RQC can be modified to allow a user to continue to use RSS) installation is not indicative of use.

injunction by instructing (and permitting) its employees and agents to continue to service the Infringing Configurations and by deliberately instructing its customers on how to continue to use RSS, even after the RQC product had been released.

## Remedy

### Measure of Compensatory Damages

Having determined that Lawson is in contempt of the May 23, 2011 injunction, it is next necessary to fashion an appropriate remedy. The "appropriate remedy for civil contempt in within the court's broad discretion." In re General Motors Corp., 61 F.3d 256, 259 (4th Cir. 1995).[18] Civil contempt implicates "the power of a court to grant the relief that is necessary to effect compliance with its decree. The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." McComb v. Jacksonville Paper Co., 336 U.S. 187, 193 (1949). Nevertheless, "the remedies and sanctions must be remedial and compensatory and, unlike criminal contempt, nonpunitive." In re General Motors, 61 F.3d at 259. "Generally,

---

[18] "Because civil contempt proceedings are not unique to patent law," the law of the regional circuit governs the available remedies for contempt. Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc., 305 F.3d 1303, 1313 (Fed. Cir. 2002) (Applying "regional circuit" law to the issue of civil contempt "because civil contempt proceedings are not unique to patent law."); see also Graves v. Kemsco Group, Inc., 864 F.2d 754, 755 (Fed. Cir. 1998) (applying regional circuit law because, "although this contempt proceeding arose out of a patent infringement suit, the damages issues before us are not unique to patent cases.").

43

**A80**

a compensatory sanction 'may not exceed the actual loss to the complainant caused by the actions of respondent, lest the contempt fine become punitive in nature, which is not appropriate in a civil contempt proceeding." Id. (quoting In re Tetracycline Cases, 927 F.2d 411, 413 (8th Cir. 1991)). On the whole, however, the Court "has broad discretion to fashion a remedy based on the nature of the harm and the probable effect of alternative sanctions." Colonial Williamsburg Found. v. Kittinger Co., 792 F. Supp. 1397, 1407 (E.D. Va. 1992) (quoting Connolly v. J.T. Ventures, 851 F.2d 930, 933 (7th Cir. 1998)). In addition, while a civil contempt fine must be nonpunitive, it "need not always be dependent on a demonstration of actual pecuniary loss." Colonial Williamsburg Found., 792 F. Supp. at 1407.

ePlus asks the Court to order disgorgement of Lawson's profits for the period following the entry of the injunction and continuing to the present.[19] Specifically, ePlus asks the Court to order disgorgement of Lawson's gross profits for that time period, which ePlus defines as "the difference between the revenue and the direct costs of providing a good or service." (Pl. Br. on Remedies at 6). In the alternative, ePlus suggests a

---

[19] As ePlus correctly notes, and Lawson does not appear to contest, the injunction dates runs from May 23, 2011 for all but Lawson's enumerated "healthcare" customers and from November 23, 2011 for the "healthcare" customers encompassed in the "sunset provision" in the original Injunction Order.

disgorgement of incremental profits, which were estimated by both ePlus' and Lawson's experts. Incremental profits are, roughly speaking, calculated by determining the "gross profits" and then deducting certain expenses, for example, administrative expenses, research and development expenses, and certain sales and marketing expenses. The goal of an incremental profit calculation is identify profits that are made "if a decision is made to go ahead (or stop) some activity, but not otherwise." Sidney Davidson et al., Managerial Accounting: An Introduction to Concepts, Methods and Uses 901 (2005). As ePlus' expert explained, "the easiest way to think about incremental profit is, if I sell one more unit, or maybe if I get one more dollar of revenue, what's the profitability associated with that incremental unit I've sold." (Tr. at 897:25-898:3). Lawson's expert agreed with that basic articulation of the incremental profit approach, explaining: "[A]n incremental profit means the profit that one - a firm earns from making an additional sale in the short run, given the understanding that in the short run, certain costs cannot be varied." (Tr. at 1023:14-17). According to him, the key difference between "net" and "incremental" profits is the time frame over which they are analyzed. Essentially, incremental profit determinations must be conducted over a shorter time period because "the longer the period of time over which you measure incremental profit, the more

45

**A82**

incremental profit becomes net profit, and the reason why is because costs that are fixed in the short run become variable in the long run." (Tr. at 1024:10-14).

Lawson opposes any remedy of disgorgement arguing, in the first instance, that it is unavailable as a matter of law and, in the alternative, that it is inappropriate under the facts of this case. Finally, Lawson argues that, even if disgorgement were available and appropriate, the proper calculation would be the "incremental profit" or "net profit" analysis and not the gross profit analysis. Of course, the parties also disagree over the calculation of the relevant profits, both gross and incremental.

As an initial matter, Lawson contends that disgorgement is "not an appropriate compensatory civil contempt remedy in the patent infringement context absent any evidence of ePlus' actual loss." (Def. Br. on Remedies at 2). In support of its position that disgorgement is not available, Lawson relies principally on the fact that none of the post-TiVo decisions in which a party was found in civil contempt award disgorgement as a remedy. Id. Lawson also relies on the district court decision in Walman Optical Co. v. Quest Optical, Inc., 2012 WL 3248150, at *10 (D. Minn. Aug. 9, 2012), in which the district court declined to award the contemnor's profits as compensatory damages absent evidence that the complainant suffered losses. The court in

46

**A83**

Walman Optical recognized a split in authority "whether a contemnor's profits may be the proper measure of compensation in a civil-contempt proceeding," id., at *10 n.10, but declined to address the issue as it drew a distinction between disgorgement and profits as the measure of compensatory damages.

As Lawson acknowledges, its argument that disgorgement is contrary to a previous decision in this case. See Memorandum Opinion (Docket No. 1032), 2013 WL 1287714, __ F. Supp. 2d ___, (E.D. Va. March 26, 2013). In that Memorandum Opinion, the Court considered, and rejected, Lawson's contention that the decision of the Supreme Court of the United States in Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448 (1932) was no longer good law. In Leman, the Supreme Court noted that:

> The Circuit Court of Appeals refused recovery of profits upon the ground that in a proceeding for civil contempt the relief should be based upon the 'pecuniary injury or damage' which the act of disobedience caused the complaining party, including such reasonable expenses as were incurred in the bringing of the proceeding. There is no question here that the respondent had made profits through the infringing sales in violation of the injunction, and the amount of the profits was ascertained, but the appellate court held that the petitioners were limited to the damages caused by such sales and that no damages had been shown. We think that the court erred in imposing this limitation. The fact that a proceeding for civil contempt is for the purpose of compensating the injured party, and not, as in criminal contempt, to redress the public wrong, does not require so narrow a view of

> what should be embraced in an adequate
> remedial award.

Id. at 455-56. The Court went on to hold that:

> While the distinction is clear between
> damages, in the sense of actual pecuniary
> loss, and profits, the latter may none the
> less be included in the concept of
> compensatory relief. In a suit in equity
> against an infringer, profits are
> recoverable not by way of punishment but to
> insure full compensation to the party
> injured.

Id. at 456. Thus, "it is apparent that there is no necessary

exclusion of profits from the idea of compensation in a remedial

proceeding." Id. at 457.

Fifteen years after Leman, the Supreme Court decided United

States v. United Mine Workers of Am., 330 U.S. 258 (1947). In

that decision, the Court observed that, "[w]here compensation is

intended [in civil contempt], a fine is imposed. . . [It] must

of course be based upon evidence of complainant's actual loss."

Id. at 304. As this Court, among others, previously noted,

"United Mine Workers did not overrule Leman." ePlus, 2013 WL

1287714, at *8; see also Connolly v. J.T. Ventures, 851 F.2d

930, 934 (7th Cir. 1988) ("We are persuaded that United Mine

Workers does not affect the Leman holding."); National Drying

Machinery Co. v. Ackoff, 245 F.2d 192, 195 (3d Cir. 1957)

(Biggs, C.J., dissenting from denial of rehearing en banc)

("[T]he Leman decision was not overruled by" United Mine

**A85**

Workers_.). Lawson marshals no further authority for the proposition that _Leman_ has been overruled or that compensatory damages require a showing of actual loss. Thus, for the reasons set forth in the previous Memorandum Opinion, and the decisions relied upon therein, the Court concludes that "profits are recoverable not by way of punishment but to insure full compensation to the party injured." _Leman_, 284 U.S. at 456; _see also Marshak v. Treadwell_, 595 F.3d 478, 495 (3d Cir. 2009) ("[A]n accounting of an infringer's profits is available if the defendant is unjustly enriched, if the plaintiff has sustained damages, _or_ if an accounting is necessary to deter infringement.") (internal quotations omitted; emphasis in original). _Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd._, 885 F.2d 1, 6 (2d Cir. 1989) ("[P]rofits are an equivalent or a substitute for legal damages, when damages have not been shown, and are recoverable not by way of punishment but to insure full compensation to the party injured.") (internal citations and quotations omitted); _Connolly_, 851 F. 2d at 934 ("[W]e conclude that an award of defendants' profits was a proper measure of damages to compensate the plaintiff in this civil contempt proceeding.").

Nevertheless, even where a particular remedy is available, it is not necessarily appropriate. ePlus appears to argue that, because disgorgement is _available_, it is therefore _appropriate_.

A86

See (Pl. Br. on Remedies at 2 (arguing that, because other "courts in this Circuit and in this district have often held disgorgement . . . is appropriate," that it is therefore appropriate here)). Lawson, on the other hand, argues that disgorgement is an extreme sanction, appropriate only when there is a showing of willful or egregious conduct by the contemnor. (Def. Br. on Remedies at 3-4 (citing John M. Golden, Injunctions as More (or Less) Than "Off Switches": Patent-Infringement Injunctions' Scope, 90 Tex. L. Rev. 1399 (2012))). Lawson argues that the evidence demonstrates that its attempts to design-around ePlus' patent were in good-faith, and, therefore, that a remedy of disgorgement is inappropriate. However, as Leman explained, the remedy of disgorgement is not punitive nor is it designed to be coercive. Rather, disgorgement is a measure by which the Court can determine compensatory damages for contumacious behavior where actual damages have not been shown. As the Court previously explained, "limiting the courts [by not allowing disgorgement] would thwart rather than aid the hand of justice." ePlus, 2013 WL 1287714, at *7.

The Court concludes that disgorgement of profits is the appropriate compensatory remedy in this instance. As the Supreme Court previously explained, "[t]he profits which are recoverable against an infringer of a patent are in fact a compensation for the injury the patentee has sustained from the invasion of his

right. They are the measure of his damages. Though called profits, they are really damages." Mowry v. Whitney, 81 U.S. 620, 653 (1871). Where, as here, "awarding a reasonable royalty would simply encourage continued defiance of court orders and promote disrespect for the law, where a defendant's profits from wrongdoing are so much greater than any estimated royalty amount, and where it is difficult if not impossible to calculate the actual loss of the plaintiff attributable to the contempt," the remedy of disgorgement of profits is appropriate. ePlus, 2013 WL 1287714, at *7.

The next question is the measure of the profits to be disgorged. ePlus suggests two measures of disgorgement for the Court's consideration: Lawson's gross profits or Lawson's incremental profits.[20] ePlus argues that the appropriate measure is "gross profits" because "there is no evidence in the record to suggest that Lawson actually incurred additional incremental costs that are specific to the Infringing Configurations." (Pl. Reply Br. on Remedies at 6). In addition, ePlus argues for disgorgement of gross profits because it is "the measure of profits the parties agree on and that Lawson reports in its

---

[20] ePlus' briefs suggest that Lawson's revenues might be an appropriate measure of disgorgement. However, ePlus' expert did not endorse that notion. Nor is there any other support for it. Hence, it will not be considered.

profit and loss statements," thus making it easier to quantify. (Id. at 5-6).

Lawson argues that, if the Court were to determine that disgorgement was appropriate, that the proper quantum would be "net profits," which would deduct "fixed costs" from the calculation in the same way that "variable costs" are deducted. (Def. Br. on Remedies at 12). Lawson takes the view that "net profits" are easily quantifiable because they are calculated in Lawson's internal spreadsheets, audited financial statements, SEC filings, and for tax purposes. (Id. at 13).

Not even ePlus' expert agrees with ePlus that the appropriate calculation of Lawson's ill-gotten gains is a disgorgement of Lawson's gross profit. Rather, Dr. Ugone testified that, in his opinion, that proper measure of Lawson's gain was the "incremental profits." (Tr. at 976:23-977:1 (The Court: "I think the bottom line, though, is in your judgment, is the correct way to equate your figures with the gain the incremental profit?" The Witness: "Yes."). In contrast, Lawson's expert, Dr. Putnam, posited that the appropriate measure of gain was "net profits." (Tr. at 1052:13-18). Dr. Putnam took this view in part because it was the "conceptually simplest" measure, but primarily because he viewed "the exercise" as "contemplating the position Lawson would have been in had it complied with the Court's order on May 23, 2011." (Tr. at 1052:18-23). In Dr.

52

Putnam's view, Lawson would have undertaken to reduce a variety of costs that might be viewed as "fixed" in the incremental analysis, but would have necessarily become variable as a result of the permanent nature of the injunction.

The purpose of disgorgement is "deprive the wrongdoer of his ill-gotten gain." SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978). It is "remedial and not punitive. The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing" Id. Thus the Court can quickly dispense with gross profits finding that they are inappropriate measures of disgorgement, because they are not an appropriate measure of the extent to which Lawson has profited from its contemptuous conduct.

The primary distinction between Dr. Puntam's and Dr. Ugone's "incremental" profit calculations are the nature of the costs that are deducted.[21] As a general matter, both parties agree that "incremental profits" is an economic concept, and not an accounting principle. Thus, it is not tracked by Lawson in the ordinary course of business. Both experts accept the basic principle that incremental profits should be determined by deducting variable costs, but not fixed costs. Lawson criticizes

---

[21] Dr. Putnam's "net" profit calculation dispenses with the debate over which costs are fixed and which are variable by deducting all costs. ePlus disputes the propriety of using that calculation, but not its accuracy.

ePlus' expert for failing to undertake "meaningful economic analysis of whether Lawson's operating costs were fixed or variable." (Def. Br. on Remedies at 9). ePlus counters that Lawson's expert performed his economic analysis based on outdated and overly general data. (Pl. Br. on Remedies at 11). Lawson's expert performed a "regression analysis" on cost variability to arrive at his conclusions, plotting historical costs against revenue fluctuations. In contrast, ePlus' expert based his analysis principally on the deposition of Kevin Samuelson, formerly Lawson's Chief Financial Officer, who testified for Lawson on various financial matters, and financial spreadsheets produced by Lawson. Lawson is correct that a scientific analysis is, conceptually, superior, but ignores that (as with all scientific analyses) the deficiencies in the data used by Dr. Putnam render his conclusion unhelpful.

A principal problem is Dr. Putnam's attempt to take company-wide financial information and use it as a proxy for the products at issue. Dr. Putnam testified that the sole basis for his conclusion that it was appropriate to "treat companywide date as a proxy for the sale of the accused configurations and the accused modules" was because Mr. Samuelson told him so. (Tr. at 1046:7-13). The Court did not find Mr. Samuelson to be a credible witness on that point and, at best, Dr. Putnam's

54

**A91**

reliance on Mr. Samuelson's "say-so" undermines the potentially compelling nature of his regression analysis.

Another difficulty with Dr. Putnam's analysis is that it was based entirely on data from when Lawson was a public company, even though the "injunction period" occurred after Lawson had gone private. Dr. Putnam conceded that, "as a matter of principle," a change in "control of management of a business can lead to differences" in the regulation of expenses and costs." (Tr. at 1127:4-8). Yet, he did not attempt to include data from after Lawson went private in his analysis because it was not "comparable" to the earlier data. (Tr. at 1126:25-1127:3).

Moreover, Dr. Putnam's regression analysis was based on data for Lawson's worldwide operations. However, there was no evidence from which one can conclude that the worldwide data was representative of the domestic data. (Tr. at 1127:24-1128:2).

Thus, although the Court can take no issue with the concept of a regression analysis itself, the result here raises the age old question: "If you put into the machine wrong figures, will the right answers come out?"[22] In this case, the answer is no.

Dr. Ugone, in contrast, began with the undisputed amount of gross profits and made a series of deductions. Dr. Ugone

---

[22] Charles Babbage, <u>Passages from the Life of a Philosopher</u> 67 (London, Longman Roberts & Green 1864).

concluded that there were three basic categories of expenses: (1) general and administrative; (2) research and development; and (3) sales and marketing. Dr. Ugone deducted all sales and marketing expenses in an effort to be "conservative" although he felt that "it's highly unlikely that all of them would be variable." (Tr. at 911:16-21). He did not, however, deduct the other two categories of expenses. As Dr. Ugone explained, most of the administrative costs are "going to be there anyway" and will not vary "with revenue associated with the infringing configurations during the injunction period." (Tr. at 909:3-10). The Court agrees that those costs are not properly viewed as variable in these circumstances because the vast majority of Lawson's administrative overhead would not vary based on the revenue from the infringing configurations. Similarly, Dr. Ugone declined to deduct "product development costs." While Dr. Ugone agreed that it is sometimes appropriate to deduct those costs, (Tr. at 910:22-23), it was not appropriate in this instance because the evidence suggested that Lawson's development costs would not have varied with the revenues associated with the infringing configurations. (Tr. at 910:24-911:3). In fact, Lawson booked research and development costs for RQC in an amount between $38,000 and $75,000. (Tr. at 987:17-20). That fact supports Dr. Ugone's conclusion. Thus, Dr. Ugone presented an incremental profits figure that represented the deduction of

56

**A93**

all direct costs and all sales and marketing costs from Lawson's revenues, but without further deduction.

The Court finds Dr. Ugone's calculations to be reliable and a more credible calculation than Dr. Putnam's analysis. The Court is not inclined to follow Lawson's suggestion and adopt the "net" profit proposal because the analysis presented to support it is not reliable. The Court finds Dr. Ugone's incremental profit calculations to be an appropriate approximation of Lawson's gains from its contumacious behavior.

In his calculations, Dr. Ugone also prepared an apportionment of the incremental profits that were fairly attributable to the infringing aspects of Configurations Nos. 3 and 5, specially by attempting to divide out the revenues from Lawson's foundational modules (LSF and Process Flow) which served as the basis for Lawson's entire S3 software line, including financial and human resources software. Based on his calculations, with which Dr. Putnam agreed, Dr. Ugone concluded that approximately fifteen percent of the revenues from LSF/Process Flow related to Configurations 3 and 5. The analysis conducted by both experts indicated that an apportionment was appropriate because the majority of the LSF/Process Flow revenues were related to products other than the Infringing Configurations.

Thus, adopting both Dr. Ugone's incremental profit and apportionment analyses, the Court concludes that the proper quantum for disgorgement is $17 million from the date of the injunction to July 1, 2013 and a daily rate of $24,850 thereafter to the present date.

### Enhancement and Attorneys' Fees

Finally, ePlus seeks enhanced damages for willful infringement and attorneys' fees, pursuant to 35 U.S.C. § 285.

As a threshold matter, it is unclear what law governs the assessment of enhanced damages or the award of attorneys' fees. As previously noted, "[b]ecause civil contempt proceedings are not unique to patent law," the law of the regional circuit governs the available remedies for contempt. Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc., 305 F.3d 1303, 1313 (Fed. Cir. 2002). However, the question of willfulness of infringement, as well as the grant of authority present in 35 U.S.C. § 285 to award attorneys' fees, necessarily raise questions that are unique to patent law.[23] Thus, Lawson relies on familiar regional principles which instruct that an award of enhanced damages and attorneys' fees in a contempt proceeding is

---

[23] At argument, ePlus argued that "willful" in a "term of art that's used specifically with respect to patent infringement." (Tr. of Closing Arguments at 194:17-19). However, as the Federal Circuit has recognized, "the term willful is not unique to patent law, and it has a well-established meaning in the civil context." In re Seagate Technology, LLC, 497 F.3d 1360, 1370 (Fed. Cir. 2007).

only appropriate when the contemnor's conduct rises "at least to the level of obstinance or recalcitrance." Omega World Travel, Inc. v. Omega Travel, Inc., 710 F. Supp. 169, 173 (E.D. Va. 1989). ePlus, on the other hand, relies on patent cases which routinely award enhanced damages based on a finding of willful infringement.  In re Seagate Technology, LLC, 497 F.3d at 1368 ("[W]e have held that an award of enhanced damages requires a showing of willful infringement.").

There has been no clear guidance from the Federal Circuit on what standard to apply to civil contempt actions. For example, in Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 903 F.2d 1568, 1578 (Fed. Cir. 1990), the district court trebled the damages award "by reason of the willful and deliberate nature of the infringement" and awarded attorneys' fees "by reason of the exceptional nature of the case." Thus, employing the conventional patent law analysis. The Federal Circuit affirmed the finding that "the [district] court justifiably characterized [the contemnor's] actions as 'flagrant contemptuous conduct'" and "[i]n these circumstances, the district court did not abuse its discretion." Id. This is language which sounds more in the law of the regional circuit, which indeed, the Federal Circuit applied in Spindelfabrik, to reverse a $2 million fine as being "punitive." Id.

Similarly, in <u>Alopex Industries, Inc. v. Seibel</u>, 61 F.3d 919 (Fed Cir. 1995) (unpublished), the Federal Circuit affirmed an award of treble damages for "willful" infringement of a consent decree, citing to <u>Smithkline Diagnostics, Inc. v. Helena Labs. Corp.</u>, 926 F.2d 1161 (Fed. Cir. 1995). In <u>Smithkline</u>, the Federal Circuit observed that "enhancement of damages and attorney fee awards are expressly committed to the court's discretion," <u>Id.</u> at 1164 n.2, citing to 35 U.S.C. §§ 284 and 285. Section 284 permits the court to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.[24] However, "enhanced damages are punitive, not compensatory." <u>Sesonics, Inc. v. Aerosonic Corp.</u>, 81 F.3d 1566, 1574 (Fed. Cir. 1996); <u>see also</u> <u>Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.</u>, 383 F.3d 1337, 1348 (Fed. Cir. 2004) (Dyk, J., concurring-in-part and dissenting-in-part) ("We have often recognized that enhanced damages awarded pursuant to 35 U.S.C. § 284 are a form of punitive damages."); <u>Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.</u>, 246 F.3d 1336, 1361 (Fed. Cir. 2001) ("Damages for willfulness are

---

[24] Although ePlus does not cite to § 284 as a basis for enhancement, the nine-part test that ePlus relies on in support of its request for enhanced damages is the test for enhancement under § 284. <u>See</u> (Pl. Br. on Remedies at 13 (<u>citing</u> <u>Read Corp. v. Portec, Inc.</u>, 970 F.2d 816 (Fed. Cir. 1992); <u>see also</u> <u>Read Corp.</u>, 970 F.2d at 826 ("Under section 284 of Title 35, damages may be enhanced up to three times the compensatory award.") (internal emphasis omitted).

punitive."); <u>Beatrice Foods Co. v. New England Printing and Lithographing Co.</u>, 923 F.2d 1576, 1580 (Fed. Cir. 1991) ("As we have held, the enhanced portion of the damage award in this case cannot be compensatory, and it, therefore, is punitive."); <u>Paper Converting Machine Co. v. Magna-Graphics Corp.</u>, 745 F.2d 11, 23 (Fed. Cir. 1984) ("[D]amages are trebled as punishment.").

Of course, the distinction between civil and criminal contempt is one of "character and purpose" in that the punishment for civil contempt is "remedial" while the punishment for criminal contempt is "punitive." <u>Gompers v. Buck's Stove & Range Co.</u>, 221 U.S. 418, 441 (1911). It is well-settled that the Court cannot impose a purely punitive sanction during a civil contempt proceeding. <u>See</u> <u>United Mine Workers of America v. Bagwell</u>, 512 U.S. 821 (1994); <u>In re General Motors Corp.</u>, 61 F.3d 256, 259 (4th Cir. 1995) (punitive sanction "not appropriate in a civil contempt proceeding").

While the law is, at best, muddled, the Court concludes that enhancement of damages for willful infringement, as contemplated in 35 U.S.C. § 284 and as provided for in the authorities to which ePlus cites, is, as the Federal Circuit has recognized, punitive in nature. This is particularly true where, as here, the Court has employed disgorgement of profits as a compensatory remedy which is, in itself, inherently an estimate of damages. Under the circumstances of this action, at least,

any enhancement of the disgorgement remedy would be punitive. Thus, enhanced damages are not appropriate remedy in this situation. And, accordingly, ePlus' request for enhanced damages will be denied.

It is similarly unclear whether (and under what authority) attorneys' fees are available in this proceeding. "In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Alyeska Pipeline Serv. Co. v. Wilderness Soc., 421 U.S. 240, 247 (1975). There is no general rule permitting the award of attorneys' fees. However, Congress has made "specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights." Alyeska, 421 U.S. at 260. In the absence of statutory authority, the Court may only award attorneys' fees in "narrowly defined circumstances" in which the award is authorized by the Court's "inherent power." Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980). The situations in which the Court has inherent authority to award attorneys' fees fall into three categories. First, "known as the 'common fund exception,' derives not from a court's power to control litigants, but from its historic equity jurisdiction, and allows a court to award attorney's fees to a party whose litigation efforts directly benefit others." Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991) (internal

62

**A99**

citations omitted). Second, "a court may assess attorney's fees as a sanction for the willful disobedience of a court order." Id. (internal quotations omitted). Finally, "a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Id. at 45-46 (internal quotations omitted).

ePlus stresses that it is seeking the award of attorneys' fees pursuant to the statutory grant of authority in 35 U.S.C. § 285. See (Pl. Reply Br. on Remedies at 13 ("ePlus is seeking attorneys' fees and costs under 35 U.S.C. § 285.")). Whether or not § 285, which permits the Court to award attorneys' fees upon a finding that the case is "exceptional," applies in a contempt proceeding appears to be an under-analyzed issue. In several decisions, the Federal Circuit has affirmed an award of attorney's fees following a contempt finding, but has done so without apparent reference to § 285, or the apparent tension between the settled principle that the law of the regional circuit governs the available remedies for contempt, Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc., 305 F.3d 1303, 1313 (Fed. Cir. 2002), and the attempt to enhance (or alter) those remedies with reference to the patent statutes. In Stryker Corp. v. Davol Inc., 234 F.3d 1252, 1260 (Fed. Cir. 2000), the Federal Circuit affirmed an award of enhanced damages and attorneys' fees "considering the conclusory nature of the

opinion of counsel used by Davol to justify selling the revised device and the minor changes made to the original device." In Spindelfabrik, the Federal Circuit affirmed an award of attorneys' fees where the district court found that the contemnor's actions amounted to "flagrant contemptuous conduct." 903 F.2d at 1578.

In contrast, the United States Court of Appeals for the Fifth Circuit considered this issue in Dow Chemical Company v. Chemical Cleaning, Inc., 434 F.2d 1212 (5th Cir. 1970) cert. denied 402 U.S. 945 (1971). The Fifth Circuit explained that the discussion of "willfulness," as set forth in 35 U.S.C. § 284 and applied in § 285, "fails to recognize that this is a civil contempt proceeding, not a patent infringement suit." Id. at 1214. The court explained,

> The patent infringement was established in the previous round of litigation; we here determine the appropriateness of damages, compensatory and exemplary, for willful violation of a court order. In dealing with a civil contempt proceeding the district court was not bound by the provisions of Title 35, U.S.C., 284. Rather it was free to exercise the inherent discretion possessed by a court to correct willful violations of its solemnly passed orders.
>
> CCI's confusion over the distinction between patent cases and contempt of court cases carries over into the area of attorney's fees and other expenses. CCI urges that the district court erred in awarding Dow $24,371.05 in attorney's fees, $5,917.77 for attorney's expenses and $12,984.85 for

64

**A101**

salary costs for several Dow employees involved in the investigation by Dow. CCI argues that attorney's fees and other expenses may only be awarded in patent cases in accordance with statutes enacted by Congress. Title 35, U.S.C., 285 provides:

'The Court in exceptional cases may award reasonable attorney fees to the prevailing party'.

The court found that the facts of this case did not qualify it as an 'exceptional' case.

We iterate that this is not a patent infringement case- it is a civil contempt proceeding. There are contempt cases in abundant number holding that a court has discretion to award reasonable attorney's fees and other expenses necessary to make an innocent party whole.

Id. at 1214-15 (internal citations omitted). The Eighth Circuit drew a similar distinction in upholding an award of attorneys' fees despite the lack of finding of an "extraordinary case" under § 284, explaining,

We are told by appellant that in patent infringement cases attorney fees should be awarded only in extraordinary cases bottomed on a finding of unfairness or bad faith. And, of course, appellant insists that this is not such a case. To be sure, the law is clear that in an action for patent infringement attorney fees should not be allowed except in the extraordinary case. The statute so provides as do the cases cited and relied upon by appellant. . . . From the argument made by appellant and the authorities relied upon by him, it is apparent that he views this as an ordinary patent infringement action. This position is untenable. As we have tried to demonstrate, this is a civil contempt

65

**A102**

> proceeding growing out of the continued infringement of the Hansen patent in the face of an injunction proscribing such infringement.

Siebring v. Hansen, 346 F.2d 474, 480 (8th Cir. 1965) (internal citations omitted).[25] Although ePlus cites a number of decisions in which attorneys' fees were imposed following a finding of contempt, none of those decisions address the fundamental question of whether § 285 applies to a civil contempt proceeding and, indeed, those decisions all appear to frame their analysis consistent with a court's inherent authority to impose attorneys' fees for "willful disobedience of a court order." Chambers, 501 U.S. at 46.[26] Conceptually, however, it is sensible

---

[25] It is true, of course, that Dow Chemical and Siebring addressed situations in which a district court awarded fees in situations that § 285 may not have permitted them. However, the reasoning of those decisions would apply with equal force to circumstances in which fees might be appropriate under § 285, but would not be under the law of the regional circuit for civil contempt actions. Because the Court concludes that § 285 does not apply, the Court does not consider which category, if either, is presented here.

[26] During argument, ePlus relied principally on the decision of the Federal Circuit in Pharmacia & Upjohn Co. v. Myland Pharmaceuticals, Inc., 182 F.3d 1356 (Fed Cir. 1999), for the proposition that the law of the Federal Circuit governs attorneys' fees. (Tr. of Closing Argument at 192:18-24). That decision is inapposite here. In Pharmacia & Upjohn Co., the Federal Circuit instructed that "our precedent governs the substantive interpretation of 35 U.S.C. § 285" and rejected the district court's reliance on the stricter Fourth Circuit standard. 182 F.3d at 1359. However, that decision involved an appeal from a patent infringement suit in which § 285 clearly applied. It provides no insight into whether § 285 is properly applied to a civil contempt action that arises out of an

66

**A103**

that if, "the law of the regional circuit" applies to "a district court's imposition of civil contempt sanctions," Zip Dee, Inc. v. A & E Systems, Inc., 935 F.2d 280, at *1 (Fed. Cir. 1991) (unpublished), then that law is adopted whole cloth to avoid a result that becomes untethered from any comprehensive remedial scheme. The Court is persuaded by the logic of Dow Chemical and Siebring and concludes that, because this is a civil contempt action, § 285 does not apply and the civil contempt damages scheme of the regional circuit controls. Thus, if attorneys' fees are to be awarded in this case, they must be awarded under the Court's inherent authority and consistent with the law of the Fourth Circuit.

In the Fourth Circuit, "no one seriously questions the right of the Court to award civil contempt damages which have long been recognized. So also to the right to include attorneys' fees as an element of the award." Folk v. Wallace Business Forms, Inc., 394 F.2d 240, 244 (4th Cir. 1968) (internal citations omitted). However, before attorneys' fees can be awarded, "a contemnor's refusal to comply with a court order must rise to the level of obstinacy, obduracy, or recalcitrance to satisfy the 'willful disobedience' standard." Omega World Travel, Inc. v. Omega Travel and Shipping Agencies, Inc., 905

---

injunction which, in turn, arose out of a patent infringement suit.

**A104**

F.2d 1530, at *4 (4th Cir. 1990) (unpublished) (<u>citing</u> <u>Wright v.</u>
<u>Jackson</u>, 522 F.2d 955, 958 (4th Cir. 1975)). This requirement
has consistently been applied by the district courts in this
circuit when addressing an award of attorneys' fees for
disobedience of a court order in a civil contempt proceeding.
<u>See e.g.</u>, <u>JTH Tax, Inc. v. Noor</u>, 2012 WL 5286955, at *1 (E.D.
Va. Oct. 23, 2012); <u>Lane v. Prima Marketing, LLC</u>, 2008 WL
793642, at *7 (S.D.W.V. March 20, 2008); <u>Wagner v. Bd. of Educ.</u>
<u>of Montgomery Cnty.</u>, 340 F. Supp. 2d 603, 620 n.8 (D. Md. 2004).
Even assuming <u>arguendo</u> that Lawson's disobedience was willful,
the Court cannot conclude that Lawson's behavior rises to the
level of "obstinate," "obdurate," or "recalcitrant."

    For the foregoing reasons, ePlus' request for an award of
attorneys' fees will be denied.

    <u>Coercive Remedies</u>

    Finally, ePlus asks the Court to impose a coercive remedy
either by shutting down Lawson's business or imposing a daily
fine to ensure compliance with the Injunction Order. There is no
question that the Court has the ability to impose sanctions "to
coerce obedience to a court order." <u>In re General Motors Corp.</u>,
61 F.3d 256, 258 (4th Cir. 1995). "The paradigmatic coercive,
civil contempt sanction . . . involves confining a contemnor
indefinitely until he complies with an affirmative command such
as an order to pay alimony, or to surrender property ordered to

be turned over to a receiver, or to make a conveyance." Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 828 (1994). "This dichotomy between coercive and punitive imprisonment has been extended to the fine context. . . . Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." Id. at 829. A coercive fine must be forward-looking and becomes punitive, and thus criminal, if it serves as "punishment for the completed act of disobedience." Gompers, 221 U.S. at 443. Lawson's contumacious conduct, while not sufficiently egregious to warrant enhanced damages or attorneys' fees, is nonetheless quite troubling because it reflects a willingness to be casual about its obligation to obey the injunction. Also, Lawson's conduct in advising customers about how to run RSS and RQC in parallel and in not verifying whether customers had stopped using RSS illustrates the need to use the coercive power of the Court to assure compliance with the injunction henceforth. However, Lawson must be given an opportunity to purge the contempt before a coercive remedy is enforced. The appropriate coercive remedy is a fine of $ 62,362 per day for every day that Lawson remains in contempt. If, however, Lawson demonstrates by September 20, 2013, that it is in compliance with the injunction, no coercive remedy will be imposed. If Lawson fails in that objection, the fine will attach nunc pro tunc to August 16, 2013.

## CONCLUSION

For the reasons set forth above, ePlus' MOTION TO SHOW CAUSE WHY LAWSON SOFTWARE, INC. SHOULD NOT BE HELD IN CONTEMPT (Docket No. 798) will be granted. The Court finds that Lawson is in contempt of the Court's May 23, 2011 injunction. The Court will award damages in the form of disgorgement of Lawson's incremental profits from the infringing configurations, calculated at $17 million from the date of the injunction until July 1, 2013 with a daily rate $24,850 thereafter until the present. The Court will deny ePlus' request for enhanced damages and attorneys' fees. The request for a coercive fine will be provisionally granted.

It is so ORDERED.

_____ /s/ _____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 16, 2013

70

**A107**



US006023683A

# United States Patent [19]

## Johnson et al.

| | |
|---|---|
| [11] | **Patent Number:** |
| [45] | **Date of Patent:** |

**6,023,683**

**Feb. 8, 2000**

[54] **ELECTRONIC SOURCING SYSTEM AND METHOD**

[75] Inventors: **James M. Johnson**, Bridgeville; **Robert P. Kinross**, Ben Avon; **Francis J. Melly**, Pittsburgh; **Douglas A. Momyer**, Upper St. Clair, all of Pa.

[73] Assignee: **Fisher Scientific Company**, Pittsburgh, Pa.

[21] Appl. No.: **08/288,577**

[22] Filed: **Aug. 10, 1994**

[51] **Int. Cl.**[7] ..................................... **G06F 17/60**

[52] **U.S. Cl.** ................................ **705/26**; 705/1; 705/28; 707/104

[58] **Field of Search** .................................. 395/226, 227, 395/235, 207, 210, 211; 705/26, 27, 35, 1, 28; 707/100, 104

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,135,241 | 1/1979 | Stanis et al. | 364/200 |
| 4,141,078 | 2/1979 | Bridges, Jr. et al. | 364/900 |
| 4,336,589 | 6/1982 | Smith et al. | 364/403 |
| 4,509,123 | 4/1985 | Vereen | 364/300 |
| 4,636,950 | 1/1987 | Caswell et al. | 364/403 |
| 4,656,591 | 4/1987 | Goldberg | 364/478 |
| 4,887,208 | 12/1989 | Schneider et al. | 364/403 |
| 4,897,867 | 1/1990 | Foster et al. | 379/93.12 |
| 4,920,488 | 4/1990 | Filley | 364/403 |
| 4,958,280 | 9/1990 | Pauly et al. | 364/403 |
| 4,972,318 | 11/1990 | Brown et al. | 364/403 |
| 4,984,155 | 1/1991 | Geier et al. | 705/26 |
| 4,992,940 | 2/1991 | Dworkin | 705/26 |
| 5,038,283 | 8/1991 | Caveney | 364/403 |
| 5,077,665 | 12/1991 | Silverman et al. | 364/408 |
| 5,101,352 | 3/1992 | Rembert | 364/401 |
| 5,103,079 | 4/1992 | Barakai et al. | 235/380 |
| 5,117,354 | 5/1992 | Long et al. | 364/401 |
| 5,168,444 | 12/1992 | Cukor et al. | 364/401 |
| 5,168,445 | 12/1992 | Kawashima et al. | 364/403 |
| 5,305,199 | 4/1994 | LoBiondo et al. | 705/28 |
| 5,319,542 | 6/1994 | King et al | 705/26 |
| 5,758,327 | 5/1998 | Gardner et al. | 705/26 |
| 5,799,289 | 8/1998 | Fukushima et al. | 705/400 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 697 669 A2 | 8/1995 | European Pat. Off. . |
| WO 90/11572 | 10/1990 | WIPO . |

### OTHER PUBLICATIONS

"Texas Instruments Puts the MRO Buy On Line," *Purchasing*, p. 37, May, 19, 1994.

"IBM Technical Viewer/2 General Information Manual," 1991.

"IBM Technical Viewer/2" product information brochure, IBM Corporation, undated.

(List continued on next page.)

*Primary Examiner*—Edward R. Cosimano
*Attorney, Agent, or Firm*—Reed Smith Shaw & McClay

[57] **ABSTRACT**

An electronic sourcing system includes a computer that maintains a catalog database of data including product information (such as product identification and descriptive information) relating to catalog items available from vendor product catalogs, and a means for building (generating) a requisition including at least one requisitioned item. Information at least partially identifying an item desired to be requisitioned is entered by a user, and utilized by a means for searching the database for catalog items matching that information and for selecting at least one catalog item located as a result of the search. Text describing the catalog items, and images of the items, may be viewed. Data identifying selected catalog items are communicated to the requisition building means, which generates a requisition including entries for items corresponding to the selected catalog items. The system checks the availability in one or more inventory locations of the corresponding desired catalog items, and generates one or more purchase orders for desired items from inventory locations stocking the items.

**45 Claims, 5 Drawing Sheets**



DEFENDANT'S EXHIBIT

**DX 543**

3:09 CV 620 (REP)

OTHER PUBLICATIONS

"Guide to Using First Place," Automated Catalogue Services Inc., Aug. 1993.

"KAware3 Retrieval Systems," Knowledge Access International, Inc., 2685 Marine Way, Suite 1305, Mountain View, California 94043, 1993.

"Grainger Electronic Catalog User's Guide," Edition 6, pp. 29–33, and 49–50, 1994.

"Automated Catalog Systems," product information brochure, Distrivision Development Corporation, 1355 Willow Way, Suite 110, Concord, California 94520, 1994.

"SweetSource User's Guide," Sweet's Electronic Publishing, 99 Monroe Avnue NW, Ste. 400, Grand Rapids, Michigan 49503–2651, Mar. 1, 1993.

"Aldrich Catalog on Disk Reference Manual," Aldrich Chemical Company, Inc., 1001 West St. Paul Avenue, Milwaukee, Wisconsin 53233, 1994.

"Easel to Move Development to Windows," *Infoworld*, May 16, 1994.

"Easel Eases the Way to OO," *Computer Select*, Jun. 1994.

"Stockclerk Inventory Management System" product information brochure, IOBar, Inc., P.O. Box 9767, The Woodlands, Texas 77367, 1993.

"Fisher STOCKPRO™ Inventory Management System" brochure, Fisher Scientific 1990.

"Systems By Fisher/Inventory Management System/STOCKPRO™—Single–User" user manual, pp. 6–1 to 6–14, 6–21 to 6–26, 7–1 to 7–18, 8–1 to 8–20, 9–1 to 9–6, and 10–1 to 10–8, Fisher Scientific Company, Feb. 28, 1989.

"Fisher Scientific PurchasePro" user manual, version 1.1, Introduction pp. 1–6, File Editors pp. 1–12, Purchase Requisitions pp. 1–12, Purchase Orders pp. 1–8, 23 and 34, Vendor Quotes p. 1, Fastback Orders pp. 1–8, Reports p. 1, ReportPro p. 1, 1984.

"LIGHTNING™ Fisher's Electronic Order Entry System" brochure, Fisher Scientific Company, 1989.

"LIGHTNING™ Order Entry and Information System" user manual, pp. 1–6, 19–54, and 91–96, Fisher Scientific Company, 1990.

"Fisher Reliance™ System" brochure, Fisher Scientific Company, 1989.

"*Fisher 88*" catalog, pp. 1536, 1549–1567, Fisher Scientific Company, 1984.

"Black Box" system electronic catalog (no document enclosed).

Excerpt from "A Prism Electronic Catalog Proposal: Product Information System For Sales and Marketing," prepared for Fisher Scientific Company, presented by MediaShare Corporation, Aug. 31, 1993.

European Seach Report, Application No. 95 305364, Dated Aug. 2, 1997.

European Search Report, Application No. 95 305364, Dated Aug. 2, 1997.



FIG. 1A

U.S. Patent    Feb. 8, 2000    Sheet 1 of 5    6,023,683



U.S. Patent

Feb. 8, 2000

Sheet 2 of 5

6,023,683

FIG. 1B



# FIG. 1C



U.S. Patent

Feb. 8, 2000

Sheet 4 of 5

6,023,683



FIG. 2



U.S. Patent

Feb. 8, 2000

Sheet 5 of 5

6,023,683

FIG. 3

6,023,683

1

# ELECTRONIC SOURCING SYSTEM AND METHOD

## BACKGROUND OF THE INVENTION

This invention relates to systems and methods for interfacing product information, such as is typically found in vendor catalogs that are provided to customers, and requisition/purchasing systems and methods that may use the results of searches of product information.

There are a number of known requisition/purchasing systems that manage and process requisitions and purchase orders. One such system is the Fisher Scientific Requisition and Inventory Management System ("Fisher RIMS"), described U.S. Pat. No. 5,712,989, filed Apr. 2, 1993 and assigned to Fisher Scientific Company of Pittsburgh, Pa., the disclosure of which is incorporated herein by reference. As its title suggests, Fisher RIMS can also manage inventory. In the Fisher RIMS system, requisition records are created from a real-time interaction between a host computer (generally a mainframe) and a local computer (generally at a customer site), with each computer using data from its own respective database of inventory in conjunction with information entered by a customer service representative operating the local computer. By accessing its respective database, each computer can build and transmit to the other computer communications blocks of data relating to a particular requisition of an item in inventory (or to the management of the inventory itself). The other computer can then use the received data to continue processing of the requisition. Thus, requisition records are created from a real-time interaction between the host and local computers, with each computer using data from its respective database in conjunction with information entered by a customer service representative operating the local computer.

Other requisition/purchasing systems can be grouped broadly into four classes. First, requisition management systems licensed to corporations purchasing for their own use include ORION software (from Medical Management Systems), ENTERPRISE software (from ESI), and NOVA software (from Johnson & Johnson). Second, there exist systems provided by distributors for transmitting orders to them in proprietary formats. Such systems include QUICK-LINK (from Abbott), ASAP system (from Baxter) and LIGHTNING system (from Fisher Scientific). Third, software packages licensed by software developers to customers and/or suppliers enable the transmission of customer purchase orders as EDI purchase orders (in ANSI X.12 format). Examples of such systems include ON-CALL EDI (from TSI International), EDI Express software (from General Electric Information Services) and GETRAN software (from Sterling Software). Fourth, comprehensive business management packages such as REAL WORLD software (from Real World Corporation of Concord, NH) and ASK software (from The ASK Group) contain a purchasing module to create replenishment orders when inventoried items fall below restocking points. The same purchasing module can also be used to place spot orders for products keyed in by the customer's purchasing personnel.

None of these known requisition/purchasing systems (including Fisher RIMS), however, provides a capability for a user readily to search for and locate information about the products that may be requisitioned and ordered in connection with the requisition/purchasing system. They also do not provide the capability for a user to search a database containing two or more vendor catalogs, and then to transfer information about the items selected as a result of such

2

searches into a requisition/purchasing system such as Fisher RIMS for building a requisition for the catalog items.

Computer systems that are capable of searching databases containing a product catalog of a particular vendor, for example on CD-ROM, are also known. Such systems can search for user requested information about products and create orders which the user can save, print or, in some cases, facsimile directly to a vendor. The known computer systems for searching vendor catalogs are limited in that only one such vendor catalog is accessible to a user at any given time. They are also limited in that they can only create an order within the particular vendor catalog database. They cannot source items to be requisitioned from a database containing multiple catalogs or interact with a requisition/purchasing system (such as Fisher RIMS) to create a purchase order or orders including the items located from that sourcing operation.

Thus, it would be desirable to provide an electronic sourcing system that provides a means for transferring information between a requisition/purchasing system that may use the results of a search of product information and a means for searching large volumes of product information such as would be included in a vendor product catalog or catalogs.

It would also be desirable to provide such an electronic sourcing system that is capable of searching a database containing at least two vendor product catalogs for product information.

It would further be desirable to provide such an electronic sourcing system that is capable of searching a database of catalog items contain in at least two vendor product catalogs, selecting particular items located, and transferring information about the items selected (for example, a catalog number and a vendor identifier, such as vendor name and/or vendor number) to a requisition/purchasing system for inclusion in a requisition generated by the system.

It would further be desirable to provide an electronic sourcing system that is capable of creating an order list including items located as the result of a catalog database search and transferring that order list of desired catalog items to a requisition/purchasing system for inclusion of the catalog items as entries in a requisition generated by the system.

## SUMMARY OF THE INVENTION

In view of the foregoing, it is an object of this invention to provide an electronic sourcing method and system that provides a user with the capability of searching a database containing data (including product/vendor identification, and other product information) relating to items available from at least two vendor product catalogs, and the capability of transferring the product information for desired catalog items obtained as a result of the search to a requisition/purchasing system for use in generating a requisition including entries for the desired catalog items.

It is also an object of this invention to provide an electronic sourcing system that provides a means for bi-directionally transferring information between a requisition/purchasing system that may use the results of a search of such product information, and a means for searching large volumes of product information such as would be included in a vendor product catalog.

It is a further object of this invention to provide an electronic sourcing system capable of creating an order list including desired catalog items located as the result of such a database search, and transferring that order list to a

6,023,683

3

requisition/purchasing system for generating a requisition including entries for the desired catalog items.

In accordance with the invention, an electronic sourcing system and method used by the system are provided. The system includes a computer that maintains a catalog database of data including product information (such as product identification information, and descriptive information) relating to catalog items available from vendor product catalogs, and a means for building (generating) a requisition including at least one requisitioned item. Information at least partially identifying an item desired to be requisitioned is entered by a user, and utilized by a means for searching the database for catalog items matching that information and for selecting at least one catalog item located as a result of the search. Text describing the catalog items, and images of the items, may be viewed. Data identifying selected catalog items are communicated to the requisition building means, which generates a requisition including entries for items corresponding to the selected catalog items. Additionally, the invention includes a means for checking the availability in one or more inventory locations of the corresponding desired catalog items, and for generating one or more purchase orders for desired items from inventory locations stocking the items.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above and other objects and advantages of the invention will be apparent from consideration of the following detailed description, taken in conjunction with the accompanying drawings, in which like reference characters refer to like parts throughout, and in which:

FIG. 1A is a block diagram showing one exemplary embodiment of the overall system of the present invention;

FIG. 1B is a block diagram showing another exemplary embodiment of the overall system of the present invention;

FIG. 1C is a block diagram showing a portion of the embodiment of FIG. 1A in greater detail;

FIG. 2 is a block diagram showing the flow of control and interaction between the various programs and data screens of the programs used for requisition management and vendor catalog searching of the present invention; and

FIG. 3 is a block diagram showing a portion of a system (Fisher RIMS) for requisition management, including the electronic sourcing system of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

FIGS. 1A and 1B show preferred embodiments of the electronic sourcing system 5 of the present invention. As shown in FIG. 1A, a local computer 20, which is preferably located at or near a Customer site and the site of Just-In-Time ("JIT") Inventory, is preferably used by an on-site Customer Service Representative ("CSR") dedicated to a Customer to assist that Customer in requisitioning items needed.

Local computer 20 includes conventional color monitor 22 and alphanumerical keyboard 24 including twelve function keys F1, F2, . . . F12. Local computer 20 is also coupled to printer 26.

Local computer 20 is preferably a conventional microcomputer (such as a 386-, 486- or Pentium-class personal computer) capable of operating the required programs and of transmitting and receiving the required communications, running the OS/2 operating system 32 and also running the CICS OS/2 application 34, both of which are available from IBM.

4

Electronic sourcing system 5 also includes a requisition/purchasing system 40, preferably but not necessarily the Fisher RIMS system, and a search program 50 that is capable of searching through large volumes of information quickly and accurately. Preferably but not necessarily, the Technical Viewer 2 search program ("TV/2"), available from IBM, is used as search program 50. As shown in the embodiment of FIG. 1A, Fisher RIMS 40 and TV/2 search program 50 are run by local computer 20.

Fisher RIMS system 40 is comprised of numerous program modules, including several programs 44, which operate within CICS environment 34 of OS/2 operating system 32. Programs 44 include, among others, Requisition Management ("REQI") program 44A, Inventory Sourcing program or programs 44B, Requisition Maintenance program 44C, Customer Variable program 44D, and Order Header program 44E, each of which will later be described in greater detail. REQI program 44A is most often the RIMS program 44 that interfaces with TV/2 search program 50.

Fisher RIMS system 40 also includes several Fisher RIMS databases 42. These databases 42 preferably include requisition databases 42A, inventory databases 42B, and customer-specific databases 42C, each maintained within OS/2 operating system 32.

Local computer 20 also preferably runs Shell program 52, which operates under search program 50 and is used to customize search program 50 to generate Order Lists 48 (shown in FIG. 1C) with particular fields of formatted data about the items selected using search program 50. Local computer 20 is preferably capable of running both a RIMS program 44 and Shell program 52 at the same time (i.e., in a multi-tasking environment), but the user of local computer 20 usually sees only RIMS program 44 or Shell program 52 at one time in the foreground on monitor 22.

Local computer 20 is also provided with a catalog database 36 comprised preferably of at least two vendor product catalogs. The catalogs, and hence catalog database 36, preferably include such information as part number, price, catalog number, vendor name or I.D., and vendor catalog number, as well as textual information and images of or relating to the catalog products. The nature of the business that the Customer using electronic sourcing system 5 conducts will determine which product catalogs are made a part of catalog database 36.

A feature of the present invention is the ability to search multiple catalogs from different suppliers. For example, catalog database 36 can contain the catalog or catalogs published by a vendor Distributor, having Distributor's catalog numbers for all listed products and vendor manufacturer's part numbers for many of the listed products. Catalog database 36 can further contain catalogs published by some of the vendor manufacturers, listing the manufacturers' part numbers for certain products correspondingly listed in the Distributor's catalogs and for certain products not listed in the Distributor's catalogs. Catalog database 36 can further contain catalogs published by outside suppliers, whether other manufacturers or other distributors, listing such vendor's products different from those in the Distributor's catalogs.

Where the Fisher RIMS system is in use with electronic sourcing system 5, a host computer 10 located at a Distributor site is also provided, as shown in FIG. 1A. Host computer 10 controls all inventory, pricing and requisitioning operations of the Distributor's regularly stocked items using host pricing and inventory databases 11. Host pricing and inventory databases 11 may include such information as: descrip-

6,023,683

| 5 | 6 |

tions of the items and the quantities thereof available at a particular Distributor warehouse and at other Distributor warehouses; item records for each Product regularly sold by the Distributor; discount records by Customer; and cross-references from the Distributor's catalog number to its corresponding vendor's part (catalog) number and to similar corresponding catalog numbers of other vendors (suppliers or distributors) for the same Product.

Host computer 10 and local computer 20 are preferably linked point-to-point or in a network employing the formats and protocols of IBM's System Network Architecture ("SNA"). Host computer 10 can be substantially any mainframe or minicomputer capable of running the desired programs and conducting the required communications. Preferably, host computer 10 is a mainframe computer, such as an IBM Model 3090, running the MVS operating system, the MVS-CICS application and a Virtual Telecommunication Access Method communications network.

As shown in FIGS. 1C and 2, interface 60 is also a part of electronic sourcing interface system 5. Interface 60 communicates shared data between requisition/purchasing system 40 and search program 50. Interface 60 is preferably based upon the dynamic data exchange ("DDE") protocol provided by OS/2 operating system 32. As shown in FIG. 2, interface 60 preferably includes three linking programs to interface requisition/purchasing system 40 and search program 50: ESRC program 70, ESCP program 80 and DDE LINK 90.

A typical data exchange may begin with requisition/ purchasing system 40 (which, in the illustrated embodiment, is the Fisher RIMS system) requesting information from catalog database 36 via search program 50. Once a search by search program 50 has been completed, the selected information will be communicated to requisition/purchasing system 40 via interface 60.

Alternatively, if the search of catalog database 36 is initiated from search program 50, the information selected from the search is returned to requisition/procurement system 40 via interface 60.

The start up of electronic sourcing system 5 (FIG. 1A) may be user-initiated or automatically started when the operating system, preferably OS/2 system 32, is brought up on local computer 20. An application-name string 61 must be identified to label interface 60. As shown in FIG. 1C, electronic sourcing system 5 by convention will use "TV2V123," "TV2V124," "TV2V125," etc. as application names 61 supporting the user's requesting service.

Preferably, application names 61 correspond to virtual terminal sessions that exist in the CICS system 34 of requisition/purchasing system 40. There will be a one-to-one correspondence between applications started (such as Shell 52) and CICS virtual terminals in use at a location of requisition/procurement system 40 (such as REQI program 44A). Local computer 20 will query OS/2 operating system 32 to determine the next application-name string 61 to create at start-up. The application-name strings 61 will be created in sequence with V123 being created first, V124 created second, etc. Each application will create only one application name-string 61 to support its user in the CICS environment 34.

If the Fisher RIMS system has been selected as requisition/purchasing system 40, and the TV/2 search program has been selected as search program 50, CICS OS/2 applications 34 must share a workstation with a TV/2 search program 50.

The data passed by interface 60 preferably comprise all or a subset of the following twelve fields: vendor name, vendor number, vendor part (catalog) number, product description, bid price, list price, keyword, page number, quantity, unit, catalog text, and catalog images. Because of the amount of data for catalog images present in database 36 and viewed on monitor 22, these data are usually not passed via interface 60. Any of the above-listed fields may be filled by requisition/purchasing system 40 prior to requesting a search of catalog database 36 by search program 50. However, requisition/purchasing system 40 is not required to pass any data to search program 50. If a field is not passed, that field will be filled with spaces. The fields that are filled with data will assist search program 50 in executing its first search against a specific catalog contained in catalog database 36.

A search priority exists when more than one field is provided by requisition/purchasing system 40. The priority is as follows: (1) part (catalog) number; (2) keyword; and (3) page number. The search will start with priority (1) and proceed through priority (3) in sequence until a search produces products matching the search criteria. At that time, the search will return the matching product information to requisition/purchasing system 40 and stop at the highest priority resulting in a match.

The operation of electronic sourcing system 5 of the present invention will now be more particularly described in the context of FIGS. 1A, 1C, 2 and 3. In FIGS. 2 and 3, the rectangles represent data screens as well as programs associated with those data screens. The rounded rectangles represent programs not associated with data screens such that, while these programs are running, the prior data screen may remain visible without, necessarily, being operational for the input of data. The programs associated with the data screens enable the user of local computer 20 to display and modify the contents of various tables associated with particular data screens. The following description illustrates the use of the Fisher RIMS system as requisition/purchasing system 40, and the TV/2 search program as search program 50. However, it will be understood that the present invention is not limited to such system or program.

Preferably, a user will start the electronic sourcing system 5 from Fisher RIMS system 40. Requisitioning on Fisher RIMS system 40 in context of the electronic sourcing system 5 of the present invention is illustrated in pertinent part in FIG. 3 (and is fully described in U.S. Pat. No. 5,712,989. As data (e.g., Account Number, Requisition Number and Stock Numbers) associated with a single requisition are entered through the various data screens on local computer 20, that computer creates a set of Requisition Tables (including a Requisition Item Table 46, shown in FIG. 1C) for that particular requisition. The Requisition Tables are stored in Requisition databases 42A (shown in FIG. 1A), and can be accessed by local computer 20 using the Requisition Number to find the desired table.

The first step in creating a requisition in Fisher RIMS system 40 involves entry by the user of information in the Order Header program 44D (shown in FIG. 1A), which has an associated Order Header data screen 100 (FIG. 3). A sample of an actual Order Header data screen 100 is set forth in Appendix I. The user enters an Account Number, which generally causes the correct name and address associated with that Account Number to be entered into the appropriate fields of Order Header data screen 100. The user must also enter a Requisition Number in the appropriate field of the Order Header screen 100. Various additional information may also be entered.

At the bottom of Order Header data screen 100 are several fields that describe the function of various function keys.

6,023,683

7

Function keys F6, F9, and F10 all cause the system to jump to a new RIMS program 44 or data screen in Fisher RIMS system 40. For example, pressing the F9 key causes the system to jump to RIMS Customer Variable program 44E (FIG. 1A) and its associated Customer Variable Header data screen 104 (FIG. 3). Customer Variable Header program 44E with its associated Customer Variable Header data screen 104 allows the user to enter and edit information that the particular customer desires to be associated with the requisition due to requirements of the customer's internal accounting system or other systems. Pressing the F10 key will cause the system to enter the Inventory Sourcing program or programs 44B.

Pressing the F6 function key from the Order Header data screen causes Fisher RIMS system 40 to jump to REQI program 44A (FIG. 1A). The screen associated with REQI program 44A is Requisition Management data screen 110 (FIG. 3) illustrated in Appendix II. Within REQI program 44A and its associated Requisition Management data screen 110, Requisition Item Table 46 (shown in FIG. 1C) is a graphical representation of a database table in which certain fields are completed on a list of items that are to be listed, sourced and ordered. Representative Requisition Management data screens 110 showing a Requisition on Requisition Item Table 46 are set forth in Appendices II, VIII and IX. It should be appreciated that data about each item is stored in Requisition Item Table 46, some of which is displayed on the screens shown in Appendices II, VIII and IX. The data stored can additionally include customer variable data. That is, the fields on Requisition Item Table 46 can be expanded to include specific item details used by a particular customer, especially when reports from requisition databases are transferred to the customer's host computer (not shown). The field structure for these data is maintained in customer-specific databases 42C.

The entire process of listing, sourcing and ordering products using Fisher RIMS system 40 can be completed without any reference to a search program 50. As described herein, however, limited fields on specific items can be transmitted from Requisition Item Table 46 to search program 50, and more completed fields of the same or different items can be received from the search program 50 into a Requisition Item Table 46.

At the bottom of Requisition Management data screen 110 (FIG. 3), and Appendices II, VIII and IX) are several fields which describe the function of various function keys (F1, F2, etc.). The user uses REQI program 44A and its associated Requisition Management data screen 110 to enter the catalog or part numbers and quantities of the various items being requisitioned.

The Account Number and Requisition Number are automatically passed to REQI program 44A and its associated Requisition Management data screen 110, and displayed at the top of the Requisition Management data screen 110 in the relevant fields. For example, in the exemplary Requisition Management data screen 110 shown in Appendix II, the number 218848 has been entered in the Account Number field, and the notation "TEST NEW ONE" has been entered in the Requisition Number field.

The user can next enter desired items and quantities for the requisition. Each desired item may be identified by entering its distributor catalog or part number, if known, in the field below the STOCK NBR label on the appropriate line in Requisition Item Table 46 shown on Requisition management data screen 110. In the sample Requisition Management data screen 110 shown in Appendix II, the part

8

number 13246818F has been entered in the STOCK NBR field of Line 001. Once the user has entered such information at least partially describing a desired item on Requisition Management data screen 110, he or she may wish to initiate a search of catalog database 36 to find all the part numbers contained in catalog database 36 that match the part number entered or other information on Requisition Management screen 110. If so, the user enters the letter "S" (for "Select") on the line number of the item that he or she wishes to search in catalog database 36. The letter "S" has been entered to the left of line 001 on the sample Requisition Management data screen 110 shown in Appendix II. Any number of items, or no items, listed on Requisition Management data screen 110 may be marked with "S."

A user may not always have information relating to the catalog or part number for the particular items that are to be requisitioned using Fisher RIMS system 40. Or, the user may have relevant information about an item from a particular vendor but may wish to locate information about the same or a similar product available from other vendors. Or, the user may simply know the name of the item that he or she wishes to requisition. In any of these cases, the user alternatively or additionally could enter text at least partially describing the product to be requisitioned in the "DESC" field of Requisition Management data screen 110 (e.g., Appendix II). Then, the user would initiate the electronic sourcing system 5 of the present invention to search the vendor product catalogs contained in catalog database 36. Alternatively, the user could initiate search program 50 of electronic sourcing system 5 without having first entered information in RIMS system 40 about the product to be requisitioned.

Once the user has built or partially built Requisition Item Table 46 by filling the line numbers (entries) on Requisition Management data screen 110 and selecting those lines to be searched, he or she is now ready to initiate electronic sourcing system 5. Pressing the F11 function key, which is labelled "Catalog," from Requisition Management screen 110 accesses electronic sourcing system 5.

Referring now to FIG. 2, after the user presses the F11 key on Requisition Management data screen 110 of Fisher RIMS system 40, Fisher RIMS system 40 will pass program control via XCTL 74 to ESRC program 70. XCTL 74 is a protocol within CICS application 34 that directs the execution of a program, as would readily be understood by one of ordinary skill in the art. As control is passed from REQI program 44A to ESRC program 70, ESRC-Comm-AREA data structure 76 is passed. ESRC-Comm-AREA is a layout of storage area in local computer 20 created by REQI program 44A to pass data to ESRC program 70, as would readily be understood by one of ordinary skill in the art.

ESRC program 70 will then LINK 82 to ESCP program 80 with ESCP-Comm-AREA 84. LINK 82 is a protocol within CICS application 32 that directs the execution of a program, as would readily be understood by one of ordinary skill in the art. Data at least partially describing one item desired to be requisitioned is passed to ESCP program 80 via LINK 82. Thus, if there are five items to be passed to ESCP program 80, there will be five LINKS 82 made. If no items are to be passed to ESCP program 80, only one LINK 82 is made to ESCP program 80. ESCP program 80 can return up to twenty items per LINK 82; in other words, for each item desired to be requisitioned up to twenty desired catalog items contained in catalog database 36 may be sent to REQI program 44A and its associated Requisition Management data screen 110 of Fisher RIMS system 40. If a user chooses to terminate the sourcing process, ESRC program 70 would

6,023,683

9

return to REQI program **44A** and its associated Requisition Management data screen **110** without processing any of the records.

ESCP program **80** links with Shell **52** and TV/**2** search program **50** via DDE LINK **90**. Shell **52** and TV/**2** search program **50** search in catalog database **36** for the item or items desired to be requisitioned that has or have been passed from ESRC program **70** to ESCP program **80**. Catalog database **36** contains the following fields: vendor name, vendor number, vendor part (catalog) number, product description, list price, page number, quantity, unit, catalog text, and catalog images. Shell **52** and TV/**2** search program **50** may, if desired, search the keyword field or any other field shown in Appendix VII. However, not all fields may appear on the monitor **22** of local computer **20**, although they are stored in memory.

After the user has pressed the F11 key from Requisition Management data screen **110** and control has been passed from REQI program **44A** to Shell **52** and TV/**2** search program **50**, monitor **22** of local computer **20** will show a footer bar representative of Shell **52** at all times that the user is in the TV/**2** search program **50**. The footer bar, which also includes appropriate icons, is used to make choices within Shell **52**. A sample of the footer bar (without the icons) representing Shell **52** is shown at the base of Appendices III–VII. In the screens of Appendices III–VI, this footer bar is active to select functions. In the screen of Appendix VII, this footer bar is in the background and another footer bar is used to select functions.

If the user has marked an item on Requisition Management data screen **110** with the designation "S," the entered data at least partially describing that item will be sent to Shell **52** and TV/**2** search program **50A** in the manner described above. TV/**2** search program **50** will search catalog database **36** for all items that match the search field sent over from REQI program **44A** and Requisition Management data screen **110**. When a search is performed in Shell **52** and search program **50**, a Hit List **47** is produced, as indicated in FIG. 1C. The user would see on monitor **22** of local computer **20** a Hit List **47** screen representing limited data about all matching catalog items that were located in catalog database **36** as a result of the search. A sample Hit List **47** produced from a search initiated when the entry "OVENS" is received as the description or keyword by search program **50** from Requisition Item Table **46** is shown in Appendix III. Similar Hit Lists **47** are produced when various searches are performed from the Search Input screen shown in Appendix VII. When a Hit List **47** is depicted on monitor **22**, the underlying catalog text and pictures (in either partial or complete form) are typically collected in a memory location for rapid viewing, printing or other use.

When multiple catalogs are present in catalog database **36**, search program **50** contains a function associated with the catalog symbol of the footer bar and screen window (not shown) for selecting catalogs to be searched. For example, the following choices might be available:

1. Fisher General Catalog 93–94;
2. Fairmont Supplies Catalog;
3. NIST Standards Catalog; and
4. Promega Biological Research Products Catalog.

Fairmont and NIST catalogs list products not in the Fisher General Catalog, but many of the products listed in the Promega catalog are also listed in the Fisher General Catalog (identified by corresponding Fisher catalog numbers). If searching for a molecular biology product, the user would select the Fisher and Promega catalogs. TV/**2** search pro-

10

gram **50** would then concatenate those two catalogs to perform a keyword, catalog number or other subject search and generate a Hit List of pages (panels) from both catalogs where the searched-for items were found. Similarly, the user might select the Fisher and NIST catalogs when searching for quality control standards or might select the Fisher and Fairmont catalogs when searching for supplies.

If the search is initiated from requisition/purchasing program **40**, for example from the Requisition Management data screen **110** of the Fisher RIMS system, then the catalogs searched can be determined by the information provided. If, for example, Promega is indicated as the desired requisition item vendor, interface **60** would direct TV/**2** search program **50** to search the Fisher and Promega catalogs. If Fairmont is indicated as vendor, the interface would direct TV/**2** to search the Fairmont and Fisher catalogs. If no catalog delimiting information is entered for the item desired to be requisitioned, interface **60** would be set up to search only the Fisher catalog or, alternatively, to search all catalogs in catalog database **36**.

Once Hit List **47** has been created by TV/**2** search program **50**, the user can view it and select particular ones of the located catalog items for Order List **48** that is being created in Shell **52**, as shown in FIG. 1C. For example, a search for "Eco RI," a restriction enzyme, may have uncovered five entries in the Promega catalog (identified by Promega catalog numbers R6011, R6012, R6013, R6015 and R401) and five entries in the Fisher catalog (identified by Fisher catalog numbers PRR6011, PRR6012, PRR6013, PRR6015 and PRR4014). If the user selected PRR6012 from the Fisher catalog, Fisher catalog number PRR6012 would be added as an entry to the Items Selected screen, with VN00000001 (identifying the vendor as distributor Fisher) accompanying it in the Order List **48**. If the user instead selected the item identified by catalog number R6012 from the Promega catalog, then Promega catalog number R6012 would be added as an entry to the Items Selected screen, with VN00005860 (identifying the vendor as Promega) accompanying it in the Order List. In either case, the information transmitted to REQI program **44A** of Fisher RIMS system **40** would also include description, list price and other information taken from the catalog database from which the selection was made. When the resultant requisition is sourced, however (as described below), Distributor's mainframe host computer **10** would recognize the entry for the item from vendor Promega's catalog (R6012, 00005860) as corresponding to that same item available from Fisher's catalog (PRR6012, 00000001). The system thus would transmit back the Customer's contract price and availability for corresponding item PRR6012 as a type **03** (regular Distributor) product available from one of distributor's inventory locations. A purchase order then would be generated for this corresponding Distributor item as further described below.

By contrast, an item selected from the Fairmont catalog would be transferred to Fisher RIMS system **40** with the vendor number for Fairmont, and would be recognized during inventory sourcing as either a type **07** product (that Distributor orders from Fairmont) or as a type **05** item (that Customer orders from Fairmont as an Administrative Purchase). In either of these two cases, a purchase order would be generated for an item, corresponding to a desired catalog item, that is identified by the same Fairmont catalog number that was requisitioned.

After the desired item has been selected from the Hit List **47** by double clicking on that item TV/**2** search program **50** can be used to bring up for viewing on monitor **22**, or

6,023,683

| 11 | 12 |

printing on printer **26**, images and text from the catalog page on which the item selected is located. For example, as shown in Appendix III, page 1106 of the Fisher catalog has been selected. If the user double clicks on highlighted page 1106, the text shown in Appendix IV (and related images, not shown) would appear on monitor **22**. On the sample screen shown in Appendix IV, the item that appears on page 1106 of the Fisher catalog relates to Fisher Isotemp 800 Series Programmable Ovens. Conventional scroll bars appearing on the screen (not shown in Appendix IV) enable the user to scroll through additional catalog information (text and/or images) not yet displayed on the screen. An example of such additional textual information is depicted on the screen shown in Appendix V.

On the screen of Appendix V, the vendor distributor's catalog number ("Cat. No.") 13-246-818F is highlighted. The catalog number of an item normally appears in blue in a screen such as Appendix V. This blue lettering is used for catalog numbers, trademarks, footnotes and other entries for which database **36** contains additional information or cross-references (called hyperlinks). When a search is conducted and the catalog segments of the resultant hit list are reviewed, the text corresponding to the search parameter is highlighted in red. Thus, in Appendix V, catalog number 13-246-818F (identified in the search) appears in red, while catalog number 13-246-838F and the trademark Isotemp each appear in blue. A word, vendor part number or catalog number located by the search will appear red, even if that word or number did not have an associated hyperlink (and thus is not normally blue).

When in search program **50**, particular items selected can be added to an Order List **48** pending in Shell **52** and search program **50**. When the Ordering portion of catalog text is viewed (as in Appendix V), particular items can be selected so as to be added to the Order List **48** by double clicking on the highlighted catalog number (even if a different field was also highlighted as a result of a search of catalog database **36**). The item is then added to an Order List **48** that is created in Shell **52** via a hypertext link. The items that are sent to the Order List **48** are collected and shown on the Items Selected screen of Shell **52**. An example of an Items Selected screen of Shell **52** is shown in Appendix VI. The Items Selected screen depicts certain fields of Order List **48** that can be viewed and edited within search program **50**. For example, Shell **52** permits the user via a pop-up window (not shown) to select units, e.g. pack or case, and quantity to be ordered, e.g. two packs. Alternatively, the data in these fields can default to one of the smallest unit and the units can be changed when the order is reviewed in REQI program **44**A. Additional fields on the same items are also present in memory at this stage. Upon clicking on "Order" when the Items Selected screen (Appendix VI) is viewed, many or all of these fields on the items in the Order List are transmitted back to REQI program **44**A (via the programs of interface **60** shown in FIG. 2) to be added to the pending Requisition Item Table **46**. The sample Items Selected screen shown in Appendix VI includes the Isotemp Oven with catalog number 1324818F that was located as a result of the search for all items in catalog database **36** that match the part number 13246818F that was entered in the STOCK NBR field of REQI program **44**A and its associated Requisition Management data screen **110** of Fisher RIMS system **40**.

The following fields are transferred to Order List **48** created in TV/2 search program **50**: Vendor name, vendor number, vendor part (catalog) number, product description, list price, page number, quantity, unit and catalog text. However, not all of these fields are viewed on the Items Selected screen.

If more than one item on Requisition Management data screen **110** had been marked with an "S," the process described above is repeated.

If the user desires to do additional searching in catalog database **36** that is not connected to catalog or other items that have been listed on Requisition Management data screen **110** of Fisher RIMS system **40**, he or she can click the box on footer bar of Shell **52** that is labelled "Search." Then, a Search screen comes up on monitor **22** of local computer **20**. An exemplary Search screen is shown in Appendix VII. In this screen, the usual footer bar is visible in the background, but is not active.

Using the Search screen, a user can search catalog database **36** by page, text description, part number (where the user has the further option to search by Fisher part number, for example if Fisher is to be the desired vendor), Vendor part number, vendor name (for vendors other than Fisher), or bulletin. Stock numbers specific to the customer can also be present in catalog database **36** and searched using the screen of Appendix VII. "Bulletin" refers to an additional vendor publication with detailed product information that may not be included in a vendor catalog. Searching for information contained in bulletins may be done by bulletin number, but only if bulletins have been made a part of catalog database **36**. For purposes of this disclosure, bulletins when included in a catalog database are considered a type of catalog.

After the user has entered the field to be searched on the Search Screen, the user clicks on the "SEARCH" box near the bottom of the Search Screen. A Hit List **47** indicating all items from catalog database **36** that match the search field that was entered on the Search Screen then is generated. Then, in a manner similar to that described previously, the user can scroll through the Hit List **47** and double click on the catalog page or panel desired. The user may then also view the detailed information located on the catalog page that was selected from the Hit List **47**. During the search, the user may also add additional items to the Order List **48** being built in Shell **52** if desired, whether those additional items had been selected from the Hit List **47** or not.

The Order List that the user has built in Shell **52** is maintained on the Items Selected screen, shown in Appendix VI. From the Items Selected screen, the user can cancel the order by clicking on the "Cancel" box at the bottom of the screen, delete an item from the Order List **48** by moving the pointer bar to the item to be deleted and then clicking on the "Delete" box at the bottom of the screen, or delete all items by clicking on the "Delete All" box. The user can also view catalog text and images for a particular item by clicking on the "Description" box.

Once the user has completely built the Order List **48** within Shell **52** and TV/2 search program **50**, he or she can transmit it to Fisher RIMS system **40**. This is accomplished by clicking on the "Order" box at the bottom of the Items Selected screen to communicate the completed Order List **48** to Fisher RIMS system **40**.

The user may have selected no items, one item or several items from the catalogs contained in catalog database **36** by using TV/2 search program **50**. If no items have been selected, the original items that were entered on Requisition Item Table **46** of Requisition Management data screen **110** will remain on that screen and will continue to be processed by Fisher RIMS system **40**. If one or several desired catalog items were selected in TV/2 search program **50**, the first item selected will replace the original item on Requisition Item Table **46** of Requisition Management data screen **110**. Additional items that were selected from the search that was performed in TV/2 search program **50** will be added to Requisition Item Table **46** of Requisition Management data screen **110**.

**A239**

6,023,683

13

Interface programs ESCP **80** and ESRC **70** (FIG. 2) are used to send data to REQI program **44A** (FIG. 1A) and its associated Requisition Management data screen **110** (FIG. 2) about the items that were selected from the search performed by TV/2 search program **50**. To the user, it appears that all the items selected from the search are sent over to Fisher RIMS system **40** at the same time. However, ESCP program **80** receives multiple items from TV/2 search program **50**, and then sends one item at a time to ESRC program **70**. ESRC program **70** then waits until all items have been passed to it before sending data about the items to REQI program **44A** and its associated Requisition Management screen **110** of Fisher RIMS system **40**. The information transmitted to Requisition Management screen **110** from the Order List built in TV/2 search program **50** and sent through ESCP program **80** and ESRC program **70** includes vendor name, vendor number, vendor part (catalog) number, product description, list price, page number, quantity, unit and catalog text. However, not all of the above-listed fields may be displayed on screen at all times. ESRC program **70** passes control back to Fisher RIMS system **40** via XCTL **78**. The requisition number, customer identification and release number (or other data identifying the requisition) will be passed in MENU-Comm-AREA **56** to confirm that the returned data are associated with the proper requisition. MENU-Comm-AREA **56** is a layout of storage area within local computer **20**, as one of ordinary skill in the art would readily understand.

As previously indicated, multiple LINKS **82** may have been created between program ESRC **70** and program ESCP **80** if multiple lines were selected (with the "S" symbol) in Requisition Management data screen **110**. After completing the first search, and any additional searches initiated with the footer bar, an order list is created and returned to Requisition Item Data Table **46** associated with Requisition Management data screen **110**. At this point, the next item is sent from a LINK **82** through program ESCP **80** and DDE LINK **90** to the TV/2 program **50**, and a hit list resulting from the corresponding search is displayed on monitor **22**. The process of searching, displaying, selecting and ordering is repeated until all of items stored by LINKS **82** have been sent to TV/2 program **50** and searched. At the end of each of these searches, an order list may be created and returned to Requisition Item Data Table **46** or cancelled. Once the last item is completed, ESRC program **70** passes control via XCTL **78**, and a Requisition Management screen **110** is displayed, reflecting all of the additions and changes that have been made to the Requisition Item Data Table **46** associated with that requisition.

A limit is normally placed on the number of items of an order that may be returned to the Requisition Item Data Table **46**. For example, if the maximum size in Requisition Item Data Table **46** is set at 200 lines, one could create a limit on the size of each order list at 20, 50, 100 or even 200. A corresponding limit can be placed on the number of LINKS **82** that can be established concurrently from the same requisition. Setting a limit of five LINKS **82** and forty items per order list would be one way of avoiding situations in which a Requisition Item Data Table **46** reaches its limit (e.g., 200 lines) before all of the searches (five) have been completed and order lists (five of forty items each) have been returned.

At this point in the use of Fisher RIMS system **40**, as many entries (lines) of Requisition Management data screen **110** have been built up (some through use of electronic sourcing system **5**) as are necessary to complete the requisition. A sample of such a Requisition Management data

14

screen **110**, in which four lines have been entered identifying desired items to be requisitioned (including catalog items located as a result of a catalogs search), is shown in Appendix VIII. The next step is that of inventory sourcing using RIMS inventory sourcing program or programs **44B** in Fisher RIMS system **40**, as shown in FIG. 3. Inventory sourcing is the process of determining what inventory will be used to fill the requisition. Pricing is also performed in this step when it is called for. Inventory sourcing in Fisher RIMS system **40** is performed on both local computer **20** and host computer **10**.

Within Fisher RIMS system **40**, a Requisition Item Table **46**, as shown in Appendix VIII (similar to that shown in Appendix II, but including more items), can be inventory sourced by pressing the key F6 from REQI program **44A** represented by Requisition Management data screen **110** shown in Appendix VIII (and in Appendix II). Since inventory records on JIT items (type **01** and **06**) are maintained in inventory database **42B**, lines **002** and **004** in Appendix VIII show the availability of these items in inventory (49 items available for line **002**, and 0 items available for line **004**). After the F6 key has been pressed, host computer **10** searches its host pricing and inventory databases for availability of the various items listed on Requisition Management data screen **110** in different inventory locations (e.g., different warehouses) as described in further detail, below.

After such inventory sourcing, and assuming that no errors occurred during sourcing (as indicated by decision step **116** in FIG. 3), the contract price, source (inventory) location and available quantity or other fields are communicated back to computer **20** by host computer **10**, and entered and displayed in the Requisition Management Screen. This can best be seen by comparing lines **001** and **003** of Appendix VIII to Appendix IX, especially as to "QTY AVAIL" (quantity available), "LOC" (inventory location) and price. As Appendix IX indicates, an inventory-sourced Requisition Item Table **46** typically contains the same items, but with more completed fields (including price, product type and inventory location). Moreover, as discussed above, an entry in an inventory-sourced Requisition Management screen may indicate for a requisitioned item a vendor and vendor catalog number that has been changed, from what was obtained from a catalog search, to a corresponding vendor and vendor catalog number for that item from another source (e.g., Fisher—which has its own catalog number for that manufacturer's item that Fisher distributes).

For example, as shown in Appendix IX, product type "01" for the item on line **002** indicates that the requested requisition item is available as Distributor-owned inventory in the JIT inventory that the vendor/distributor maintains near local computer **20**, either for the particular Customer or for a group of customers. Product type "06" for the item on line **004** indicates that this item is available for the requisitioner employed by the Customer from inventory owned by Customer's purchasing department but managed by local computer **20**. Product type "03" for the items on lines **001** and **003** indicates that these are regular Distributor items that the communication between Distributor's host computer **10** and local computer **20** determined were available in sufficient quantity at one or another of Distributor's general warehouses designated "DEL" and "EDC" in the location ("LOC") field. Product type "05" (not shown in Appendix IX) indicates that a requisitioned item is to be purchased by Customer directly from an outside supplier, using an Administrative Purchase Order that local computer **20** creates and prints (or transmits) for Customer.

The inventory sourcing process described above also determines the net prices shown in Appendix IX for each

15

item. Type **01** and type **03** items are priced by Distributor's host computer **10** searching host databases **11**, which contain various formulae and tables of Distributor's pricing agreement with the Customer. Host computer **10** also prices any type **04** or type **07** item, if present. These prices were transmitted to local computer **20** along with the location and availability information for the type **01** items. Prices for type **05** and **06** items are maintained in the local computer's **20** own databases **42B** and **42C**.

From Requisition Maintenance data screen **120**, the CSR can accept all lines of the requisition—if all lines show the status "S" for sourced in the "STAT" field of Requisition Maintenance data screen **120**—by pressing the F6 function key. If item errors are found at step **116** in the data transmitted back to local computer **20** from host computer **10** during the sourcing process, then those particular items for which error was found will be returned and displayed by local computer **20** in Requisition Management data screen **110**.

Once a requisition has been inventory sourced and accepted by the CSR, it can be converted to one or more purchase orders, as represented by step **114** in FIG. **3**. For example, the requisition represented by the Requisition Item Table **46** of Appendix IX, if accepted without further revision by pressing function key F6 ("ACCEPT"), would result in the generation of the following three purchase orders:

A. Line **002** would be ordered from on-site distributor-owned inventory;

B. Line **004** would be ordered from on-site customer-owned inventory (a transfer internal to the customer); and

C. Lines **001** and **003** would be ordered, respectively, from Distributor's "DEL and "EDC" warehouses.

Of these three purchase orders, Orders A (type "01") and C (type "03") are shared between host computer **10** and local computer **20** (as shown in FIG. **3**). Upon execution of Order A, the inventory records on both computers for Distributor-owned JIT inventory are adjusted synchronously. A purchase order is generated by host computer **10** immediately thereafter. Order B (type "06") is executed and stored only on local computer **20**. Upon execution of Order B, the inventory record on local computer **20** is adjusted (the host computer contains no records on Customer-owned JIT inventory or on items ordered by Administrative Purchases). For Administrative Purchases (type **05** items), a purchase order is printed, and mailed or faxed, locally by computer **20** as indicated at step **118** in FIG. **3**, or via host computer **10** via EDI (if EDI was selected in the Header of Appendix I and an EDI transfer arrangement existed with vendor).

It is an important feature of the present invention that a requisition may be filled by searching and selecting from a catalog database of items, inventory sourced, and the resulting requisition then divided into one or more purchase orders. This contrasts with known prior art CD-ROM catalog systems in which only a single purchase order to a single supplier is built without reference to inventory records, and in which the information used to create the purchase order is limited to that contained in the product catalog of a single vendor.

Electronic sourcing system **5** also contains the capability to log messages returned from inventory sourcing program or programs **44B** of Fisher RIMS system **40**. Messages will be logged for any of the following reasons: (1) part number changes for line sent to ESCP program **80**; (2) list price from inventory sourcing program **44B** differs from list price returned from ESCP program **80**; (3) vendor name from inventory sourcing program **44B** differs from vendor name

16

returned from ESCP program **80**; (4) on a "master or blanket" order, in which local computer **20** tracks the amount of purchases against a blanket or cumulative sum available and/or in which there is limited access to products or limited access to certain parts, the part has already been entered on another line; and (5) the maximum number of line items has been reached.

Referring again to FIG. **2**, a user is able to view the messages returned by pressing the ALT F11 function keys in REQI program **44A** and its associated Requisition Management screen **110** in Fisher RIMS system **40**. After the ALT F11 keys have been pressed, REQI program **44A** will link to ESMV program **112** via XCTL link **111** for displaying the message log created. ESMV program **112** is a function of Fisher RIMS system **40**. ESMV program **112** allows the user to page through the messages created and then to return to Requisition Management screen **110**. A sample ESMV message screen **81** associated with ESMV program **112** is shown in Appendix X.

The first two messages of the message screen of Appendix X indicate that a part number for line **001**, identified as part number 53610, was successfully added in substitution for a prior part originally entered as part number S100-06 (from the Fisher Scientific catalog). These messages were generated because the originally entered part (S100-06) did not exist in the Fisher catalog, but its corresponding part number S100-06 (that was located by another search in another catalog) did exist in that other catalog. The next message indicates that the vendor for part number 53610 was changed in line **001** from "VN00000001"—meaning that the originally requested vendor (Fisher) was changed. The next two messages indicate that two other part numbers (53620 and 53650) were successfully added as lines **002** and **003**.

In the previous description, an exemplary embodiment has been described in which a Distributor CSR operates Fisher RIMS requisition/purchasing system **40** and IBM TV/2 search program **50** as part of a Just-In-Time activity for a particular customer, Customer. Electronic sourcing system **5** of the present invention may also be used, however, in other requisition and purchasing environments.

In some embodiments, a Customer end user or a Customer purchasing employee operating REQI program **44A** of Fisher RIMS system **40** may also operate TV/2 search program **50**. Operating either from a terminal connected to local computer **20**, or from a separate local computer networked with the CSR's local computer **20**, such a Customer end user can select requisitioned items for inclusion in Requisition Item Table **46** by keystrokes viewing that screen and by searches in TV/2 search program **50** which are transmitted to the Requisition Item Table **46** via interface **60**, as described above. Depending upon his or her authorization level and access code to Fisher RIMS system **40**, the Customer purchasing employee may be able to source the final requisition and/or accept the sourced requisition, as shown in Appendix IX. If, however, the sourced requisition was split into more purchase orders than the Customer purchasing employee might prefer, the intervention of the Distributor CSR could be invoked to revise and re-source the requisition (causing, for example, certain items originally sourced as type **01** products to be sourced for this order as corresponding type **03** products from a common Distributor warehouse with other type **03** products on the requisition). The Customer end user may have authority only to build the Requisition Item Table, but then calls the Distributor CSR or Customer purchasing employee to source and accept the requisition.

As shown in FIG. **1B**, the present invention also has application to Distributor's regional customer service loca-

6,023,683

tions where a large number of CSRs may be placing orders directly on Distributor's host computer 210 for thousands of different customers who call in. In that environment, search program 250, which preferably comprises TV/2 search program 250, and catalog databases 236 are stored on file server 200. In this environment, file server 200 is a large personal computer, a work station or a mini-computer such as an IBM AS/400. Alternatively, the server 200 and a minicomputer (such as an IBM AS/400) can be independently connected to each local computer 200. Each CSR has a local personal computer 220 having a monitor 222, a keyboard 224 and a printer 226. Local computer 220 is provided with programs including requisition/purchasing program 240, Shell program 252 and a graphic user interface 254 (preferably EASEL Workbench program 254 for OS/2) for listing items. One or more of these may be copied from server 220 when needed. Work-in-progress requisitions 260 are established for each customer and are attached to graphic user interface 254. Server 200 maintains complete requisitions 242, in a manner similar to the manner in which local computer 20 maintains requisition databases 42 in the embodiment shown in FIG. 1A.

Normally, in such an environment, the CSR creates Order lists for customers by entering Distributor catalog numbers into graphic user interface 254 and connecting to the Distributor mainframe 210 for price and availability. For this purpose, each local computer is connected to host computer 210 via a phone/dataline and either a gateway or a minicomputer acting as a local host. When a customer asks for products by manufacturer part number or a competitor's catalog number, the CSR has access to cross-reference files, as earlier described, either maintained on the local host or maintained on the Distributor host computer 210.

Appropriate Distributor catalogs and manufacturer catalogs then are consulted, using TV-2 search program 250 and proper selection of Distributor catalogs and of catalogs and bulletins from manufacturers whose products Distributor regularly sells. Catalogs and bulletins are contained in catalog database 236. The resultant lists of products are then transferred by Shell program 252 to a work-in-progress requisition 260, and then entered from graphical user interface 254 directly onto Distributor's mainframe computer 210 as orders from the applicable customer to Distributor. The CSR, knowing which items are available from which Distributor warehouse and direct-shipping supplier, then may divide the customer's requested items into multiple orders, so as to assure that each order is completely filled by a single shipment. In this regional environment, file server 200 or the minicomputer acting as local host can maintain files of completed requisitions 242 which can be subsequently used for generating reports for customers in the region. Reports can be generated either from such local data or from data periodically downloaded to the local host from Distributor's host computer 210.

Another environment where the present invention can be used is in Distributor's purchasing department. The item lists created in that environment can include lists of items Distributor does not regularly stock or purchase, but for which particular customers indicate a requirement to buy. The file server 200 in that environment contains TV-2 search program 250, EASEL graphical user interface 254 and multiple catalog databases 236 containing catalogs similar to the Fairmont and NIST catalogs described above for the embodiment of FIG. 1A. The Distributor purchasing employee can receive by phone or via Distributor's host computer 210 requests for items not shown on Distributor's host databases either as regular products (type 03) or third

party items purchased for particular customers on a regular basis (type 07 items). Transmitting certain such requirements to the applicable Distributor purchasing employee can be a function of the inventory sourcing routines of host computer, or may be directed by the Distributor CSR interfacing with the customer.

The Distributor purchasing employee can search appropriate catalogs using TV-2 search program 250, and can transfer the "Items Selected" to a product list in EASEL interface 254. The resultant list might display, for example, supplier part number, supplier, list price, product and catalog page, with access to other fields such as complete description (up to 500 characters). The Distributor purchasing employee can then either forward the information to the CSR, customer end user or customer purchasing employee who requested the item (to confirm that the requirement is being met) or contact the supplier to confirm pricing and availability. Once responses from either or both have been obtained, the Distributor purchasing employee can use the item list in EASEL interface 254 to create one or more of the following purchase orders:

1. an order from the customer to the supplier (an Administrative Purchase);
2. an order from the customer to Distributor (for a type 07 product); and
3. an order from the Distributor to the supplier (usually providing for direct shipment from the supplier to the customer or to a JIT site maintained by Distributor for the customer).

From the foregoing description, it should be apparent that the network arrangements of FIG. 1B can be used to apply the present invention in a variety of contexts. The context will dictate which catalog databases 236 are provided on file server 200: in the regional CSR environment, Distributor's catalogs can be present with a variety of catalogs and bulletins from manufacturers that Distributor regularly represents and a limited selection of outside suppliers; and in the Distributor purchasing environment, the number of outside supplier catalogs will be increased. The number of client (local) computers 220 and the number and size of catalog databases 236 will help dictate what size file server 200 is required. The operating environment (regional CSR site, on-site CSR, on-site CSR networked with Customer end users and with purchaser personnel or Customer purchasing site) will also affect the catalog databases 236 included, file server 200 size and requisition/purchasing program 240 used. In some situations (e.g., purchasing) each client computer has an independent copy of requisition/purchasing program 240; in others (e.g., on-site CSR) a single copy of the requisition/purchasing program 240 is maintained with associated local databases on the server 200. Where the requisition/purchasing program 240 and local databases are maintained on file server 200, the local database is updated after each use for the benefit of subsequent users. For example, in an environment using Fisher RIMS for requisition/purchasing program 240, if a NIST standard is selected using TV-2 search program 250 and ordered using Fisher RIMS 240 (as either a type 07 purchase from Distributor or a type 05 administrative purchase from NIST), that item is available in the applicable database for subsequent requisitions. For example, a NIST standard ordered as a type 05 item will be stored in the local database on file server 200, with NIST as the vendor for subsequent administrative purchases by Customer. A NIST standard ordered from Distributor as a type 07 item will be stored in Distributor's host databases as a type 07 available to Distributor from NIST. The local databases on file server 200

6,023,683

**19**                    **20**

will also contain records of all items requisitioned and ordered, useful to transfer files to a Customer's computer (e.g., of purchase orders placed by that Customer in a day) or to generate reports for a Customer (e.g., or requisitions placed by each Customer department and/or budget number in a week).

Thus it is seen that an electronic sourcing system including means for linking a requisition/purchasing system and a means for searching large volumes of information has been described. Persons skilled in the art will appreciate that the present invention can be practiced by other than the described embodiments, which are presented for the purposes of illustration and not of limitation, and the present invention is limited only by the claims which follow.

## APPENDIX I

FISHER SCIENTIFIC RIMS
REQUISITION HEADER

DATE: 08/05/94
TIME: 07:04:57
ACCT-NBR  :                                    NAME:
                                               ADDRESS:
COMPANY  :                                        :
REQ NBR  :                                        :
RELEASE  :                       ORDER TYPE : R ORDER
                                 HOLD/REL: I                    RUSH CODE: 9
CALLER   :               FREIGHT OVERRIDE: N          TAX OVERRIDE:
                         EDI PO TO HOST: N POA 855
ATTN     :                       PRT ACK: Y           NBR OF COPIES: 1
                         ACK DELV CODE: P PRINT & DELIVER
BILL TO  :               REQ DELV CODE: W WALK IN
                         SERVICE CHARGE:   0.00
VENDOR   :
                                 CREATED: 08-04-1994           STATUS: R
RESPONSE:      KEY(S):
+F2:ADD  F3:EXIT  F4:UPDATE  F5:REFRESH  F6:ITEM  F9:VAR  F10:SRCE  F11:CHGPO  F12 DEL
1BV123

## APPENDIX II

** REQUISITION MANAGEMENT SCREEN ***

ACCT NBR: 218848 002 REQ NBR: TEST NEW ONE
    COMP:   1     REL NBR:
  S  LINE    STOCK NBR        QTY  UM PT  STKRM XREF SPI UNIT PRICE  EXT PRICE
     001  13246818F            0   CS  03                   0.00       0.00
     DESC:                          QTY AVAIL:      0     LOC: FSHR WHSE: BLW
     002
     DESC:                          QTY AVAIL:            LOC:        WHSE:
     003
     DESC:                          QTY AVAIL:            LOC:        WHSE:
     004
     DESC:                          QTY AVAIL:            LOC:        WHSE:
     005
     DESC:                          QTY AVAIL:            LOC:        WHSE:
            KEY(S):
ALL ITEMS DISPLAYED
F3:EXIT F6:SOURCE F7:BKWD F8:FWD F9:NEW F10:NONCAT F11: CATALOG F12:CNCL

60

65

**A243**

6,023,683

21

22

## APPENDIX III

ovens
General
(1106)Fisher Isotemp 800 Series Programmable Ovens
(1107)Isotemp 700 Series Deluxe Lab Ovens
(1108)Isotemp 600 Standard Lab Ovens
(1109)Fisher Isotemp 500 Series Economy Lab Ovens
(1110)Gravity Convection Ovens
(1111)Utility Ovens
(1112)Mechanical Convection Ovens with Electronic Temperature
(1113)General-Purpose Ovens
(1114)Heavy Duty Deluxe Ovens
(1116)Large Capacity Model 2882A
(1117)Standard Capacity Model 281A
(1118)Fisher Models 280 and 285 Vacuum Ovens
(1119)NAPCO Vacuum Ovens

Help   Catalogs   Search   Order List   Minimize   Clear   Prev   Next        Exit

## APPENDIX IV

(FSC1106)Fisher Isotemp 800 Series Programmable Ovens

Fisher Isotempx 800 Series Programmable Ovens
   Three linear heat-up and cool-down stages
   Talking control panel
   Keypad and lighted graphics
   300 to 325° C. range
   RS-422 serial communications capability
   The latest technology at your fingertips. Accurate, easy-to-use
controls allow you to program up to 3 heat-up stages and 3 cool-
down stages linearly to provide the most appropriate conditions
for your samples. Using the large keyboard, you can choose the
heat-up or cool-down rate, the temperature you want for each
stage, and the length of time you want the oven to hold each
temperature. And, for projects requiring repeatability, you can
duplicate the settings at any time.

Help   Catalogs   Search   Order List   Minimize   Clear   Prev   Next        Exit

## APPENDIX V

(FSC1106)Fisher Isotemp 800 Series Programmable Ovens

| Model | 818F | 838F |
|---|---|---|
| Inside D × W × H | 16 × 12 × 16 (41 × 30 × 41 cm) | 18 × 18 × 20 (46 × 46 × 51 cm) |
| Shp. wt. | 156 lb. (71 kg) | 195 lb. (88 kg) |
| Electrical Requirements | 230 V 50/60 Hz 11.3 Amps | 230 V 50/60 Hz 19 Amps |
| Cat. No. | 13-246-818F | 13-246-838F |
| Each | 3495.00 | 3995.00 |

Extra Shelves for 800 Series Ovens
No-tip design. Move to any position in seconds. Full Depth Shelves: Chrome-
Plated Steel

Help   Catalogs   Search   Order List   Minimize   Clear   Prev   Next        Exit

## APPENDIX VI

### ITEMS SELECTED

| Part Number | Description | List Price |
|---|---|---|
| 13246818F | ISOTEMP OVEN MDL818F 230 V | 3495.00 |

Help   Cancel   Delete   Delete All   Order   Description

## APPENDIX VII

SEARCH

Page:
Search For:
Part Number: ○Fisher   ○Vendor   ○Cust-omer

Vendor Name:
Bulletin:

HELP   SEARCH   CANCEL   CLEAR   USER
DATA   EXTENDED

60

65

**A244**

6,023,683

23                                                                                                24

APPENDIX VII-continued

| Help | Catalogs | Search | Order List | Minimize | Clear | Prev |
| Next | Exit |

5

APPENDIX VIII

RICREQI1          FISHER SCIENTIFIC RIMS          DATE: 07-29-94
                  REQUISITION MANAGEMENT SCREEN TIME: 14:54:22
    ACCT NBR: 363690 006 REQ NBR: PO NBR 001
      COMP:   1    REL NBR:
    0  LINE    STOCK NBR          QTY UM  PT  STKRM XREF SPI UNIT PRICE  EXT PRICE
        001 A181                  1 EA  03                       0.00       0.00
        DESC:                       QTY AVAIL:        0           LOC: FSHR WHSE: EDC
        002 02540K                1 PK  01                       0.00       0.00
        DESC:                       QTY AVAIL:       49           LOC:  WHSE: JIT
        003 13246818F             1 EA  03                       0.00       0.00
        DESC:                       QTY AVAIL:        0           LOC: FSHR WHSE: EDC
        004 A181-06               1 EA  06                     100.00     100.00
        DESC: ACETONE              QTY AVAIL:        0           LOC:  WHSE: JIT
    JIT BACKORDER WILL OCCUR
        005
        DESC:                       QTY AVAIL:        0           LOC:  WHSE:
    RESPONSE:              KEY(S):
    I ITEM(S) PROCESSED
    +F3:EXIT F6:SOURCE F7:BKWD F8:FWD F9:NEW ITM F10:NONCAT F11: CATALOG F12:CNCL
    1B V123

APPENDIX IX

RICPOMP1          FISHER SCIENTIFIC RIMS          DATE: 08-03-94
                  REQUISITION MANAGEMENT SCREEN TIME: 07:44:13
      COMP ID: 001          REQ-NBR : PO NBR 001
      ACCT NBR: 363690 006    REL-NBR :
    ORDER NBR:                          PICKLIST REVIEWED :
      SERVICE: 0.00    ORDER:          0.00 FREIGHT:
    CARRIER:
    O LINE    PART          QTY  UOM PRD UNIT PRICE SERVICE EXT PRICE  LOC-
                                   STAT
        001 A181              1   EA 03        35.30    0.00    35.30  DEL  S
            ACETONE CERTIFIED ACS  1L   QTY AVAIL:     1        QTY REC: O
        002 02540K            1   PK 01        32.70    0.00    32.70 JIT  S
            BEAKER GRIFFIN 250 ML  12/9 QTY AVAIL:    49        QTY REC: O
        003 13246818F         1   EA 03      3495.00    0.00  3495.00 EDC  S
            PROGRAMMABLE OVEN         QTY AVAIL:     0        QTY REC: O
        004 A181-06           1   EA 06       100.00    0.00   100.00 JIT  S
            ACETONE                   QTY AVAIL:     0        QTY REC: O
    RESPONSE:          KEY(S):
    + F3:EXIT F6:ACCEPT F7:BKWD F8:FWD F9:PRINT ACK F11:M/B ERRORS F12 DELETE
    1B V123

50

APPENDIX X

*** REQUISITION MANAGEMENT SCREEN ***

ACCT NBR: 218848 002 REQ NBR: TEST NEW ONE
    COMP: 001    REL NBR:
        ELECTRONIC SOURCING MESSAGES
    LINE NUMBER   001    PART NUMBER 53610
PART ADDED SUCCESSFULLY
    LINE NUMBER   001    PART NUMBER 53610
REPLACEMENT WAS MADE FOR PRIOR PART: S100-06
    LINE NUMBER   001    PART NUMBER 53610
VENDOR CHANGED FROM:   VN000000001
    LINE NUMBER   002    PART NUMBER 53620
PART ADDED SUCCESSFULLY
    LINE NUMBER   003    PART NUMBER 53650
PART ADDED SUCCESSFULLY

55

60

65

APPENDIX X-continued

*** REQUISITION MANAGEMENT SCREEN ***

F6:RETURN   F7:BACKWARD   F8:FORWARD

We claim:

1. An electronic sourcing system comprising:

at least two product catalogs containing data relating to items associated with the respective sources;

means for selecting the product catalogs to search;

means for searching for matching items among the selected product catalogs;

means for building a requisition using data relating to selected matching items and their associated source(s);

**A245**

6,023,683

25

means for processing the requisition to generate one or more purchase orders for the selected matching items; and

means for determining whether a selected matching item is available in inventory.

**2**. The electronic sourcing system of claim **1** wherein the purchase orders include data relating to a catalog number for the selected matching items.

**3**. An electronic sourcing system comprising:

at least two product catalogs containing data relating to items associated with the respective sources;

means for selecting the product catalogs to search;

means for searching for matching items among the selected product catalogs;

means for building a requisition using data relating to selected matching items and their associated source(s);

means for processing the requisition to generate one or more purchase orders for the selected matching items; and

means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

**4**. The electronic sourcing system of claim **3** further comprising means for determining whether a selected matching item is available in inventory.

**5**. The electronic sourcing system of claim **3** further comprising means for determining the applicable price of a selected matching item.

**6**. An electronic sourcing system comprising:

a database containing data relating to items associated with at least two sources;

means for searching for matching items in the database;

means for building a requisition using data relating to selected matching items and their associated source(s);

means for processing the requisition to generate one or more purchase orders for the selected matching items; and

means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

**7**. An electronic sourcing system of claim **6** wherein the requisition includes matching items from at least two sources.

**8**. The electronic sourcing system of claim **6** wherein the purchase orders include data relating to catalog numbers.

**9**. The electronic sourcing system of claim **6** further comprising means for determining whether a selected matching item is available in inventory.

**10**. The electronic sourcing system of claim **6** further comprising means for determining the applicable price of a selected matching item.

**11**. An electronic sourcing system comprising:

at least two product catalogs containing data relating to items associated with the respective sources;

means for searching for matching items among the product catalogs;

means for building a requisition that includes a first matching item and a second matching item, each associated with a different source;

means for processing the requisition to generate purchase orders for the first and the second matching items; and

means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

26

**12**. The electronic sourcing system of claim **11** wherein a first purchase order includes data relating to the first matching item.

**13**. The electronic sourcing system of claim **12** wherein a second purchase order includes data relating to the second matching catalog item.

**14**. An electronic sourcing system comprising:

data relating to items associated with at least two sources maintained so that selected data may be searched separately;

means for searching for matching items among the selected data;

means for building a requisition using data relating to selected matching items and their associated source(s);

means for processing the requisition to generate purchase orders using data relating to the selected matching items and their associated source(s); and

means for coverting data relating to a selected matching item and an associated source to data relating to an item and a different source.

**15**. The electronic sourcing system of claim **14** wherein the purchase orders use data relating to at least two sources.

**16**. The electronic sourcing system of claim **14** wherein the purchase orders use data relating to catalog numbers.

**17**. The electronic sourcing system of claim **14** further comprising means for determining whether a selected matching item is available in inventory.

**18**. The electronic sourcing system of claim **14** further comprising means for determining the applicable price of a selected matching item.

**19**. An electronic sourcing system comprising:

a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately;

means for searching for matching items in the selected portions of the database;

means for building a requisition that includes data relating to selected matching items;

means for processing the requisition to generate purchase orders for selected matching items.

**20**. The electronic sourcing system of claim **19** wherein the purchase orders include data relating to vendor catalog numbers.

**21**. The electronic sourcing system of claim **19** further comprising means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

**22**. The electronic sourcing system of claim **19** further comprising means for determining whether a selected matching item is available in inventory.

**23**. The electronic sourcing system of claim **19** further comprising means for determining the applicable price of a selected matching item.

**24**. An electronic sourcing system of claim **19** wherein the requisition includes matching items from at least two sources.

**25**. The electronic sourcing system of claim **24** wherein the purchase orders include data relating to the source associated with the selected matching item.

**26**. A method comprising the steps of:

maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;

selecting the product catalogs to search;

searching for matching items among the selected product catalogs;

6,023,683

building a requisition using data relating to selected matching items and their associated source(s);

processing the requisition to generate one or more purchase orders for the selected matching items; and

determining whether a selected matching item is available in inventory.

**27.** The method of claim **26** wherein the purchase orders include data relating to a vendor catalog number for the selected matching items.

**28.** A method comprising the steps of:

maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;

selecting the product catalogs to search;

searching for matching items among the selected product catalogs;

building a requisition using data relating to selected matching items and their associated source(s);

processing the requisition to generate one or more purchase orders for the selected matching items; and

converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

**29.** The method of claim **28** further comprising the step of determining whether a selected matching item is available in inventory.

**30.** The method of claim **28** further comprising the step of determining the applicable price of a selected matching item.

**31.** A method comprising the steps of:

maintaining a database containing data relating to items associated with at least two sources;

searching for matching items among the data relating to the items;

building a requisition using data relating to selected matching items and their associated sources;

processing the requisition to generate purchase orders using data relating to the selected matching items and their associated source(s); and

converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

**32.** The method of claim **31** wherein the purchase orders use data relating to at least two sources.

**33.** The method of claim **31** wherein the purchase orders use data relating to catalog numbers.

**34.** The method of claim **31** further comprising the step of determining whether a selected matching item is available in inventory.

**35.** The method of claim **31** further comprising the step of determining the applicable price of a selected matching item.

**36.** A method comprising the steps of:

maintaining a database containing at least two product catalogs containing data relating to items associated with the respective sources;

searching for matching items among the product catalogs;

building a requisition that includes a first matching item and a second matching item, each from a different product catalog;

processing the requisition to generate purchase orders for the first and the second matching items; and

converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

**37.** The method of claim **36** wherein a first purchase order uses data relating to the first matching item and a second purchase order uses data relating to the second matching catalog item.

**38.** The method of claim **36** further comprising the step of determining whether a selected matching item is available in inventory.

**39.** The method of claim **36** further comprising the step of determining the applicable price of a selected matching item.

**40.** A method comprising the steps of:

maintaining a database containing data relating to items associated with at least two sources whereby selected portions of the database may be searched separately;

searching for matching items among the selected portions of the database;

building a requisition using data relating to selected matching items and their associated source(s);

processing the requisition to generate purchase orders using data relating to the selected matching items and their associated source(s); and

determining whether a selected matching item is available in inventory.

**41.** A method comprising the steps of:

maintaining a database containing data relating to items associated with at least two sources whereby selected portions of the database may be searched separately;

searching for matching items among the selected portions of the database;

building a requisition using data relating to selected matching items and their associated source(s);

processing the requisition to generate purchase orders using data relating to the selected matching items and their associated source(s); and

converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

**42.** The method of claim **41** wherein a first purchase order uses data relating to selected matching items from a first source and a second purchase order uses data relating to selected matching items from a second source.

**43.** The method of claim **41** further comprising the step of determining whether a selected matching item is available in inventory.

**44.** The method of claim **41** further comprising the step of determining the applicable price of a selected matching item.

**45.** A method comprising the steps of:

maintaining a database containing data relating to items associated with at least two vendors whereby selected portions of the database may be searched separately;

searching for matching items in the selected portions of the database;

building a requisition that includes selected matching items;

processing the requisition to generate purchase orders for selected matching items.

\* \* \* \* \*


ters into force with respect to the United States [Jan. 1, 1995], with provisions relating to earliest filed patent application, see section 534(a), (b)(3) of Pub. L. 103–465, set out as a note under section 154 of this title.

## CHAPTER 27—GOVERNMENT INTERESTS IN PATENTS

Sec.
[266.    Repealed.]
267.    Time for taking action in Government applications.

### AMENDMENTS

1965—Pub. L. 89–83, § 8, July 24, 1965, 79 Stat. 261, struck out item 266 "Issue of patents without fees to Government employees".

### [§ 266. Repealed. Pub. L. 89–83, § 8, July 24, 1965, 79 Stat. 261]

Section, act July 19, 1952, ch. 950, § 1, 66 Stat. 811, provided for issuance of patents to government employees without fees.

#### EFFECTIVE DATE OF REPEAL

Repeal effective three months after July 24, 1965, see section 7(a) of Pub. L. 89–83, set out as an Effective Date of 1965 Amendment note under section 41 of this title.

### § 267. Time for taking action in Government applications

Notwithstanding the provisions of sections 133 and 151 of this title, the Director may extend the time for taking any action to three years, when an application has become the property of the United States and the head of the appropriate department or agency of the Government has certified to the Director that the invention disclosed therein is important to the armament or defense of the United States.

(July 19, 1952, ch. 950, 66 Stat. 811; Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, § 4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, § 13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906; Pub. L. 112–29, § 20(j), Sept. 16, 2011, 125 Stat. 335.)

#### AMENDMENT OF SECTION

*Pub. L. 112–29, § 20(j), (l), Sept. 16, 2011, 125 Stat. 335, provided that, effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, this section is amended by striking "of this title" each place that term appears. See 2011 Amendment note below.*

#### HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., § 37 (R.S. 4894, amended (1) Mar. 3, 1897, ch. 391, § 4, 29 Stat. 692, 693, (2) July 6, 1916, ch. 225, § 1, 39 Stat. 345, 347–8, (3) Mar. 2, 1927, ch. 273, § 1, 44 Stat. 1335, (4) Aug. 7, 1939, ch. 568, 53 Stat. 1264).

This provision, which appears as the last two sentences of the corresponding section of the present statute (see note to section 133) is made a separate section and rewritten in simpler form.

#### AMENDMENTS

2011—Pub. L. 112–29 struck out "of this title" after "151".

2002—Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113. See 1999 Amendment note below.

1999—Pub. L. 106–113, as amended by Pub. L. 107–273, substituted "Director" for "Commissioner" in two places.

#### EFFECTIVE DATE OF 2011 AMENDMENT

Amendment by section 20(j) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

#### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–113 effective 4 months after Nov. 29, 1999, see section 1000(a)(9) [title IV, § 4731] of Pub. L. 106–113, set out as a note under section 1 of this title.

## CHAPTER 28—INFRINGEMENT OF PATENTS

Sec.
271.    Infringement of patent.
272.    Temporary presence in the United States.
273.    Defense to infringement based on prior commercial use.

### AMENDMENTS

2011—Pub. L. 112–29, § 5(b), Sept. 16, 2011, 125 Stat. 299, amended item 273 generally, substituting "Defense to infringement based on prior commercial use" for "Defense to infringement based on earlier inventor".

1999—Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, § 4302(b)], Nov. 29, 1999, 113 Stat. 1536, 1501A–557, added item 273.

### § 271. Infringement of patent

(a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view

of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

(e)(1) It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention (other than a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Act of March 4, 1913) which is primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques) solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

(2) It shall be an act of infringement to submit—

(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent,

(B) an application under section 512 of such Act or under the Act of March 4, 1913 (21 U.S.C. 151–158) for a drug or veterinary biological product which is not primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques and which is claimed in a patent or the use of which is claimed in a patent, or

(C)(i) with respect to a patent that is identified in the list of patents described in section 351(*l*)(3) of the Public Health Service Act (including as provided under section 351(*l*)(7) of such Act), an application seeking approval of a biological product, or

(ii) if the applicant for the application fails to provide the application and information required under section 351(*l*)(2)(A) of such Act, an application seeking approval of a biological product for a patent that could be identified pursuant to section 351(*l*)(3)(A)(i) of such Act,

if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug, veterinary biological product, or biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

(3) In any action for patent infringement brought under this section, no injunctive or other relief may be granted which would prohibit the making, using, offering to sell, or selling within the United States or importing into the United States of a patented invention under paragraph (1).

(4) For an act of infringement described in paragraph (2)—

(A) the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed,

(B) injunctive relief may be granted against an infringer to prevent the commercial manu-

facture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug, veterinary biological product, or biological product,

(C) damages or other monetary relief may be awarded against an infringer only if there has been commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug, veterinary biological product, or biological product, and

(D) the court shall order a permanent injunction prohibiting any infringement of the patent by the biological product involved in the infringement until a date which is not earlier than the date of the expiration of the patent that has been infringed under paragraph (2)(C), provided the patent is the subject of a final court decision, as defined in section 351(k)(6) of the Public Health Service Act, in an action for infringement of the patent under section 351(*l*)(6) of such Act, and the biological product has not yet been approved because of section 351(k)(7) of such Act.

The remedies prescribed by subparagraphs (A), (B), (C), and (D) are the only remedies which may be granted by a court for an act of infringement described in paragraph (2), except that a court may award attorney fees under section 285.

(5) Where a person has filed an application described in paragraph (2) that includes a certification under subsection (b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) of section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), and neither the owner of the patent that is the subject of the certification nor the holder of the approved application under subsection (b) of such section for the drug that is claimed by the patent or a use of which is claimed by the patent brought an action for infringement of such patent before the expiration of 45 days after the date on which the notice given under subsection (b)(3) or (j)(2)(B) of such section was received, the courts of the United States shall, to the extent consistent with the Constitution, have subject matter jurisdiction in any action brought by such person under section 2201 of title 28 for a declaratory judgment that such patent is invalid or not infringed.

(6)(A) Subparagraph (B) applies, in lieu of paragraph (4), in the case of a patent—

(i) that is identified, as applicable, in the list of patents described in section 351(*l*)(4) of the Public Health Service Act or the lists of patents described in section 351(*l*)(5)(B) of such Act with respect to a biological product; and

(ii) for which an action for infringement of the patent with respect to the biological product—

(I) was brought after the expiration of the 30-day period described in subparagraph (A) or (B), as applicable, of section 351(*l*)(6) of such Act; or

(II) was brought before the expiration of the 30-day period described in subclause (I), but which was dismissed without prejudice or was not prosecuted to judgment in good faith.

(B) In an action for infringement of a patent described in subparagraph (A), the sole and ex-

clusive remedy that may be granted by a court, upon a finding that the making, using, offering to sell, selling, or importation into the United States of the biological product that is the subject of the action infringed the patent, shall be a reasonable royalty.

(C) The owner of a patent that should have been included in the list described in section 351(*l*)(3)(A) of the Public Health Service Act, including as provided under section 351(*l*)(7) of such Act for a biological product, but was not timely included in such list, may not bring an action under this section for infringement of the patent with respect to the biological product.

(f)(1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(g) Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent. In an action for infringement of a process patent, no remedy may be granted for infringement on account of the noncommercial use or retail sale of a product unless there is no adequate remedy under this title for infringement on account of the importation or other use, offer to sell, or sale of that product. A product which is made by a patented process will, for purposes of this title, not be considered to be so made after—

(1) it is materially changed by subsequent processes; or

(2) it becomes a trivial and nonessential component of another product.

(h) As used in this section, the term "whoever" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

(i) As used in this section, an "offer for sale" or an "offer to sell" by a person other than the patentee, or any designee of the patentee, is that in which the sale will occur before the expiration of the term of the patent.

(July 19, 1952, ch. 950, 66 Stat. 811; Pub. L. 98–417, title II, § 202, Sept. 24, 1984, 98 Stat. 1603; Pub. L. 98–622, title I, § 101(a), Nov. 8, 1984, 98 Stat. 3383; Pub. L. 100–418, title IX, § 9003, Aug. 23, 1988, 102 Stat. 1563; Pub. L. 100–670, title II, § 201(i), Nov. 16, 1988, 102 Stat. 3988; Pub. L. 100–703, title II, § 201, Nov. 19, 1988, 102 Stat. 4676; Pub. L. 102–560, § 2(a)(1), Oct. 28, 1992, 106 Stat. 4230; Pub. L. 103–465, title V, § 533(a), Dec. 8, 1994, 108 Stat. 4988; Pub. L. 108–173, title XI, § 1101(d), Dec. 8, 2003, 117 Stat. 2457; Pub. L. 111–148, title VII, § 7002(c)(1), Mar. 23, 2010, 124 Stat. 815.)

HISTORICAL AND REVISION NOTES

The first paragraph of this section is declaratory only, defining infringement.

Paragraphs (b) and (c) define and limit contributory infringement of a patent and paragraph (d) is ancillary to these paragraphs, see preliminary general description of bill. One who actively induces infringement as by aiding and abetting the same is liable as an infringer, and so is one who sells a component part of a patented invention or material or apparatus for use therein knowing the same to be especially made or especially adapted for use in the infringement of the patent except in the case of a staple article or commodity of commerce having other uses. A patentee is not deemed to have misused his patent solely by reason of doing anything authorized by the section.

REFERENCES IN TEXT

The Federal Food, Drug, and Cosmetic Act, referred to in subsec. (e)(1), (2), is act June 25, 1938, ch. 675, 52 Stat. 1040, which is classified generally to chapter 9 (§ 301 et seq.) of Title 21, Food and Drugs. Sections 505 and 512 of the Act are classified to sections 355 and 360b, respectively, of Title 21. For complete classification of this Act to the Code, see section 301 of Title 21 and Tables.

Act of March 4, 1913, referred to in subsec. (e)(1), (2), is act Mar. 4, 1913, ch. 145, 37 Stat. 828. The provisions of such act relating to viruses, etc., applicable to domestic animals, popularly known as the Virus-Serum-Toxin Act, are contained in the eighth paragraph under the heading "Bureau of Animal Industry" of act Mar. 4, 1913, at 37 Stat. 832, and are classified generally to chapter 5 (§ 151 et seq.) of Title 21, Food and Drugs. For complete classification of this Act to the Code, see Short Title note set out under section 151 of Title 21 and Tables.

Section 351 of the Public Health Service Act, referred to in subsec. (e)(2)(C), (4)(D), (6)(A), (C), is classified to section 262 of Title 42, The Public Health and Welfare.

AMENDMENTS

2010—Subsec. (e)(2). Pub. L. 111–148, § 7002(c)(1)(A)(iv), substituted ", veterinary biological product, or biological product" for "or veterinary biological product" in concluding provisions.

Subsec. (e)(2)(C). Pub. L. 111–148, § 7002(c)(1)(A)(i)–(iii), added subpar. (C).

Subsec. (e)(4). Pub. L. 111–148, § 7002(c)(1)(B)(iv), substituted "(C), and (D)" for "and (C)" in concluding provisions.

Subsec. (e)(4)(B). Pub. L. 111–148, § 7002(c)(1)(B)(i), substituted ", veterinary biological product, or biological product" for "or veterinary biological product" and struck out "and" at end.

Subsec. (e)(4)(C). Pub. L. 111–148, § 7002(c)(1)(B)(ii), substituted ", veterinary biological product, or biological product" for "or veterinary biological product" and ", and" for period at end.

Subsec. (e)(4)(D). Pub. L. 111–148, § 7002(c)(1)(B)(iii), added subpar. (D).

Subsec. (e)(6). Pub. L. 111–148, § 7002(c)(1)(C), added par. (6).

2003—Subsec. (e)(5). Pub. L. 108–173 added par. (5).

1994—Subsec. (a). Pub. L. 103–465, § 533(a)(1), inserted ", offers to sell," after "uses" and "or imports into the

United States any patented invention'' after ''the United States''.

Subsec. (c). Pub. L. 103–465, §533(a)(2), substituted ''offers to sell or sells within the United States or imports into the United States'' for ''sells''.

Subsec. (e)(1). Pub. L. 103–465, §533(a)(3)(A), substituted ''offer to sell, or sell within the United States or import into the United States'' for ''or sell''.

Subsec. (e)(3). Pub. L. 103–465, §533(a)(3)(B), substituted ''offering to sell, or selling within the United States or importing into the United States'' for ''or selling''.

Subsec. (e)(4)(B), (C). Pub. L. 103–465, §533(a)(3)(C), (D), substituted ''offer to sell, or sale within the United States or importation into the United States'' for ''or sale''.

Subsec. (g). Pub. L. 103–465, §533(a)(4), substituted ''offers to sell, sells,'' for ''sells'', ''importation, offer to sell, sale,'' for ''importation, sale,'', and ''other use, offer to sell, or'' for ''other use or''.

Subsec. (i). Pub. L. 103–465, §533(a)(5), added subsec. (i).

1992—Subsec. (h). Pub. L. 102–560 added subsec. (h).

1988—Subsec. (d). Pub. L. 100–703 added cls. (4) and (5).

Subsec. (e)(1). Pub. L. 100–670, §201(i)(1), inserted ''which is primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques'' after ''March 4, 1913)'' and ''or veterinary biological products'' after ''sale of drugs''.

Subsec. (e)(2). Pub. L. 100–670, §201(i)(2), amended par. (2) generally. Prior to amendment, par. (2) read as follows: ''It shall be an act of infringement to submit an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent, if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.''

Subsec. (e)(4). Pub. L. 100–670, §201(i)(3), inserted ''or veterinary biological product'' after ''drug'' in subpars. (A) to (C).

Subsec. (g). Pub. L. 100–418 added subsec. (g).

1984—Subsec. (e). Pub. L. 98–417 added subsec. (e).

Subsec. (f). Pub. L. 98–622 added subsec. (f).

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective on date that is one year after date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], with provisions relating to earliest filed patent application, see section 534(a), (b)(3) of Pub. L. 103–465, set out as a note under section 154 of this title.

EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–560 effective with respect to violations that occur on or after Oct. 28, 1992, see section 4 of Pub. L. 102–560, set out as a note under section 2541 of Title 7, Agriculture.

EFFECTIVE DATE OF 1988 AMENDMENTS

Section 202 of title II of Pub. L. 100–703 provided that: ''The amendment made by this title [amending this section] shall apply only to cases filed on or after the date of the enactment of this Act [Nov. 19, 1988].''

Section 9006 of Pub. L. 100–418 provided that:

''(a) IN GENERAL.—The amendments made by this subtitle [subtitle A (§§9001–9007) of title IX of Pub. L. 100–418, enacting section 295 of this title and amending this section and sections 154 and 287 of this title] take effect 6 months after the date of enactment of this Act [Aug. 23, 1988] and, subject to subsections (b) and (c), shall apply only with respect to products made or imported after the effective date of the amendments made by this subtitle.

''(b) EXCEPTIONS.—The amendments made by this subtitle shall not abridge or affect the right of any person

or any successor in business of such person to continue to use, sell, or import any specific product already in substantial and continuous sale or use by such person in the United States on January 1, 1988, or for which substantial preparation by such person for sale or use was made before such date, to the extent equitable for the protection of commercial investments made or business commenced in the United States before such date. This subsection shall not apply to any person or any successor in business of such person using, selling, or importing a product produced by a patented process that is the subject of a process patent enforcement action commenced before January 1, 1987, before the International Trade Commission, that is pending or in which an order has been entered.

''(c) RETENTION OF OTHER REMEDIES.—The amendments made by this subtitle shall not deprive a patent owner of any remedies available under subsections (a) through (f) of section 271 of title 35, United States Code, under section 337 of the Tariff Act of 1930 [19 U.S.C. 1337], or under any other provision of law.''

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–622 applicable only to the supplying, or causing to be supplied, of any component or components of a patented invention after Nov. 8, 1984, see section 106(c) of Pub. L. 98–622, set out as a note under section 103 of this title.

REPORTS TO CONGRESS; EFFECT ON DOMESTIC INDUSTRIES OF PROCESS PATENT AMENDMENTS ACT OF 1988

Pub. L. 100–418, title IX, §9007, Aug. 23, 1988, 102 Stat. 1567, provided that the Secretary of Commerce was to make annual reports to Congress covering each of the successive five 1-year periods beginning 6 months after Aug. 23, 1988, on the effect of the amendments made by subtitle A (§§9001–9007) of title IX of Pub. L. 100–418, enacting section 295 of this title and amending sections 154, 271, and 287 of this title, on those domestic industries that submit complaints to the Department of Commerce alleging that their legitimate sources of supply have been adversely affected by the amendments.

## § 272. Temporary presence in the United States

The use of any invention in any vessel, aircraft or vehicle of any country which affords similar privileges to vessels, aircraft or vehicles of the United States, entering the United States temporarily or accidentally, shall not constitute infringement of any patent, if the invention is used exclusively for the needs of the vessel, aircraft or vehicle and is not offered for sale or sold in or used for the manufacture of anything to be sold in or exported from the United States.

(July 19, 1952, ch. 950, 66 Stat. 812; Pub. L. 103–465, title V, §533(b)(4), Dec. 8, 1994, 108 Stat. 4989.)

HISTORICAL AND REVISION NOTES

This section follows the requirement of the International Convention for the Protection of Industrial Property, to which the United States is a party, and also codifies the holding of the Supreme Court that use of a patented invention on board a foreign ship does not infringe a patent.

AMENDMENTS

1994—Pub. L. 103–465 substituted ''not offered for sale or sold'' for ''not sold''.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective on date that is one year after date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], with provisions relating to earliest filed patent

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing on counsel of record on October 22, 2013, by CM/ECF.

/s/ Mark A. Perry

Mark A. Perry

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,952 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point.

/s/ Mark A. Perry
Mark A. Perry